Matthew FERDON, by his Guardian ad Litem,
Vincent R. Petrucelli,
Cynthia Ferdon
and Dennis Ferdon,
Plaintiffs-Appellants-Petitioners,

v.

WISCONSIN PATIENTS COMPENSATION FUND, Medical
Protective Company, Michael J. Brockman, M.D.,
and Aurora Health Care, Inc., d/b/a Bay West
Gynecology & Obstetrics, Ltd.,
Defendants-Respondents,

CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
a/k/a Cigna Insurance, f/k/a Healthsource
Provident Administrators, Inc., a/k/a
Healthsource Provident, and County of Oconto,
Nominal-Defendants.

Supreme Court

*No. 2003AP988. Oral argument April 26, 2005.
—Decided July 14, 2005.*

2005 WI 125

(Also reported in 701 N.W.2d 440.)

580

582

For the plaintiffs-appellants-petitioners there were briefs by *Vincent R. Petrucelli* and *Petrucelli & Petrucelli, P.C.,* Iron River, MI, and oral argument by *Marie A. Stanton* and *Merrick R. Domnitz.*

For the defendant-respondent Wisconsin Patients Compensation Fund there was a brief by *Steven P. Means, Christine Cooney Mansour, Roisin H. Bell* and *Michael Best & Friedrich, LLP,* Madison, and oral argument by *Steven P. Means.*

An amicus curiae brief was filed by *Michael B. VanSicklen, Roberta F. Howell* and *Foley & Lardner, LLP,* Madison, on behalf of Physicians Insurance Company of Wisconsin and the Property Casualty Insurers Association of America; and by *Eric Englund,* Madison, on behalf of the Wisconsin Insurance Alliance.

An amicus curiae brief was filed by *Timothy J. Muldowney, Jennifer L. Peterson* and *LaFollette Godfrey & Kahn,* Madison, and *Melanie Cohen,* Madison, on behalf of the Wisconsin Medical Society and the American Medical Association.

An amicus curiae brief was filed by *D. James Weis, Robert L. Jaskulski* and *Habush Habush & Rottier, S.C.,* Milwaukee, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Colleen D. Ball* and *Appellate Counsel, S.C.,* Wauwatosa, on behalf of Wisconsin Coalition for Civil Justice and Wisconsin Manufacturers and Commerce.

An amicus curiae brief was filed by *Thomas M. Pyper, Cynthia L. Buchko* and *Whyte Hirschboeck Dudek S.C.,* Madison, on behalf of The Wisconsin Hospital Association, Inc. and The American Hospital Association.

¶ 1. SHIRLEY S. ABRAHAMSON, C.J. This is a review of a summary order[1] of the court of appeals affirming a judgment of the circuit court for Brown County, Peter J. Naze, Judge. The judgment in this medical malpractice action was in favor the Wisconsin Patients Compensation Fund (Fund)[2] and against Matthew Ferdon.

---

[1] *Ferdon v. Wis. Patients Comp. Fund,* No. 2003AP988, unpublished order (Wis. Ct. App. Feb. 10, 2004).

[2] The name of the Fund was recently changed to "Injured Patients and Families Compensation Fund." *See* 2003 Wis. Act 111.

¶ 2. This medical malpractice action arose as a result of a doctor's negligence that injured Matthew Ferdon during birth. Despite surgeries, he has a partially paralyzed and deformed right arm.

¶ 3. A jury awarded Matthew Ferdon $700,000 in noneconomic damages for injuries caused by medical malpractice and $403,000 for future medical expenses. The jury heard that Matthew Ferdon had a life expectancy of 69 years. Therefore, the jury's noneconomic damage award reflects an award of slightly more than $10,000 a year as the reasonable amount necessary to compensate Matthew Ferdon for having to live every day of his life with a partially functioning, deformed right arm.

¶ 4. After the verdict the Fund moved to have the noneconomic damages reduced pursuant to the limitation established in Wis. Stat. §§ 655.017 and 893.55(4)(d) (2001–02).[3] The statutory limitation (sometimes called a cap) on the jury award means that Matthew Ferdon will have an award of approximately $5,900 a year as the reasonable amount necessary to compensate him for living with a partially functioning, deformed right arm.

¶ 5. The Fund also moved to have that portion of the award for future medical expenses exceeding $100,000 deposited into a state-administered fund pursuant to Wis. Stat. § 655.015.

¶ 6. The circuit court granted both of the Fund's motions. The court of appeals summarily affirmed the judgment of the circuit court, and this court granted review.

---

[3] All references to Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 7. Three questions are presented in the instant case:

¶ 8. First, is the $350,000 statutory limitation on noneconomic damages resulting from a medical malpractice injury in Wis. Stat. §§ 655.017 and 893.55(4)(d) constitutional?

¶ 9. Matthew Ferdon challenges the statutory limitation on noneconomic damages in medical malpractice actions on several grounds. He asserts that the mandatory statutory limitation (1) violates the equal protection guarantees of the Wisconsin Constitution;[4] (2) violates the right to a trial by jury as provided in Article I, Section 5 of the Wisconsin Constitution;[5] (3) violates the right to a remedy as provided in Article I, Section 9 of the Wisconsin Constitution;[6] (4) violates the due process clause of the Wisconsin Constitution;[7]

---

[4] Article I, Section 1 reads as follows:

**Equality; inherent rights.** Section 1. All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

[5] Article I, Section 5 reads as follows:

**Trial by jury; verdict in civil cases.** Section 5. The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy . . . .

[6] Article I, Section 9 reads as follows:

**Remedy for wrongs.** Section 9. Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

[7] Due process, like equal protection, is guaranteed by Article I, Section 1 of the Wisconsin Constitution: "All people are

and (5) violates the separation of powers doctrine by infringing remittitur, a core judicial power, contrary to Article VII, Section 2 of the Wisconsin Constitution.[8] The circuit court held the statutory limitation was constitutional; the court of appeals agreed.

¶ 10. We hold that the $350,000 cap (adjusted for inflation) on noneconomic medical malpractice damages set forth in Wis. Stat. §§ 655.017 and 893.55(4)(d) violates the equal protection guarantees of the Wisconsin Constitution. We therefore need not, and do not, address Matthew Ferdon's other constitutional challenges to the cap. We remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

¶ 11. Second, if the statutory limitation is unconstitutional, is the Fund liable for payment of the amount of the jury award in excess of the statutory limitation? The Fund argues it need not pay the excess amount. Matthew Ferdon does not brief this question. The circuit court and court of appeals did not answer this question. We therefore remand this question to the circuit court so that the parties may be heard on it.

¶ 12. Third, is Wis. Stat. § 655.015, which requires the portion of the jury's award for future medical expenses exceeding $100,000 to be deposited into an account over which the Fund has control, constitu-

---

born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

[8] Article VII, Section 2 reads as follows:

**Court System.** Section 2. The judicial power of this state shall be vested in a unified court system consisting of one supreme court, a court of appeals, a circuit court, such trial courts of general uniform statewide jurisdiction as the legislature may create by law, and a municipal court if authorized by the legislature under section 14.

tional? The parties argue the constitutionality of § 655.015 and the administrative rule implementing it, Wis. Admin. Code § Ins 17.26. The parties have not adhered to the procedure set forth in Wis. Stat. § 227.40 before challenging the constitutionality of the rule and have not considered whether the rule exceeds the authority delegated under § 655.015. Accordingly, we remand this question to the circuit court for the parties to comply with § 227.40 and address the validity of the rule, as well as to be heard on the constitutionality of the statute and rule.

¶ 13. Before continuing, it is important to highlight that this case is not about whether all caps, or even all caps on noneconomic damages, are constitutionally permissible. The question before this court is a narrow one: Is the $350,000 cap (adjusted for inflation and hereinafter referred to as the $350,000 cap) on noneconomic damages in medical malpractice cases set forth in Wis. Stat. §§ 655.017 and 893.55(4)(d) constitutional?

¶ 14. Medical malpractice litigation is a highly charged area of the law with ramifications not only for the injured party and the health care provider involved, but for all victims of medical malpractice, all health care providers, and the public. After a patient is injured, sometimes severely and permanently, a medical malpractice lawsuit pits the unfortunate patient and the patient's family against the health care provider in whom the patient and family had previously placed their trust. Physicians have contended that since the early- to mid-Nineteenth Century there has been a medical malpractice crisis pitting physicians against injured patients and their attorneys.[9]

---

[9] *See generally* Catherine T. Struve, *Doctors, The Adversary System, and Procedural Reform in Medical Liability Litigation,*

¶ 15. Emotion is not the only force at work in medical malpractice actions. Money is at stake for everyone involved, including the public. In the case of medical malpractice, interest groups representing every aspect of the delivery of health care are heavily involved in lobbying the legislature. A sampling of the interest groups includes hospital associations, insurance companies, doctor and nurse associations, patient advocates, and lawyer associations. Despite these circumstances, the task of the court in a medical malpractice action is the same as in any other case: to conduct a fair and neutral evaluation of the merits of the parties' arguments in light of the state's laws and constitution.

¶ 16. Both in his briefs and at oral argument, Matthew Ferdon asks this court to strike down all statutory caps on noneconomic damages in medical malpractice actions under chapter 655. This court has not held that statutory limitations on damages are per se unconstitutional.[10] Indeed, this court has recently upheld the cap on noneconomic damages for wrongful

72 Fordham L. Rev. 943, 952 (2004) (" '[T]he physician consequently practices his art in chains, being perpetually exposed to the risk of a suit which may ruin his reputation as well as his fortune." (quoting John Ordronaux, *The Jurisprudence of Medicine, in its Relations to the Law of Contracts, Torts, and Evidence, with a Supplement on the Liabilities of Vendors of Drugs* 58 (1869)).

[10] *Maurin v. Hall,* 2004 WI 100, ¶ 208, 274 Wis. 2d 28, 682 N.W.2d 866 (Abrahamson, C.J., and Crooks, J., concurring).

This court has upheld limitations on damages in tort suits against governmental entities. *See Sambs v. City of Brookfield,* 97 Wis. 2d 356, 293 N.W.2d 504 (1980), *cert. denied,* 449 U.S. 1035 (1980); *Stanhope v. Brown County,* 90 Wis. 2d 823, 280 N.W.2d 711 (1979).

death medical malpractice actions.[11] Just because caps on noneconomic damages are not unconstitutional per se does not mean that a particular cap is constitutional.

¶ 17. Courts across the country are divided about whether caps on noneconomic damages are constitutional. Even in state courts in which caps have been declared constitutional, there is invariably one or more strong dissents.[12]

---

[11] *Maurin,* 274 Wis. 2d 28, ¶ 116.

[12] Some state courts have reached the conclusion that caps are unconstitutional. *See, e.g., Arneson v. Olson,* 270 N.W.2d 125, (N.D. 1978) (holding a statutory cap of $300,000 on all medical malpractice damages as a violation of equal protection); *Moore v. Mobile Infirmary Ass'n,* 592 So. 2d 156, 165–71 (Ala. 1992) (holding cap on noneconomic damages in medical malpractice action violated the equal protection and right to jury trial guarantees of the Alabama Constitution); *Brannigan v. Usitalo,* 587 A.2d 1232, 1234–36 (N.H. 1991), *aff'g Carson v. Maurer,* 424 A.2d 825 (N.H. 1980) (holding a noneconomic damages cap in medical malpractice actions unconstitutional as a violation of the equal protection clause of the New Hampshire Constitution).

Other states have found caps on noneconomic damages constitutional, oftentimes over strong dissents. *See, e.g., Judd v. Drezga,* 103 P.3d 135, 141 (Utah 2004) (examining articles and studies and determining that the cap was reasonably related to making medical malpractice and health insurance rates affordable and that noneconomic damage caps did help achieve that goal, even if only in small part), *but see Judd,* 103 P.3d at 145 (Durham, C.J., dissenting); *Zdrojewski v. Murphy,* 657 N.W.2d 721, 737–38 (Mich. Ct. App. 2003) (cap on noneconomic damages upheld against, among other challenges, an equal protection challenge), *but see Zdrojewski,* 657 N.W.2d at 739 (Fitzgerald, P.J., dissenting), and *Wiley v. Henry Ford Cottage Hosp.,* 668 N.W.2d 402, 416 (Mich. Ct. App. 2003) (holding that *Zdrojewski's* decision regarding the constitutionality of the caps was incorrect and should be overruled but that the court was bound to follow *Zdrojewski's* precedent); *Univ. of Miami v. Echarte,* 618 So. 2d

¶ 18. The roadmap to this opinion is as follows:

I. The facts (¶ 19 to ¶ 23)

II. The medical malpractice statutes (¶ 24 to ¶ 28)

III. Stare Decisis (¶ 29 to ¶ 56)

IV. Equal Protection

 A. The level of scrutiny (¶ 59 to ¶ 80)

 B. The classifications (¶ 81 to ¶ 84)

 C. The legislative objectives (¶ 85 to ¶ 96)

 D. The rational basis (¶ 97 to ¶ 176)

V. Other Statutes (¶ 177 to ¶ 183)

VI. Conclusion (¶ 184 to ¶ 188)

189, 191 (Fla. 1993) (upholding constitutionality of noneconomic damages cap in medical malpractice actions), *but see Echarte,* 618 So. 2d at 198 (Barkett, C.J., dissenting); *Fein v. Permanente Med. Group,* 695 P.2d 665, 684 (Cal. 1985) (upholding cap on noneconomic damages cap in medical malpractice actions against due process and equal protection challenges), *but see Fein,* 695 P.2d at 687 (Bird, C.J., dissenting); *Murphy v. Edmonds,* 601 A.2d 102, 114–16 (Md. 1992) (upholding Maryland's $350,000 noneconomic damage cap on personal injury awards against equal protection challenge), *but see Murphy,* 601 A.2d at 120 (Chasanow, J., dissenting).

The Alaska Supreme Court divided 2–2 in *Evans ex rel. Kutch v. Alaska,* 56 P.3d 1046 (Alaska 2002), with two justices finding the noneconomic damage cap on all tort claims constitutional and two finding the caps unconstitutional.

For discussions of state court rulings on caps, see Kevin J. Gfell, Note, *The Constitutional and Economic Implications of a National Cap on Non-Economic Damages in Medical Malpractice Actions,* 37 Ind. L. Rev. 773, 810–14 (2004); Carol A. Crocca, Annotation, *Validity, Construction, and Application of State Statutory Provisions Limiting Amount of Recovery in Medical Malpractice Claims,* 26 A.L.R. 5th 245 (1995).

# I. FACTS

¶ 19. According to evidence produced at trial that the jury apparently accepted, as the doctor was delivering Matthew Ferdon, the doctor pulled on Matthew Ferdon's head. The manner in which the doctor pulled caused an injury called obstetric brachial plexus palsy. As a result of this injury, Matthew Ferdon's right arm is partially paralyzed and deformed. Matthew Ferdon underwent surgeries and occupational therapy; as a result of the injury, more surgery and more therapy will be required. Matthew Ferdon's right arm will never function normally.

¶ 20. Through his guardian ad litem, Vincent Petrucelli, Matthew Ferdon brought negligence claims against the doctor and the hospital. The Fund, as required, was named as a defendant.[13] Matthew Ferdon's parents, Cynthia and Dennis Ferdon, also brought a negligence claim, seeking to recover for loss of society and companionship. A jury found the delivery doctor negligent for the injuries Matthew Ferdon sustained during the birth.

¶ 21. The jury awarded the following damages to Matthew Ferdon: (1) Future medical and hospital expenses: $403,000; and (2) Past and future personal injuries (noneconomic damages): $700,000. The jury made no award to Matthew Ferdon for loss of future earning capacity. The jury awarded $87,600 to Cynthia and Dennis Ferdon as compensation for the personal care they will render for Matthew until the age of 18.

---

[13] *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 500, 261 N.W.2d 434 (1978) ("Malpractice claimants seeking damages in excess of $200,000 must name the fund as a defendant, and the fund may appear and defend against the action.").

¶ 22. After the verdict, the Fund moved the circuit court to reduce the $700,000 personal injury award to $410,322, the amount of the $350,000 cap (adjusted for inflation) on noneconomic damages recoverable in a medical malpractice action under Wis. Stat. §§ 655.017 and 893.55(4)(d). Further, the Fund moved to have the award for future medical and hospital expenses exceeding $100,000 placed under the Fund's control pursuant to Wis. Stat. § 655.015.

¶ 23. The circuit court granted the Fund's motions, reducing the noneconomic damage award to the statutorily limited amount of $410,322 and ordering that $168,667.67 of the future medical and hospital expenses be paid into the reimbursement fund.[14] Matthew Ferdon appealed; the court of appeals summarily

---

[14] The amount of $168,667.67 reflects the portion of the award over $100,000 that is left after attorney fees are taken out of the jury's award for future medical expenses. The overall award of $403,000 is the amount the jury felt was necessary to pay Matthew Ferdon's future medical expenses, reduced to present value. The jury was asked to determine the present value of future medical expenses as required by Wis. Stat. § 893.55(4)(e). Awards are reduced to their present value because a lump sum received today may be worth more than the same amount spread out over a period of years. Section 893.55(4)(e) provides:

> Economic damages recovered under ch. 655 for bodily injury or death, including any action or proceeding based on contribution or indemnification, shall be determined for the period during which the damages are expected to accrue, taking into account the estimated life expectancy of the person, then reduced to present value, taking into account the effects of inflation.

The jury was informed that Matthew Ferdon was six years old, that he had a life expectancy of 69 years, and that the award should take into account economic conditions and the effect of inflation. With respect to present value, the jury was instructed

affirmed the circuit court based on its reading of *State ex rel. Strykowski v. Wilkie*[15] and *Guzman v. St. Francis Hospital, Inc.*.[16]

## II. MEDICAL MALPRACTICE STATUTES

■

¶ 24. In Wisconsin, a claim for injury resulting from medical malpractice by a health care provider is subject to the provisions of chapter 655.[17] Chapter 655 provides the exclusive procedures for the "prosecution of malpractice claims against a health care provider."[18] Among the damages available to a claimant are noneco-

---

that their award should be reduced to present value "because a sum received today can be invested and earn money at current interest rates."

From the $403,000 award for future medical expenses, it appears that the amount of $134,333.33 (amounting to one-third) was earmarked as "an amount sufficient to pay the cost of collection, including attorney fees reduced to present value" as required by § 655.015, leaving a balance of $268,666.67. Section 655.015 requires that of the $268,666.67, $100,000 is to go to Matthew Ferdon, with the remainder deposited into an account with the Fund for payment of future medical expenses consistent with § 655.015 and Wis. Admin. Code § Ins 17.26.

[15] *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 261 N.W.2d 434 (1978).

[16] *Guzman v. St. Francis Hosp., Inc.*, 2001 WI App 21, 240 Wis. 2d 559, 623 N.W.2d 776.

[17] Wis. Stat. § 655.007 ("On and after July 24, 1975, any patient or the patient's representative having a claim or any spouse, parent, minor sibling or child of the patient having a derivative claim for injury or death on account of malpractice is subject to this chapter."). *See Strykowski v. Wilkie*, 81 Wis. 2d 491, 499, 261 N.W.2d 434 (1978).

[18] *Maurin*, 274 Wis. 2d 28, ¶ 50 (internal quotations omitted).

nomic damages, including damages to compensate for pain and suffering, mental distress, loss of enjoyment of normal activity, and loss of society and companionship.[19]

¶ 25. The Fund was created to pay medical malpractice claims that exceed primary insurance thresholds established by statute. The primary malpractice coverage is $1,000,000 for each occurrence and $3,000,000 per policy year.[20] Health care providers must participate in the Fund. Although noneconomic damages are capped, the Fund provides unlimited liability coverage for economic damages exceeding the primary limits.[21]

¶ 26. Should a claimant recover noneconomic damages as a result of a medical malpractice injury, those damages are statutorily capped pursuant to Wis. Stat. §§ 655.017 and 893.55(4) at $350,000, a sum to be adjusted annually to reflect inflation.

¶ 27. Section 655.017 reads as follows:

> **Limitation on noneconomic damages.** The amount of noneconomic damages recoverable by a claimant or plaintiff under this chapter for acts or omissions of a health care provider if the act or omission occurs on or

---

[19] "Noneconomic" damages are defined in Wis. Stat. § 893.55(4)(a). That subsection reads:

> (4)(a) In this subsection, "noneconomic damages" means moneys intended to compensate for pain and suffering; humiliation; embarrassment; worry; mental distress; noneconomic effects of disability including loss of enjoyment of the normal activities, benefits and pleasures of life and loss of mental or physical health, well-being or bodily functions; loss of consortium, society and companionship; or loss of love and affection.

[20] Wis. Stat. § 655.23(4)(b)(2).

[21] 2003–2004 Joint Legislative Audit Committee, An Audit, Injured Patients and Families Compensation Fund (Office of the Commissioner of Insurance) (Oct. 2004) at 3, 15.

after May 25, 1995, and for acts or omissions of an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for acts or omissions occurring on or after May 25, 1995, is subject to the limits under s. 893.55(4)(d) and (f).[22]

¶ 28. The financial limits to which § 655.017 refers are contained in Wis. Stat. § 893.55(4)(d), which reads as follows:

(d) The limit on total noneconomic damages for each occurrence under par. (b) on or after May 25, 1995, shall be $350,000 and shall be adjusted by the director of state courts to reflect changes in the consumer price index for all urban consumers, U.S. city average, as determined by the U.S. department of labor, at least annually thereafter, with the adjustment limit to apply to awards subsequent to such adjustments.

The parties do not dispute that in the instant case the inflation-adjusted cap authorized by Wis. Stat. § 893.55(4)(d) was $410,322.

### III. STARE DECISIS

¶ 29. The Fund's first assertion is that, under the doctrine of stare decisis, prior cases of both this court and the court of appeals bind this court in the present case.

---

[22] Wisconsin Stat. § 893.55(4)(f) deals with wrongful death actions. This subsection reads as follows:

(f) Notwithstanding the limits on noneconomic damages under this subsection, damages recoverable against health care providers and an employee of a health care provider, acting within the scope of his or her employment and providing health care services, for wrongful death are subject to the limit under s. 895.04(4). If damages in excess of the limit under s. 895.04(4) are found, the court shall make any reduction required under s. 895.045 and shall award the lesser of the reduced amount or the limit under s. 895.04(4).

¶ 30. The doctrine of stare decisis, or "stand by things decided,"[23] normally compels a court to follow its prior decisions. "Fidelity to precedent ensures that existing law will not be abandoned lightly."[24] We have stated that stare decisis is not mechanical in application, nor is it a rule to be inexorably followed.[25]

¶ 31. The doctrine of stare decisis is inapplicable here. Although Wisconsin appellate decisions have treaded close to the constitutionality of the cap on recovery of noneconomic damages in medical malpractice cases, none has reached the issue central to the instant case. Nevertheless, the prior cases, including equal protection challenges to various provisions of chapter 655, inform our decision.

¶ 32. We begin with *Strykowski,* the earliest case from this court addressing a challenge to chapter 655.[26] Soon after chapter 655 was enacted, a group of petitioners challenged chapter 655 on several grounds, including equal protection. The petitioners challenged a subclassification that made a formal review panel available at the request of either party to a medical malpractice action if the claim exceeded $10,000, but made a review panel available for a claim under $10,000 only upon the stipulation of both parties.[27] This court reasoned that the legislature could conclude that because claims over

---

[23] *Mackenzie v. Miller Brewing Co.,* 2001 WI 23, ¶ 16 n.13, 241 Wis. 2d 700, 623 N.W.2d 739.

[24] *Schultz v. Natwick,* 2002 WI 125, ¶ 37, 257 Wis. 2d 19, 653 N.W.2d 266.

[25] *Johnson Controls, Inc. v. Employers Ins. of Wausau,* 2003 WI 108, ¶¶ 96–97, 264 Wis. 2d 60, 665 N.W.2d 257.

[26] *Strykowski,* 81 Wis. 2d at 498–99.

[27] *Strykowski,* 81 Wis. 2d at 510.

$10,000 may be more complex, a formal review panel may be a more appropriate initial forum. This court was careful to recognize that the 1975 legislative findings[28] that medical malpractice raised special problems different from those in other tort actions, "while not binding on the court, carr[ied] great weight."[29]

¶ 33. *Strykowski* addressed a different aspect of chapter 655 than that involved in the instant case. *Strykowski* involved an equal protection challenge to the formal review panels. This case concerns the $350,000 cap implemented in 1995, not the overall constitutionality of chapter 655. Therefore, the equal protection challenge in *Strykowski* was to a different classification than that at issue in the instant case. Thus, the discussion of equal protection in *Strykowski* is not helpful, much less controlling, in resolving the issue facing us in the present case.

¶ 34. Although chapter 655 as enacted contained a cap on noneconomic damages, that cap did not go into effect until 1979 and even then was a contingency. The cap adopted in 1979 provided that awards would be limited to $500,000 per incident if the Fund's assets fell below certain levels.[30] Because the cap was not in effect at the time *Strykowski* was being decided and therefore had not affected the petitioners' recoveries, the court declined to address the constitutionality of the cap in the face of an equal protection challenge.[31]

¶ 35. Our recent decision in *Maurin v. Hall*, 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866, similarly does not control the present case. In *Maurin*, this court

---

[28] § 1, ch. 37, Laws of 1975.

[29] *Strykowski*, 81 Wis. 2d at 508.

[30] *Id.* at 500.

[31] *Id.* at 511.

rejected an equal protection challenge to the noneconomic damages cap in wrongful death actions.[32]

¶ 36. *Maurin* involved a challenge to the provisions of chapters 655 and 893 that are specifically concerned with wrongful death medical malpractice actions (Wis. Stat. § 893.55(4)(f)). This case, a common law medical malpractice case, raises different equal protection challenges. Different legislative objectives are at play in a wrongful death action because the medical malpractice victim is dead. As noted by the majority in *Maurin,* the noneconomic damages cap in wrongful death cases was "implemented to assuage fears 'that passion would run high where the wrongdoer causes death and that huge damage awards would be imposed on the wrongdoer.' "[33] The heightened passion surrounding a dead medical malpractice victim is not at issue in this case. Matthew Ferdon survived. And while Matthew Ferdon's injuries are indeed tragic, they pale in comparison to five-year-old Shay Maurin's death and are therefore not as likely to arouse the same passion in a jury.

¶ 37. This court turned away an equal protection challenge in *Czapinski v. St. Francis Hospital, Inc.*[34] Like *Maurin, Czapinski* dealt with caps on wrongful death medical malpractice actions. The court held that in the context of wrongful death actions, "[section] 893.55(4)(f) does not violate the equal protection clause of the Wisconsin Constitution."[35]

---

[32] *Maurin,* 274 Wis. 2d 28, ¶¶ 105–09.

[33] *Id.,* ¶ 106.

[34] *Czapinski v. St. Francis Hosp., Inc.,* 2000 WI 80, ¶¶ 26–32, 236 Wis. 2d 316, 613 N.W.2d 120.

[35] *Id.,* ¶ 2.

¶ 38. The petitioners in *Czapinski* challenged a classification not at issue in this case. The classification challenged was the distinction between how adult claimants were treated and how minor claimants were treated for loss of society and companionship of a parent who died as a result of medical malpractice.[36] Adult children were denied recovery; minor children were entitled to recovery.

¶ 39. In discussing the classification the court explained that "the distinction between adult children and minor children could be the different degree of dependency which each would be presumed to have on their parents for their continued financial and emotional support."[37] Notably, when "[f]aced with the need to draw the line on who can collect for loss of society and companionship, . . . the availability of claims . . . should be limited to those who would suffer most severely from the loss of an intimate family relationship; adult children cannot be included in this classification."[38]

¶ 40. The $350,000 cap on noneconomic damages at issue here has exactly the opposite effect as the classification in *Czapinski*. The $350,000 cap limits the claims of those who can least afford it; that is, the claims of those, including children such as Matthew Ferdon, who have suffered the greatest injuries.

¶ 41. A recent court of appeals decision, *Guzman v. St. Francis Hospital, Inc.*, 2001 WI App 21, 240 Wis. 2d 559, 623 N.W.2d 776, is not strong precedent. While

[36] *Id.*, ¶ 30.

[37] *Id.*, ¶ 31 (quoted source omitted).

[38] *Id.*

the issue is the same as the instant case, the court of appeals' opinion is neither controlling nor particularly compelling.

¶ 42. In *Guzman,* the circuit court held that the $350,000 cap on noneconomic damages was unconstitutional as violating both the Wisconsin constitutional right to trial by jury and the separation of powers doctrine. We granted a petition to bypass the court of appeals.[39]

¶ 43. The supreme court divided equally, 3–3, in *Guzman,* with Justice David Prosser not participating. The order to bypass was vacated[40] because no majority of justices could agree on whether to affirm or reverse the circuit court order holding the statutory cap in Wis. Stat. §§ 655.017 and 893.55(4)(d) unconstitutional. The case returned to the court of appeals, which declared the cap constitutional.

¶ 44. Each of the three judges on the court of appeals panel authored a separate opinion. Only one of the three court of appeals judges supported the constitutionality of the noneconomic damages cap.

¶ 45. One judge, in the lead opinion, concluded that the cap on noneconomic damages in Wis. Stat. §§ 655.017 and 893.55(4)(d) was constitutional. He declared that whether a health-care crisis justified the legislature's responses was an assessment to be made by the legislature, not the courts.[41] He further concluded that the cap did not violate the right to a trial by jury (Wis. Const. art. I, § 5),[42] the right to a remedy for

---

[39] Wis. Stat. § 809.60.

[40] *Guzman v. St. Francis Hosp., Inc.,* 2000 WI 34, ¶ 3, 234 Wis. 2d 170, 609 N.W.2d 166.

[41] *Id.,* ¶ 5.

[42] *Id.,* ¶¶ 7–12.

wrongs (Wis. Const. art. I, § 9),[43] substantive due process,[44] and the doctrine of separation of powers.[45]

¶ 46. The concurring judge "reluctantly" joined the majority opinion, concluding that "the statute barely passes constitutional muster" and that she could not overturn legal precedent that supports the legislature's action.[46]

¶ 47. The dissenting judge would have struck down the cap as a violation of Article I, Section 5, the right to a jury trial.

¶ 48. None of the three opinions in *Guzman,* however, addresses whether the $350,000 cap on non-economic damages violates the state constitutional equal protection guarantees.

¶ 49. In their equal protection challenge, the Guzmans argued that the classifications created by the cap should be reviewed using strict scrutiny. They did not address whether the cap survived review under the rational basis test. The court of appeals' lead opinion ruled that the rational basis test was the appropriate level of review and concluded that "[t]he Guzmans' silence on the rational-basis test is a concession that the cap passes that test."[47]

¶ 50. We do not agree with this reasoning. "A party's concession of law does not bind the court."[48] The

---

[43] *Id.,* ¶ 18.

[44] *Id.,* ¶¶ 22–25.

[45] *Id.,* ¶¶ 13–17.

[46] *Id.,* ¶ 26.

[47] *Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, ¶ 21, 240 Wis. 2d 559, 623 N.W.2d 776.

[48] *Bergmann v. McCaughtry,* 211 Wis. 2d 1, 7, 564 N.W.2d 712 (1997).

lead opinion further stated that because the Guzmans did not argue that the caps lacked a rational basis, the judge would not address that issue.[49] Thus the lead opinion, the only opinion to address equal protection directly, did not decide whether the cap passed the rational basis test.

¶ 51. *Guzman* therefore provides no opinion on the equal protection challenge and accordingly has no precedential vitality as to equal protection. Furthermore, with three separate opinions, only one of which supports the constitutionality of the cap, *Guzman* is not a strong precedent for any proposition.

¶ 52. In *Martin v. Richards*,[50] the court determined whether a retroactive application of the $1,000,000 cap on noneconomic damages in malpractice cases could violate due process; it did not directly determine the constitutionality of the noneconomic damages cap.[51]

¶ 53. The court's discussion of the cap in *Martin* is relevant to the instant case. The court concluded that retroactive application of the cap would have a negli-

---

[49] *Guzman*, 240 Wis. 2d 559, ¶ 21.

[50] *Martin v. Richards*, 192 Wis. 2d 156, 531 N.W.2d 70 (1995).

[51] *Id.* at 212.

*Martin* involved a substantive due process challenge to the retroactive application of a cap. Equal protection analysis and substantive due process have much in common. Under substantive due process analysis the statute must bear a rational relationship to a reasonable legislative goal. Under equal protection analysis there must be a rational relationship between the disparity in treatment resulting under a statute and a legitimate governmental objective. *Estate of Makos v. Wis. Masons Health Care Fund*, 211 Wis. 2d 41, 75, 564 N.W.2d 662 (1997) (Bradley, J., dissenting) (citing *State v. Post*, 197 Wis. 2d 279, 319, 541 N.W.2d 115 (1995)).

gible effect on the cost of health care in the state.[52] The court observed that although the claim is that noneconomic damages caps were implemented to prevent increasing costs associated with medical malpractice actions, "in this court these assertions are supported by a paucity of evidence."[53]

¶ 54. In *Rineck v. Johnson*,[54] this court held that the then-$1,000,000 cap on noneconomic damages in medical malpractice actions superseded the lower cap in the wrongful death statute where the death resulted from medical malpractice.[55] This court did not address the constitutionality of the medical malpractice cap.

¶ 55. In *Jelinek v. St. Paul Fire & Casualty Insurance Co.*,[56] this court held that after the expiration of the $1,000,000 cap in 1991, recovery of noneconomic damages in medical malpractice actions involving death was unlimited.[57] This court did not determine the constitutionality of a cap.

¶ 56. Each of these cases informs our examination in the instant case, but none is controlling.

## IV. EQUAL PROTECTION

¶ 57. We next examine Matthew Ferdon's assertion that the cap on noneconomic damage awards vio-

---

[52] *Martin,* 192 Wis. 2d at 203–04.

[53] *Id.* at 203.

[54] *Rineck v. Johnson,* 155 Wis. 2d 659, 456 N.W.2d 336 (1990), *cert. denied,* 498 U.S. 1068 (1991).

[55] *Rineck,* 155 Wis. 2d at 666–68.

[56] *Jelinek v. St. Paul Fire & Cas. Ins. Co.,* 182 Wis. 2d 1, 512 N.W.2d 764 (1994), superseded by statute as stated in *Czapinski,* 236 Wis. 2d 316.

[57] *Jelinek,* 182 Wis. 2d at 12.

lates the equal protection guarantees of the Wisconsin Constitution.

¶ 58. The interpretation of the Wisconsin Constitution and a determination of the constitutionality of a statute are ordinarily questions of law that this court determines independently of the circuit court and court of appeals, but benefiting from their analyses.

A. Level of Scrutiny

¶ 59. In deciding Matthew Ferdon's challenge to the $350,000 cap on noneconomic damages on equal protection grounds, our first task is to determine the appropriate level of judicial scrutiny to be applied in determining constitutionality.

¶ 60. The parties disagree about which level of judicial scrutiny should apply in this case. Matthew Ferdon invites this court to use the strict scrutiny standard in reviewing the statutory $350,000 cap. He argues that the noneconomic damages cap implicates the fundamental right to a trial by jury and the right to a remedy protected by the state constitution. The Fund argues that strict scrutiny is unwarranted and that the proper level of review is rational basis review.

¶ 61. Strict scrutiny applies if a statute challenged on equal protection grounds "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class."[58] If strict

---

[58] *State v. Annala,* 168 Wis. 2d 453, 468, 484 N.W.2d 138 (1992) (citing *Mass. Bd. of Ret. v. Murgia,* 427 U.S. 307, 312 (1976)).

scrutiny were applied in the instant case, the Fund would have the burden of showing that the $350,000 cap on noneconomic damages caused by medical malpractice tortfeasors promotes a compelling governmental interest and that the $350,000 cap is the least restrictive means for doing so. That is, the Fund would have to show that the cap is precisely tailored to serve a compelling state interest.

¶ 62. Courts apply strict scrutiny sparingly, although at least one state court has used the strict scrutiny level of review in medical malpractice cases.[59]

¶ 63. Several state courts have applied an intermediate level of scrutiny to caps in medical malpractice cases.[60] Under intermediate scrutiny, the classification "must serve important governmental objectives and must be substantially related to achievement of those

---

[59] *See Kenyon v. Hammer,* 688 P.2d 961, 973–74 (Ariz. 1984) (the right to a remedy was a matter of importance since the state's early days of statehood and therefore strict scrutiny was appropriate).

[60] *See, e.g., Carson v. Mauer,* 424 A.2d 825, 830–31 (N.H. 1980) (holding that the right to a remedy is an "important substantive right" requiring an intermediate level of scrutiny); *Arneson v. Olson,* 270 N.W.2d 125, 132–33 (N.D. 1978) (applying a heightened level of scrutiny to statute capping economic and noneconomic damages to require a "close correspondence between statutory classification and legislative goals"); *Judd v. Drezga,* 103 P.3d 135 (Utah 2004) (holding that a challenge under Utah's version of a right to a remedy clause of the Utah constitution warranted application of heightened scrutiny). *But see Murphy v. Edmonds,* 601 A.2d 102 (Md. 1992) (rejecting plaintiff's contention that because the access to courts right was implicated, a heightened level of scrutiny was therefore warranted).

objectives."[61] This court has applied an intermediate level of scrutiny on at least one prior occasion.[62]

¶ 64. Neither party in the present case has argued that we should apply the intermediate level of review.

¶ 65. We agree with the Fund that rational basis, not strict scrutiny, is the appropriate level of scrutiny in the present case.[63] This court has stated that Wis. Stat. chapter 655 does not deny any fundamental right and does not involve a suspect classification.[64] In the context of wrongful death medical malpractice actions, this court has previously held that "[c]apping noneconomic wrongful death damages does not violate any fundamental right . . . ."[65] Similarly, in examining whether the appointment of six-member compensation panels effectively denied suing patients access to the courts, thereby violating their rights to a jury trial as preserved in Article I, Section 5 of the Wisconsin Constitution, this court held that chapter 655 did not involve funda-

---

[61] *Craig v. Boren,* 429 U.S. 190, 197 (1976) (applying intermediate scrutiny to a gender-based classification).

[62] *See Brandmiller v. Arreola,* 199 Wis. 2d 528, 544 N.W.2d 894 (1996) (applying intermediate level of scrutiny to determine whether restrictions in ordinance on cruising in cars were narrowly tailored to serve significant government interests).

[63] *Maurin,* 274 Wis. 2d 28, ¶ 212 (Abrahamson, C.J., and Crooks, J., concurring) (constitutionality of cap on noneconomic damage award in wrongful death case).

[64] *Czapinski,* 236 Wis. 2d 316, ¶ 28; *Strykowski,* 81 Wis. 2d 491, 507, 261 N.W.2d 434 (1978).

[65] *Maurin,* 274 Wis. 2d 28, ¶ 105; *see also Czapinski,* 236 Wis. 2d 316, ¶ 26 ("Although § 893.55(4)(f) [covering wrongful death medical malpractice actions] creates separate classifications for . . . tort victims [based on their status as adults or children], these classifications do not violate equal protection.").

mental rights or suspect classifications.[66] As for Article I, Section 9, "[t]his court has never construed the right [to a remedy provision] to be fundamental."[67]

¶ 66. This discussion is not meant to minimize the importance of the right to a jury and the right to a remedy; both are important rights. Nevertheless, in the context of equal protection challenges to medical malpractice provisions, this court has not viewed these two constitutional guarantees as belonging to the class of rights warranting strict scrutiny. The rational basis level of scrutiny is therefore applied in the present case.

¶ 67. A person challenging a statute on equal protection grounds under the rational basis level of scrutiny bears a heavy burden in overcoming the presumption of constitutionality afforded statutes.[68] Statutes are afforded the presumption of constitutionality "[b]ecause statutes embody the economic, social, and political decisions entrusted to the legislature . . . ."[69]

¶ 68. The longstanding rule set forth by this court is that "all legislative acts are presumed constitutional, that a heavy burden is placed on the party challenging

---

[66] *Strykowski,* 81 Wis. 2d 491, 506–07, 261 N.W.2d 434 (1978).

[67] *Doering v. WEA Ins. Group,* 193 Wis. 2d 118, 130, 532 N.W.2d 432 (1995).

[68] *Aicher ex rel. LaBarge v. Wis. Patients Comp. Fund,* 2000 WI 98, ¶¶ 18–19, 237 Wis. 2d 99, 613 N.W.2d 849.

[69] *Maurin,* 274 Wis. 2d 28, ¶ 93. *See also Aicher,* 237 Wis. 2d 99, ¶ 20 ("[T]he judiciary is not positioned to make the economic, social, and political decisions that fall within the province of the legislature."); *Sambs,* 97 Wis. 2d at 377 (legislature evaluates the risks and balances the competing interests of exposure to liability and the need to compensate individuals for injury).

constitutionality, and that if any doubt exists it must be resolved in favor of the constitutionality of a statute."[70] A challenger must demonstrate that a statute is unconstitutional beyond a reasonable doubt.[71]

¶ 69. Nevertheless, when a legislative act unreasonably invades rights guaranteed by the state constitution, a court has not only the power but also the duty to strike down the act. Although we do not address Ferdon's constitutional challenges under Article I, Section 5 (right to a jury trial) and Section 9 (right to a remedy), the $350,000 cap on noneconomic damages may implicate these constitutional rights. In short, "neither our respect for the legislature nor the presumption of constitutionality allows for absolute judicial acquiescence to the legislature's statutory enactments."[72] The court has emphasized that "[s]ince *Marbury v. Madison,* it has been

[70] *Sambs,* 97 Wis. 2d at 370 (citing *Stanhope,* 90 Wis. 2d at 837).

[71] *Maurin,* 274 Wis. 2d 28, ¶ 93; *Sambs,* 97 Wis. 2d at 370, (citing *Stanhope,* 90 Wis. 2d at 837).

The constitutionality of a statute is an issue of law, not fact. The "beyond the reasonable doubt burden of proof" language is, however, reminiscent of an evidentiary burden of proof in criminal cases. The beyond a reasonable doubt burden of proof in a constitutional challenge case means that a court gives great deference to the legislature, and a court's degree of certainty about the unconstitutionality results from the persuasive force of legal argument. *See Davis v. Grover,* 166 Wis. 2d 501, 564 n. 13, 480 N.W.2d 460 (1992) (Abrahamson, J., dissenting); *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973); *Guzman,* 240 Wis. 2d 559, ¶ 4, n.3; *United Air Lines, Inc. v. City of Denver,* 973 P.2d 647, 658 (Colo. Ct. App. 1998) (Briggs, J., concurring).

[72] *Guzman,* 240 Wis. 2d 559, ¶ 39.

recognized that it is peculiarly the province of the judiciary to interpret the constitution and say what the law is."[73]

¶ 70. The decisions in this court, in other state courts, and in the United States Supreme Court have expressed judicial review on the basis of equal protection in a variety of iterations.[74] Cases within a single jurisdiction have expressed divergent views on the clarity with which a legislative purpose must be stated and on the degree of deference afforded the legislature in suiting means to ends.[75]

¶ 71. This court has often quoted the United States Supreme Court's articulation of the rational basis test set forth in *McGowan v. Maryland*[76] as follows:

> [The Equal Protection Clause] permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.[77]

---

[73] *State ex rel. Wis. Senate v. Thompson,* 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988) (citation omitted).

[74] *See County of Portage v. Steinpreis,* 104 Wis. 2d 466, 487 n.4, 312 N.W.2d 731 (1981) (Abrahamson, J., dissenting).

[75] *Id.* at 487 n.4 (Abrahamson, J., dissenting); *Schweiker v. Wilson,* 450 U.S. 221, 243 (1981) (Powell, J., dissenting).

[76] *McGowan v. Maryland,* 366 U.S. 420 (1961).

[77] *McGowan,* 366 U.S. at 425–26. This court and the United States have applied various formulations of the rational basis test, including some that have articulated a five-part standard.

¶ 72. The court has written that the rational basis standard in the equal protection context does not require that all individuals be treated identically, but any distinctions must be relevant to the purpose motivating the classification.[78] Similarly situated individuals should be treated similarly.[79] In essence, the rational basis standard asks "whether there are any real differences to distinguish the favored class . . . from other classes . . . who are ignored by the statute . . . ."[80]

¶ 73. A statute will be upheld against an equal protection challenge if a plausible policy reason exists for the classification and the classification is not arbitrary in relation to the legislative goal.[81] A statute will be held unconstitutional if the statute is shown to be "patently arbitrary" with "no rational relationship to a

See, e.g., Omernik v. State, 64 Wis. 2d 6, 19, 218 N.W.2d 734 (1974); Aicher, 237 Wis. 2d 99, ¶ 58. The essential question posed by the five-part test is whether there are any real differences to distinguish the favored class from other classes. Kallas Millwork Corp. v. Square D Co., 66 Wis. 2d 382, 389, 225 N.W.2d 454 (1975). Other cases have articulated a more qualitative approach. See, e.g., Doering, 193 Wis. 2d at 131–32.

[78] Doering, 193 Wis. 2d at 131–32 (citing Szarzynski v. YMCA, Camp Minikani, 184 Wis. 2d 875, 886, 517 N.W.2d 135 (1994)); see also Maurin, 274 Wis. 2d 28, ¶ 106; Sambs, 97 Wis. 2d at 370–72; Stanhope, 90 Wis. 2d at 837–38.

[79] Treiber v. Knoll, 135 Wis. 2d 58, 68, 398 N.W.2d 756 (1987).

[80] Doering, 193 Wis. 2d at 131 n.11 (quoted source omitted).

[81] Maurin, 274 Wis. 2d 28, ¶ 106; Doering, 193 Wis. 2d at 131 (citing Szarzynski v. YMCA, Camp Minikani, 184 Wis. 2d 875, 886, 517 N.W.2d 135 (1994)); see also Sambs, 97 Wis. 2d at 370–72.

legitimate government interest."[82] The party challenging the classification has the burden of demonstrating that the classification is arbitrary and irrationally discriminatory.

¶ 74. In evaluating whether a legislative classification rationally advances the legislative objective,[83] "we are obligated to locate or, in the alternative, construct a rationale that might have influenced the legislative determination."[84]

¶ 75. Once the court identifies a rational basis for a statute, the court must assume the legislature passed the act on that basis,[85] and "[a]ll facts necessary to sustain the act must be taken as conclusively found by the legislature, if any such facts may be reasonably conceived in the mind of the court."[86]

¶ 76. The rational basis test does not require the legislature to choose the best or wisest means to achieve its goals.[87] Deference to the means chosen is due even if

---

[82] *Maurin,* 274 Wis. 2d 28, ¶ 106 (citations omitted).

[83] *Treiber v. Knoll,* 135 Wis. 2d 58, 65, 398 N.W.2d 756 (1987).

[84] *Aicher,* 237 Wis. 2d 99, ¶ 57. *See also Maurin,* 274 Wis. 2d 28, ¶ 212 (Abrahamson, C.J., and Crooks, J., concurring). *See also Sambs,* 97 Wis. 2d at 371; *Stanhope,* 90 Wis. 2d at 838.

[85] *Aicher,* 237 Wis. 2d 99, ¶ 57.

[86] *Treiber v. Knoll,* 135 Wis. 2d 58, 65, 398 N.W.2d 756 (1987) (quoting *State ex rel. Carnation Milk Prods. Co. v. Emery,* 178 Wis. 147, 189 N.W. 564 (1922); *State v. Interstate Blood Bank, Inc.,* 65 Wis. 2d 482, 489, 222 N.W.2d 912 (1974)).

[87] *Stanhope,* 90 Wis. 2d at 843.

the court believes that the same goal could be achieved in a more effective manner.[88]

¶ 77. Nevertheless, judicial deference to the legislature and the presumption of constitutionality of statutes do not require a court to acquiesce in the constitutionality of every statute. A court need not, and should not, blindly accept the claims of the legislature. For judicial review under rational basis to have any meaning, there must be a meaningful level of scrutiny, a thoughtful examination of not only the legislative purpose, but also the relationship between the legislation and the purpose. The court must "probe beneath the claims of the government to determine if the constitutional 'requirement of some rationality in the nature of the class singled out' has been met."[89]

¶ 78. The rational basis test is "not a toothless one."[90] "Rational basis with teeth," sometimes referred to as "rational basis with bite," focuses on the legislative

---

[88] *Aicher,* 237 Wis. 2d 99, ¶ 66.

[89] *Doering,* 193 Wis. 2d at 132 (quoting *James v. Strange,* 407 U.S. 128, 140 (1972)).

[90] *Doering,* 193 Wis. 2d at 132 ("the rational basis test is 'not a toothless one' "), quoting *Schweiker,* 450 U.S. at 234 (quoted with approval in *Wis. Wine & Spirit Inst. v. Ley,* 141 Wis. 2d 958, 964, 416 N.W.2d 914 (Ct. App. 1987)). *See also Mathews v. Lucas,* 427 U.S. 495, 510 (1976) (scrutiny is not toothless); *State ex rel. Grand Bazaar Liquors, Inc. v. Milwaukee,* 105 Wis. 2d 203, 209, 313 N.W.2d 805 (1982) (rational basis standard of review is not a toothless one); *State ex rel. Watts v. Combined Cmty. Servs.,* 122 Wis. 2d 65, 81 n.8, 362 N.W.2d 104 (1984) (citing Gerald Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 22, 31 (1972), and referring to "a middle level tier of judicial scrutiny," which has been termed " 'vigorous

means used to achieve the ends.[91] This standard simply requires the court to conduct an inquiry to determine whether the legislation has more than a speculative tendency as the means for furthering a valid legislative purpose. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."[92] At least one law student note, while observing that the U.S. Supreme Court had "employ[ed] searching scrutiny under the label of rational basis review,"[93] nevertheless criticized the U.S. Supreme Court and implored the use

---

rational basis scrutiny' " or the traditional standard " 'with new bite' "); *County of Portage v. Steinpreis,* 104 Wis. 2d 466, 487, 312 N.W.2d 731 (1981) (Abrahamson, J., dissenting) (rational basis is not a toothless standard).

Justice Thurgood Marshall (joined by Justice William Brennan and Justice Harry Blackmun) rejected a rigid approach to equal protection analysis and proposed using varying levels of scrutiny depending on the importance of the interests adversely affected and the invidiousness of the basis on which the classification is drawn. Justice Marshall wrote for himself and the other two Justices that "[t]he Court's opinion [in *Cleburne*] approaches the task of principled equal protection in what I view as precisely the wrong way. . . . in focusing obsessively on the appropriate label to give its standard of review . . . ." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 478 (1985) (Marshall, J., concurring in part and dissenting in part).

[91] Gerald Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 18–19 (1972).

[92] *See Cleburne,* 473 U.S. at 446.

[93] For several of these cases, see, *e.g., Lawrence v. Texas,* 539 U.S. 558, 580 (2003) (O'Connor, J., concurring); *Romer v. Evans,* 517 U.S. 620 (1996); *Cleburne,* 473 U.S. 432; *Hooper v. Bernalillo County Assessor,* 472 U.S. 612 (1985); *Williams v. Vermont,* 472 U.S. 14 (1985); *Metro. Life Ins. Co. v. Ward,* 470 U.S. 869 (1985); *Zobel v. Williams,* 457 U.S. 55 (1982).

of intermediate scrutiny rather than rational basis with teeth.[94]

¶ 79. Constitutional law scholar Professor Gerald Gunther wrote, however, as follows that rational basis with teeth "is *not* the same as " 'intermediate scrutiny' ":

> [Rational basis with teeth] does not take issue with the heightened scrutiny tiers of "strict" and "intermediate" review. Instead, it is solely addressed to the appropriate intensity of review to be exercised when the lowest tier, that of rationality review, is deemed appropriate. . . . What the [rational basis with teeth model] asks is that some teeth be put into that lowest level of scrutiny, that it be applied "with bite," focusing on means without second-guessing legislative ends. (Evaluating the importance of the ends is characteristic of all higher levels of scrutiny.) In short, [rational basis with teeth raises] slightly the lowest tier of review under the two- or three-tier models; but it does *not* seek to raise the "mere rationality" level appropriate for run-of-the-mill economic regulation cases all the way up to the level of "intermediate" or of "strict" scrutiny.[95]

¶ 80. Whether the level of scrutiny is called rational basis, rational basis with teeth, or meaningful rational basis, it is this standard we now apply in this case.

[94] Gayle Lynn Pettinga, Note, *Rational Basis With Bite: Intermediate Scrutiny By Any Other Name,* 62 Ind. L.J. 779, 802 (1987).

[95] Gerald Gunther, *Constitutional Law,* 605 n.5 (11th ed. 1985) (emphasis added). *See* Lawrence Tribe, *American Constitutional Law,* § 16–3, at 1445–46 (2d ed. 1988) (suggesting open use of rational basis with bite only when quasi-suspect classifications are at issue, but also noting that "[w]hile there may be grounds for the reluctance to proliferate new categories of classifications overtly triggering closer scrutiny, its *covert* use under the minimum rationality label presents dangers of its own.").

## B. The Classifications

¶ 81. The task of drawing lines, that is the task of creating classifications, is a legislative one in which perfection "is neither possible nor necessary."[96] The court's goal is to determine whether the classification scheme rationally advances the legislative objective. In limiting noneconomic damages in medical malpractice actions, Wis. Stat. §§ 655.017 and 893.55(4)(d) together create a number of classifications and sub-classifications.[97] One main classification is relevant to the present case, and one sub-classification is implicated:

¶ 82. The main classification is the distinction between medical malpractice victims who suffer over $350,000 in noneconomic damages, and medical mal-

---

[96] *Estate of Makos v. Wis. Masons Health Care Fund,* 211 Wis. 2d 41, 75, 564 N.W.2d 662 (1997) (Bradley, J., dissenting) (quoted with approval in *Aicher,* 237 Wis. 2d 99, ¶ 57).

[97] There are two large classifications of plaintiffs and defendants created by the statutes whom we do not address here. (1) Two classes of tort plaintiffs are created by the $350,000 cap: those injured by the medical malpractice of health care providers covered by chapter 655 and therefore subject to the cap on noneconomic damages, and those injured by tortious conduct of non-health care providers who are not subject to the $350,000 cap on noneconomic damages. The court has held that medical malpractice actions are substantially distinct from other tort actions. *Czapinski,* 236 Wis. 2d 316, ¶ 30. (2) Two classes of tortfeasors are created by the $350,000 cap: health care tortfeasors and non-health care tortfeasors. Health care tortfeasors whose conduct producing the most harm (in excess of the $350,000 cap) are partially shielded by the $350,000 cap on noneconomic damage awards, as compared with health care tortfeasors whose conduct produces less harm.

practice victims who suffer less than $350,000 in noneconomic damages. That is, the cap divides the universe of injured medical malpractice victims into a class of severely injured victims and less severely injured victims. Severely injured victims with more than $350,000 in noneconomic damages receive only part of their damages; less severely injured victims with $350,000 or less in noneconomic damages receive their full damages. In other words, the statutory cap creates a class of fully compensated victims and partially compensated victims. Thus, the cap's greatest impact falls on the most severely injured victims.[98]

¶ 83. A main sub-classification is created as part of the $350,000 cap on noneconomic damages. A single cap applies to all victims of a medical malpractice occurrence regardless of the number of victims/claimants. Because the total noneconomic damages recoverable for bodily injury or death may not exceed the $350,000 limit for each occurrence, the total award for a patient's claim for noneconomic damages (such as pain, suffering and disability) and the claims of the patient's spouse, minor children, or parents for loss of society and companionship cannot exceed $350,000.[99] Thus, classes of victims are created depending on whether the patient has a spouse, minor children, or a parent. An injured patient who is single may recover the entire $350,000, while a married injured patient shares the cap with his or her spouse; a non-married injured patient with children

[98] Wisconsin Patients Compensation Fund Report to Joint Legislative Audit Committee (prepared by the Special Committee of the Board of Governors), Executive Summary, at 14 (June 13, 1994).

[99] *See* Wis. Stat. §§ 655.007, 893.55(5).

shares the $350,000 with the children; a married injured patient with children shares the cap with the spouse and children.

¶ 84. With these classifications in mind, we turn to the legislature's objectives for enacting a $350,000 cap on noneconomic damages in medical malpractice actions.

C. Legislative Objectives.

¶ 85. Identifying the legislative objectives will allow us to determine whether the legislatively created classifications are rationally related to achieving appropriate legislative objectives.[100]

¶ 86. Although the legislature did not explicitly state its objectives as such, it made a number of findings when it enacted chapter 655.[101] These findings give a strong indication of the legislature's objectives. The findings can be summarized as follows:

---

[100] *Doering,* 193 Wis. 2d at 137–38.

[101] *Maurin,* 274 Wis. 2d 28, Appendix. Section 1, ch. 37, Laws of 1975 reads:

Section 1. Legislative findings. (1) The legislature finds that:

(a) The number of suits and claims for damages arising from professional patient care has increased tremendously in the past several years and the size of judgments and settlements in connection therewith has increased even more substantially;

(b) The effect of such judgments and settlements, based frequently on newly emerging legal precedents, has been to cause the insurance industry to uniformly and substantially increase the cost and limit the availability of professional liability insurance coverage;

(c) These increased insurance costs are being passed on to patients in the form of higher charges for health care services and facilities;

(d) The increased costs of providing health care services, the increased incidents of claims and suits against health care providers and the size of such claims and judgments has caused many liability insurance companies to withdraw completely from the insuring of health care providers;

1. Judgments and settlements have increased, thereby increasing the cost and limiting the availability of professional liability insurance coverage;[102]

2. The increased costs of medical malpractice premiums are passed on to the patients in the form of higher charges for health care;[103]

3. Individual and institutional health care providers are being forced to practice defensively, to the detriment of the health care provider and patient, and

---

(e) The rising number of suits and claims is forcing both individual and institutional health care providers to practice defensively, to the detriment of the health care provider and the patient;

(f) As a result of the current impact of such suits and claims, health care providers are often required, for their own protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care;

(g) As another effect of the increase of such suits and claims and the costs thereof, health care providers are reluctant to and may decline to provide certain health care services which might be helpful, but in themselves entail some risk of patient injury;

(h) The cost and the difficulty in obtaining insurance for health care providers discourages and has discouraged young physicians from entering into the practice of medicine in this state;

(i) Inability to obtain, and the high cost of obtaining, such insurance has affected and is likely to further affect medical and hospital services available in this state to the detriment of patients, the public and health care providers;

(j) Some health care providers have curtailed or ceased, or may further curtail or cease, their practices because of the nonavailability or high cost of professional liability insurance; and

(k) It therefor [sic] appears that the entire effect of such suits and claims is working to the detriment of the health care provider, the patient and the public in general.

[102] § 1 (1)(a), (b), ch.37, Laws of 1975.
[103] § 1 (1)(c), ch. 37, Laws of 1975.

619

may decline to provide certain services that might be helpful but may entail some risk to the patient;[104]

4. The cost and difficulty of obtaining medical malpractice insurance discourages young physicians from entering into the practice of medicine in this state and may encourage health care providers to curtail or cease their practices in Wisconsin.[105] Malpractice insurers may leave the marketplace, making it harder for health care providers to obtain medical malpractice insurance.[106]

5. "[T]he entire effect of such suits and claims is working to the detriment of the health care provider, the patient and the public in general."[107]

¶ 87. In sum, the legislature found that malpractice lawsuits raise the cost of medical malpractice insurance for providers. According to the legislature, higher medical malpractice insurance costs, in turn, harm the public because they result in increased medical costs for the public and because health care providers might leave Wisconsin. The legislature also found that health care providers were practicing defensive medicine because of the rising number of claims and that they might refuse to enter the Wisconsin health care market. These legislative findings are not binding on the court but carry great weight.[108]

¶ 88. From the findings set forth when chapter 655 was enacted in 1975, we can deduce a primary, overall legislative objective and five interconnected

---

[104] § 1 (1)(e), (f), (g), ch. 37, Laws of 1975.

[105] § 1 (1)(h), (i), (j), ch. 37, Laws of 1975.

[106] § 1 (d), ch. 37, Laws of 1975.

[107] § 1 (1)(k), ch. 37, Laws of 1975.

[108] *Strykowski,* 81 Wis. 2d at 508.

legislative objectives that led to adoption of the $350,000 cap on noneconomic damage awards.

¶ 89. The primary, overall legislative objective is to ensure the quality of health care for the people of Wisconsin.[109] The legislature obviously did not intend to reach this objective by shielding negligent health care providers from responsibility for their negligent actions. After all, "[i]t is a major contradiction to legislate for quality health care on one hand, while on the other hand, in the same statute, to reward negligent health care providers."[110] A cap on noneconomic damages diminishes tort liability for health care providers and diminishes the deterrent effect of tort law.[111]

---

[109] *Id.* at 509.

[110] *Farley v. Engelken,* 740 P.2d 1058, 1067 (Kan. 1987).

The General Accounting Office concluded that one of the surest ways to "deal with the problem of increasing insurance costs" is to eliminate the conditions that result in acts amounting to medical malpractice. U.S. General Accounting Office, *Medical Malpractice: A Framework for Action,* GAO/HRD-87–73, at 3, 12–19 (May 1987).

> Efforts to accomplish this may include (1) disciplining or removing from practice those physicians not providing an acceptable quality of care; (2) protecting patients from physicians who lose their licenses in one state but have them in another; and (3) developing and expanding risk management programs to educate providers concerning better ways of delivering an acceptable quality of health care, minimizing the possibility of future malpractice suits.

*Id.* at 12.

[111] *Prosser & Keeton on the Law of Torts* § 4, at 25 (W. Page Keeton ed., 5th ed. 1984) ("The 'prophylactic' factor of preventing future harm has been quite important in the field of torts."); Kenneth E. Thorpe, *The Medical Malpractice 'Crisis': Recent Trends and the Impact of State Tort Reforms,* Health Affairs W4–20, W4–25, W4–24 (Jan. 21, 2004), at http://content.

¶ 90. The all-encompassing legislative objective is reached, according to the legislative reasoning, by accomplishing the following objectives.

¶ 91. Legislative Objective #1: Ensure adequate compensation for victims of medical malpractice with meritorious injury claims. The legislature retained the tort system as a means of identifying health care providers who are practicing below the required due care standards and as a means of deterring them and other health care providers from negligent practices. The legislature obviously considers noneconomic injuries to be real injuries for which plaintiffs should be compensated in appropriate cases.

¶ 92. Legislative Objective #2: Enable health care insurers to charge lower malpractice insurance premiums by reducing the size of medical malpractice awards.

¶ 93. Legislative Objective #3: Keep the Fund's annual assessment to health care providers at a low rate and protect the Fund's financial status. The fewer and smaller the claims the Fund must pay, the more likely the Fund will have a sound cash flow, and the more likely the Fund will be able to lower its annual assessments to health care providers. With lower insurance premiums charged by the primary insurers and lower annual assessments by the Fund, health care will be more affordable to Wisconsin's citizens.

¶ 94. Legislative Objective #4: Reduce overall health care costs (by lowering malpractice insurance premiums) for consumers of health care.

---

healthaffairs.org/cgi/reprint/hlthaff.w4.20v1 ("[D]eterring substandard medical care is a major rationale for using a tort-liability system for medical malpractice." Also, "[r]ising claims costs may reflect a rise in underlying negligence.").

¶ 95. Legislative Objective #5: Encourage health care providers to practice in Wisconsin. Health care providers ensure quality health care for the people of Wisconsin. Lower malpractice insurance premiums will prevent health care providers from leaving Wisconsin. Related are the goals of avoiding the practice of defensive medicine and retaining malpractice insurance vendors in Wisconsin.

¶ 96. In sum, chapter 655 was designed by the legislature to help limit the increasing cost of health care and possible "diminishing . . . availability of health care in Wisconsin."[112] The legislature's immediate objective in enacting the $350,000 cap was apparently to ensure the availability of sufficient liability insurance at a reasonable cost to cover claims of patients. "Taming the costs of medical malpractice and ensuring access to affordable health care are legitimate legislative objectives."[113] The legislative cap and the classification of medical malpractice victims appear to express a legislative balancing of objectives: to ensure quality health care in the state; to compensate injured victims of medical malpractice; and to protect health care providers from excessive costs of medical malpractice insurance.

D. The Rational Basis

1.

¶ 97. We now explore whether a rational relationship exists between the legislative objective of compen-

---

[112] *Patients Comp. Fund v. Lutheran Hosp.-La Crosse, Inc.,* 216 Wis. 2d 49, 53, 573 N.W.2d 572 (Ct. App. 1997).

[113] *Aicher,* 237 Wis. 2d 99, ¶ 78.

sating victims fairly and the classification of medical malpractice victims into two groups—those who suffer noneconomic damages under $350,000 and those who suffer noneconomic damages over $350,000. With regard to the classification of victims, "the Equal Protection Clause 'imposes a requirement of some rationality in the nature of the class singled out.' "[114]

¶ 98. No one disputes that the cap does not apply equally to all medical malpractice victims. Indeed, the burden of the cap falls entirely on the most seriously injured victims of medical malpractice. Those who suffer the most severe injuries will not be fully compensated for their noneconomic damages, while those who suffer relatively minor injuries with lower noneconomic damages will be fully compensated.[115] The greater the injury, the smaller the fraction of noneconomic damages the victim will receive.

¶ 99. According to a 1992 report by the Wisconsin Office of the Commissioner of Insurance, children from ages 0 to 2 with medical malpractice injuries comprise less than 10% of malpractice claims, yet their claims comprise a large portion of the paid claims and expenses of insurers and the Fund.[116] That is, "[p]laintiffs with the most severe injuries appear to be at the highest

---

[114] *James v. Strange,* 407 U.S. 128, 140 (1972) (quoting *Rinaldi v. Yeager,* 384 U.S. 305, 308–09 (1966)).

[115] The lower the cap, the larger the number of people affected. The higher the cap, the smaller the number of people affected.

[116] Office of Commissioner of Insurance, *Wisconsin Health Care Liability Insurance Plan (WHCLIP): Preliminary Report on Medical Malpractice In Wisconsin,* Special Report 16, 30, 38 (1992).

risk for inadequate compensation. Hence, the worst-off may suffer a kind of 'double jeopardy' under caps."[117]

¶ 100. Young people are most affected by the $350,000 cap on noneconomic damages, not only because they suffer a disproportionate share of serious injuries from medical malpractice, but also because many can expect to be affected by their injuries over a 60– or 70–year life expectancy. This case is a perfect example. Matthew Ferdon has a life expectancy of 69 years; he was injured at birth. An older person with a similarly serious medical malpractice injury will have to live with the injury for a shorter period. Yet both the young and the old are subject to the $350,000 cap on noneconomic damages. Furthermore, because an injured patient shares the cap with family members, the cap has a disparate effect on patients with families.

¶ 101. The legislature enjoys wide latitude in economic regulation. But when the legislature shifts the economic burden of medical malpractice from insurance companies and negligent health care providers to a small group of vulnerable, injured patients, the legislative action does not appear rational. Limiting a patient's recovery on the basis of youth or how many family members he or she has does not appear to be germane to any objective of the law.

¶ 102. If the legislature's objective was to ensure that Wisconsin people injured as a result of medical malpractice are compensated fairly, no rational basis exists for treating the most seriously injured patients of medical malpractice less favorably than those less seri-

---

[117] David Studdert et al., *Are Damages Caps Regressive? A Study of Malpractice Jury Verdicts in California,* 23 Health Affairs 54, 65 (2004) ("Decisions to implement [damage caps] should be made with an awareness that they are likely to exacerbate existing problems of fairness in compensation.").

ously injured. No rational basis exists for forcing the most severely injured patients to provide monetary relief to health care providers and their insurers.[118]

¶ 103. At least as to the legislative objective of ensuring fair compensation, the legislative classification created by a $350,000 cap on noneconomic damages is arbitrary and creates an undue hardship on a small unfortunate group of plaintiffs. Limitations on noneconomic damages are regressive.

¶ 104. This court made these very same observations in 1995 in *Martin v. Richards. Martin* involved a successful due process challenge to the retroactivity of the $1,000,000 cap on noneconomic damage awards. This court concluded that the cap unfairly sought to repair the tort system at the expense of those more seriously injured:

> There is yet one more measure of unfairness that the cap extracts, not just to the Martins but to all people whose noneconomic damages exceed [the cap]. The underlying assertion of the defendants, and of all who seek to impose a cap, is that the tort system is "broke" or at least badly in need of repair. Assuming the truth of that assertion for the sake of argument, the cap

---

[118] A rationale sometimes offered for limiting recovery for noneconomic damages is that it is difficult to place a monetary value on such a loss, that money is an imperfect compensation for intangible injuries, and that sympathetic juries may award excessive sums for noneconomic damages. Yet no one contends that the legislature determined that when someone is injured through medical malpractice, the maximum reasonable compensation for noneconomic damages is $350,000. Apparently, $350,000 was selected not necessarily in relation to what constitutes reasonable compensation for the victim, but rather was arrived at as a result of its relation to the other legislative objectives such as lowering medical malpractice premiums and health care costs.

imposed here seeks to fix that system at the sole expense of those most seriously injured. That strikes us as neither fair nor equitable. A person whose noneconomic damages is [at or below the cap] recovers 100 percent of his or her noneconomic loss. Those whose injuries exceed the cap receive but a fraction.[119]

¶ 105. We therefore conclude that a rational relationship does not exist between the classifications of victims in the $350,000 cap on noneconomic damages and the legislative objective of compensating victims of medical malpractice fairly.

2.

¶ 106. Providing reasonably priced medical malpractice insurance for health care providers is one of the objectives the legislature believed necessary to achieve quality health care for the people of the state. The State has a legitimate interest in reasonably priced premiums for medical malpractice insurance if the cost or delivery of health care is threatened by escalating premiums. The legislature apparently concluded that reducing the size of medical malpractice awards would reduce medical malpractice insurance premiums.

¶ 107. As of 1997, health care providers in Wisconsin must carry primary insurance coverage of $1,000,000 per occurrence and $3,000,000 aggregate per year.[120] The Fund then acts as an excess carrier, covering any losses above that amount. Therefore, "[s]ince the increase in the threshold to $1,000,000 per

---

[119] *Martin,* 192 Wis. 2d at 210.

[120] Wis. Stat. § 655.23(4)(b)(2); 1997 Wis. Act 11; Analysis by the Legislative Reference Bureau for 1997 Assembly Bill 248, (available in Drafting Records for 1997 Wis. Act 11 at the Wisconsin Legislative Reference Bureau, Madison, WI).

incident and $3,000,000 aggregate, in 1997, the primary [medical malpractice insurance] carriers are subject to more of an impact from the enactment of Wisconsin Act 10."[121]

¶ 108. We discuss first the relationship between the cap and premiums charged by primary medical malpractice carriers, and then we discuss the relationship between the cap and the assessments by the Fund.

¶ 109. A $350,000 cap on noneconomic damages in medical malpractice actions intuitively appears to be rationally related to the legislative objective of lowering medical malpractice insurance costs to ensure quality health care for the people of the state. If medical malpractice insurance costs are fueled by large judgments and settlements, as the legislature declared in 1975, a cap would limit payouts by insurance companies; the lower payouts would enable insurance companies to reduce premiums to health care providers; a cap would enable insurance carriers to have greater predictability about the size of payouts and greater ease in calculating premiums and in setting more accurate rates; lower premiums and lower assessments by the Fund would decrease overall health care costs to consumers.

¶ 110. The Wisconsin legislature chose a $350,000 cap on noneconomic damages as the means of achieving its objective. We do not question the wisdom of that choice, but we must test whether the legislative hypothesis that a $350,000 cap on noneconomic damages bears a rational relationship to malpractice insurance premiums has a basis in reality.

---

[121] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005).

¶ 111. In testing the hypothesis, we begin with the recognition, in deference to the legislature, that to some extent the selection of any specific monetary limitation on noneconomic damages is arbitrary, in the sense that any limitation is based on imponderables.[122] The legislature decides the specific numerical cap after balancing equal justice and fiscal considerations.[123] The legislature's decision fixing a numerical cap must be accepted unless we can say it is very wide of any reasonable mark.[124] We have said that a statutory limit on tort recoveries may violate equal protection guarantees if the limitation is harsh and unreasonable, that is, if the limitation is too low when considered in relation to the damages sustained.[125]

¶ 112. Nevertheless, considerations of equal protection require some rationale for the cap and the figure chosen.

■

¶ 113. For the reasons we shall set forth below, we conclude that the $350,000 ceiling adopted by the legislature is unreasonable and arbitrary because it is

---

[122] *Stanhope,* 90 Wis. 2d at 843.

[123] *See Sambs,* 97 Wis. 2d at 366–67; *Stanhope,* 90 Wis. 2d at 843.

[124] *Stanhope,* 90 Wis. 2d at 843 n.11; *Sambs,* 97 Wis. 2d at 367. The court has adopted the principle that a legislative limitation on recovery violates due process if the limitation is harsh and unreasonable compared to the alleged damages. *Sambs,* 97 Wis. 2d at 368, citing *Estate of Cargill v. City of Rochester,* 406 A.2d 704, 708, 709 (N.H. 1979).

[125] *Sambs,* 97 Wis. 2d at 368 (quoting *Cargill,* 406 A.2d at 708). *See also Stanhope,* 90 Wis. 2d at 843; *Maurin,* 274 Wis. 2d 28, ¶ 97 (Abrahamson, C.J., and Crooks, J., concurring).

not rationally related to the legislative objective of lowering medical malpractice insurance premiums.

¶ 114. A statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies.[126] A past crisis does not forever render a law valid.[127]

---

[126] *See Hanauer v. Republic Bldg. Co.,* 216 Wis. 49, 58–59, 255 N.W. 136 (1934) (quoting with approval *Chastleton Corp. v. Sinclair,* 264 U.S. 543, 547–48 (1924), stating that "[a] law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." *See also Baker v. Carr,* 369 U.S. 186, 254 (1962) (citing *Chastleton*). In *United States v. Carolene Products Co.,* 304 U.S. 144, 153 (1938), the Court stated:

> Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may properly be made the subject of judicial inquiry, *Borden's Farm Products Co. v. Baldwin,* 293 U.S. 194 . . . , and the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist. *Chastleton Corp. v. Sinclair,* 264 U.S. 543 (1924).

[127] Norman J. Singer, 2 *Sutherland Statutory Construction,* § 34:5, at 38, 40 (6th ed. 2000):

> Over a period of time social, political and economic changes may render a statute obsolete. . . . Where changed conditions have rendered a statute unconstitutional, the basis for its abrogation by court action is clear. It is well settled that the continued existence of facts upon which the constitutionality of legislation depends remains at all times open to judicial inquiry.

*See also* Norman J. Singer, 1 *Sutherland Statutory Construction,* § 2:6, at 41 (6th ed. 2000) ("Where validity of legislation depends on factual justification, if the pertinent facts are of such nature that they may change with the times, a statute or regulation

¶ 115. This court previously discussed caps on noneconomic damages and their impact on medical practice costs in 1995. In *Martin v. Richards,* this court was confronted with a due process constitutional challenge to the retroactive application of the $1,000,000 cap. The argument favoring the constitutionality of the retroactive application of the cap was that a cap on noneconomic damages prevents high awards and therefore keeps medical malpractice insurance premiums from rising. The court acknowledged having "seen these arguments raised in other forums and the media"[128] and being "familiar with the generic reasons which are often cited for caps on noneconomic damages."[129]

¶ 116. The court went on to conclude, however, that a retroactive application of the $1,000,000 cap was unconstitutional because the cap would have a negligible effect on malpractice costs in the state and would not further the purposes asserted.[130]

which is valid at one time may become invalid at a later time, and vice versa." (citing *Chastleton Corp. v. Sinclair,* 264 U.S. 543 (1924))).

[128] *Martin,* 192 Wis. 2d at 203.

[129] *Id.* at 205.

[130] *Id.* at 203–05.

The North Dakota Supreme Court reached a similar conclusion about the effect of caps, based on a review of the record, that the legislature was "misinformed or subsequent events have changed the situation substantially," that is, that there was no medical malpractice "crisis." Without a crisis to justify the restriction on recovery, North Dakota's $300,000 cap on medical malpractice economic and noneconomic damages violated equal protection guarantees. *Arneson,* 270 N.W.2d at 136.

Other courts have reached different conclusions about the effect of caps. *See, e.g., Judd v. Drezga,* 103 P.3d 135, 141 (Utah 2004) (examining articles and studies and determining that the cap was reasonably related to making medical malpractice and

¶ 117. The *Martin* court referred to several studies in making this point.

¶ 118. The studies showed that the $1,000,000 cap had an insignificant, if any, effect on medical malpractice costs, the express purpose of this legislation. The *Martin* court summarized the evidence as follows:

> First, evidence indicates that few individuals receive noneconomic damages in excess of $1,000,000. In fact, the U.S. Department of Justice Tort Policy Working Group found that only 2.7 percent of all medical malpractice claimants receive noneconomic damages in excess of $100,000. *See Report of the Tort Policy Working Group on the Causes, Extent and Policy Implications of the Current Crisis in Insurance Availability and Affordability,* U.S. Dept. of Justice, at 66, February 1986. Further, in those medical malpractice cases going to verdict where noneconomic damages above $100,000 are awarded, the noneconomic damages award aver-

health insurance rates affordable and that caps did help achieve that goal, even if only in small part); *Robinson v. Charleston Area Med. Ctr.,* 414 S.E.2d 877, 883 (W. Va. 1992) (upholding a $1 million cap on noneconomic damages; the legislative classification will be upheld "if it is reasonably related to the achievement of a legitimate state purpose."); *Zdrojewski v. Murphy,* 657 N.W.2d 721, 737–38 (Mich. Ct. App. 2003) (cap on noneconomic damages upheld against, *inter alia,* equal protection challenge); *Etheridge v. Med. Ctr. Hosps.,* 376 S.E.2d 525, 533–34 (Va. 1989) (upholding Virginia's $750,000 cap on total recovery, including economic loss, against equal protection challenge); *Murphy v. Edmonds,* 601 A.2d 102, 114–16 (Md. 1992) (upholding Maryland's $350,000 cap on noneconomic damages against equal protection challenge); *Adams v. Children's Mercy Hosp.,* 832 S.W.2d 898, 903–05 (Mo. 1992) (upholding a reduction of a $13 million noneconomic damage award to the capped amount of $250,000 against equal protection challenge for each of the two victims).

ages between $428,000—$728,000. *Id. See also* Gary J. Highland, *California's Medical Injury Compensation Reform Act: An Equal Protection Challenge,* 52 S. Cal. L. Rev. 829, 951 n.745 (recognizing that nationally, fewer than 1 percent of all awards in 1970 exceeded $100,000); *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825, 836 (1980) (noting as significant the fact that " 'few individuals suffer non-economic damages in excess of $250,000' [the legislative cap in New Hampshire]" (citation omitted)). Acknowledging that few individuals receive damages in excess of $1,000,000, we can safely assume that the number of persons retroactively affected by the law whose jury awarded noneconomic damages exceed $1,000,000 is too insignificant to have an affect [sic] on future malpractice costs.[131]

¶ 119. The *Martin* court concluded then that "these assertions [of the effect of the cap on medical malpractice insurance costs] are supported by a paucity of evidence."[132] Subsequent reports and commentary[133] support this court's conclusions in *Martin*.[134]

¶ 120. The Wisconsin Commissioner of Insurance is charged by law to report every two years on the impact of 1995 Wisconsin Act 10 (which adopted the

---

[131] *Martin,* 192 Wis. 2d at 203–04.

[132] *Id.* at 203.

[133] Gfell, *supra* note 12, at 804 (citing U.S. General Accounting Office, *Medical Malpractice: Effects of Varying Laws in the District of Columbia, Maryland and Virginia* (1999)).

[134] Gfell, *supra* note 12, at 804 ("If medical malpractice insurance premiums have had any effect, most sources indicate it has been relatively small."); Elizabeth Stewart Poisson, Comment, *Addressing the Impropriety of Statutory Caps On Pain and Suffering Awards in the Medical Liability System,* 82 N.C. L. Rev. 759, 767–70 (2004) (discussing a variety of other factors that may well be more of an impact on medical malpractice premium rates).

cap and other measures).[135] The Commissioner of Insurance's 2005 report on the impact of 1995 Wis. Act 10 draws similar conclusions to the Commissioner's reports issued in 2003, 2001, 1999 and 1997. The 2005 Report's bottom line conclusion is that "the only discernable effect on these areas has been [a] reduction in the actuarially determined assessment levels [of the Fund] over the last seven years."[136]

¶ 121. As to the Act's impact on medical malpractice insurance premiums, the Commissioner indicates that a number of factors affect malpractice premium insurance rates, and that "it would be difficult to draw any conclusions from premium numbers based solely on the enactment of Wisconsin Act 10."[137] This is confirmation of the Commissioner's conclusions in 2003, 2001, 1999 and 1997.[138] The Commissioner also asserts

---

[135] Act 10 adopted the $350,000 cap on noneconomic damages and the requirements that damages for future medical expenses in excess of $100,000 be paid out periodically and that evidence of collateral source payments be admissible.

*See* Wis. Stat. § 601.427(9), requiring the report to evaluate the effects that the Act has had on the following: (a) the number of health care providers practicing in Wisconsin; (b) the fees that health care providers pay to the Fund; and (c) the premiums that health care providers pay for health care liability insurance. The Commissioner's report on the impact of the Act focuses on the $350,000 cap on noneconomic damages.

[136] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005).

[137] *Id.*

[138] *Id.;* Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2003) ("Therefore, it would be difficult to draw any conclusions from premium numbers based solely on the enactment of Wisconsin Act 10."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (July 25, 2001)

that "[n]o direct correlation can be drawn between the caps enacted in 1995 and current rate changes taking place in the primary market today."[139]

¶ 122. Nevertheless, the Commissioner does mention that "rate stability could be dramatically impacted for both the Fund and primary carriers should the caps be removed and insurers face unlimited non-economic damages."[140] But private insurers do not face the possibility of "unlimited" noneconomic damages because private insurer's liability, even without a cap on noneconomic damages, is $1,000,000 per occurrence and $3,000,000 per year.

¶ 123. Other studies support the Commissioner's finding that medical malpractice insurance premiums are not affected by caps on noneconomic damages. For example, studies by the U.S. General Accounting Office, a non-partisan federal government entity that is the audit, evaluation, and investigative arm of Congress, have concluded that a number of factors go into whether medical malpractice premiums increase or decrease and that there is no definitive correlation between caps on noneconomic damages and lower medi-

---

("Therefore, it would be difficult to draw any conclusions from premium numbers based solely on the enactment of Wisconsin Act 10."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 6, 1999) ("Therefore, it would be difficult to draw any conclusions from premium numbers based soley [sic] on the enactment of Wisconsin Act 10."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 20, 1997) ("Therefore, it would be difficult to draw any conclusions from premium numbers based solely on the enactment of Wisconsin Act 10.").

[139] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005).

[140] *Id.*

cal malpractice premium rates.[141] This conclusion was reached despite the recognition that losses on medical malpractice claims may constitute a large part of insurers' losses.[142]

[141] U.S. General Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates,* GAO-03–702 (June 2003) (indicating that while medical malpractice suits are one of the leading costs for insurance carriers, the effect on premium rates cannot be determined; a number of factors go into health care providers' premium rates); *see also* Melissa C. Gregory, *Note: Capping Noneconomic Damages in Medical Malpractice Suits is Not the Panacea of the "Medical Liability Crisis",* 31 Wm. Mitchell L. Rev. 1031, 1044–45 (2005) (same, citing General Accounting Office study); Health Insurance Association of America, *Issue Brief: Why Do Health Insurance Premiums Rise* (Sept. 2002) (indicating that rising consumer health insurance premiums are due to increases in the overall cost of health care and that "claims and consumer service" account for only 0.12 cents of every dollar spend on health care).

The Wisconsin Academy of Trial Lawyers provided a study discussing the effects of noneconomic damage caps on premiums, payouts and the availability of insurance coverage. *See* Martin D. Weiss et al., *Medical Malpractice Caps: The Impact of Non-Economic Damages Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage* (June 2, 2003) (Amicus Brief of Wisconsin Academy of Trial Lawyers, App. E-1). The problem with the Weiss Report, however, is that it uses only "median" figures in drawing its conclusions without providing the reader with the underlying data, averages, or even the range that gave rise to the median figures used. Therefore, a state that shows a median decrease in premiums may have actually had an average increase in premiums, or vice versa. It is impossible to draw any conclusions from the data and figures contained in the Weiss Report. Weiss reports a 5% *median* decrease in medical malpractice premiums in Wisconsin from 1991–2002.

[142] U.S. General Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates,* GAO-03–702 (June 2003).

¶ 124. One General Accounting Office study concluded that malpractice claims payments against all physicians between 1996 and 2002 tended to be lower and grew less rapidly in states with noneconomic damage caps.[143] The Office's ultimate conclusion was that these averages obscured wide variation between states and within a state from year to year.[144] The study's malpractice claims payments in cap and non-cap states therefore do not provide a rational basis for the connection between the cap and lower premiums.

¶ 125. Indeed, according to a General Accounting Office report, differences in both premiums and claims payments are affected by multiple factors in addition to damage caps, including state premium rate regulation, level of competition among insurers, and interest rates and income returns that affect insurers' investment returns.[145] Thus, the General Accounting Office concluded that it could not determine the extent to which

---

[143] U.S. General Accounting Office 03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 30 (Aug. 28, 2003), *available at* http://www.gao.gov (also available in Matthew Ferdon's Supplemental Appendix).

[144] *Id.*

[145] *Id.* at 7.

Another report also reached the conclusion that multiple factors affect medical malpractice premiums. The report stated that "[p]remiums in states with a cap on awards were 17.1% lower than in states without such caps." Kenneth E. Thorpe, *The Medical Malpractice 'Crisis': Recent Trends And The Impact Of State Tort Reforms* W4–26 (Jan. 21, 2004), *available at* http://content.healthaffairs.org/cgi/reprint/hlthaff.w4.20v1. The report defined a "cap on awards" as including states with caps on noneconomic damages and states with caps on all damages—noneconomic and economic. It is therefore impossible to draw any conclusions from this report on a cap's effect on premiums if only noneconomic damages are capped.

differences among states in premium rates and claims payments were attributed to damage caps or to additional factors.[146] For example, Minnesota, which has no caps on damages, has relatively low growth in premium rates and claims payments.[147]

¶ 126. One reason that the cap does not have the expected impact on medical malpractice insurance premiums may be that a very small number of claims are ever filed for medical injuries,[148] and even fewer of any eventual awards are for an amount above the cap.[149] Another reason may be that insurers incur significant

[146] U.S. General Accounting Office 03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* at 30, 37 (Aug. 29, 2003), *available at* http://www.gao.gov (also available in Matthew Ferdon's Supplemental Appendix). *See also* Mitchell S. Berger, Note, *Following the Doctor's Orders—Caps on Non-Economic Damages in Medical Malpractice Cases,* 22 Rutgers L.J. 173, 187–88 ("Data of the National Association of Insurance Commissioners indicates that the caps are not likely to affect malpractice premiums greatly.").

[147] U.S. General Accounting Office 03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 37 (Aug. 29, 2003), *available at* http://www.gao.gov (also available in Matthew Ferdon's Supplemental Appendix).

[148] U.S. Dep't of Health & Human Servs., *Addressing the New Health Care Crisis: Reforming the Medical Litigation System to Improve the Quality of Health Care,* at 15 (Mar. 3, 2003) ("Most victims of medical error do not file a claim . . . only 1.53% of those who were injured by medical negligence even filed a claim."); *see also* Joint Economic Committee, *The Perverse Nature of the Medical Liability System* (March 2005) (noting that only 3% of injured patients actually file suit against their health care provider).

[149] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (July 25, 2001) ("Over the last couple of years the Fund has seen claims that [are affected by] Act 10 and the noneconomic damages cap,

expense in defending non-meritorious claims.[150] The cap does nothing to eliminate the large number of meritless claims that are ultimately dismissed or dropped without any payments to the plaintiffs.[151] It is a reasonable inference that the cost of defending meritless suits contributes significantly to malpractice insurance premiums.[152]

¶ 127. Articles and studies, including a General Accounting Office study, indicated that in 1984, 57% to 70% of all claims resulted in no payment to the patient.[153] Wisconsin statistics are similar. According to information derived from the Office of Medical Mediation Panels,[154] from 1989 through 2004 a little more

---

however, this experience has not been significant."); U.S. General Accounting Office, *Medical Malpractice: Characteristics of Claims Closed in 1984,* GAO/HRD-87–55 (Apr. 1987) (4% of all claims, with all damages included, were over $250,000. *Id.* at 2. 2.1% of noneconomic damages were over $200,000. *Id.* at 50.).

[150] U.S. Dep't of Health & Human Servs., *Confronting the New Health Care Crisis: Improving Health Care Quality and Lowering Costs by Fixing Our Medical Liability System* (July 25, 2002), *available at* http://aspe.hhs.gov/daltcp/reports/litrefm.htm, (citing U.S. General Accounting Office, *Medical Malpractice: Characteristics of Claims Closed in 1984,* General Accounting Office/HRD-87–55, 18 (Apr. 1987) (cited in Gregory, *supra* note 141, at 1046).

[151] Gfell, *supra* note 12, at 779.

[152] Gregory, *supra* note 141, at 1046.

[153] U.S. General Accounting Office, *Medical Malpractice: Characteristics of Claims Closed in 1984,* GAO/HRD-87–55 (April 1987); Gregory, *supra* note 141, at 1046.

[154] Litigants must file a request for mediation with the Medical Mediation Panel System prior to or simultaneously with filing a court action. Office of Medical Mediation information is reprinted in the Amicus Curiae Brief & Appendix of the Wisconsin Academy of Trial Lawyers, at B-1.

than 10% of the claims filed resulted in verdicts, with only about 30% of those favorable to the plaintiffs. In 2004, out of the 23 medical malpractice verdicts in Wisconsin, only four were in favor of the plaintiffs.

¶ 128. Victims of medical malpractice with valid and substantial claims do not seem to be the source of increased premiums for medical malpractice insurance, yet the $350,000 cap on noneconomic damages requires that they bear the burden by being deprived of full tort compensation.[155] While one federal Executive Branch agency, the Department of Health & Human Services, indicated that "[t]he number of payments of $1 million or more [for all medical malpractice damages, not just noneconomic damages, has] . . . exploded in the past 7 years [in a number of states other than Wisconsin],"[156] the same has not been true in Wisconsin. The Director

---

[155] Berger, *supra* note 146, at 185–86.

[156] U.S. Dep't of Health & Human Servs., *Addressing the New Health Care Crisis: Reforming the Medical Litigation System to Improve the Quality of Health Care,* at 12 (Mar. 3, 2003).

In recent years, in conjunction with an Executive Branch push for federal medical malpractice reform, the Department of Health and Human Sevices' Office of the Assistant Secretary for Planning and Evaluation has produced a number of policy papers saying, in essence, "The litigation system is responsible for the crisis." *Id.* The report also notes that in two recent reports on Florida and Texas, noneconomic damages comprised 77% and 70%, respectively, of awards. No specific percentages are given for other states without caps, but in discussing "mega-awards" in non-cap states the report draws the conclusion, apparently from 17 jury "mega-awards" across 10 states spanning a six-year period, that noneconomic damages may comprise 50% or more of total awards.

A recent article concluded that medical malpractice payments have leveled off since 2000 and that any rise in malpractice payments is proportionate with overall changes in health

of the Wisconsin Patients Compensation Fund has written that Wisconsin has "not seen the huge jury verdicts that have been reported in other states . . . ."[157]

¶ 129. Based on the available evidence from nearly 10 years of experience with caps on noneconomic damages in medical malpractice cases in Wisconsin and other states, it is not reasonable to conclude that the $350,000 cap has its intended effect of reducing medical malpractice insurance premiums.[158] We therefore conclude that the $350,000 cap on noneconomic damages in medical malpractice cases is not rationally related to

care spending. Amitabh Chandra et al., *The Growth of Physician Medical Malpractice Payments: Evidence from the National Practitioner Data Bank,* W5–243, W5–247 (May 31, 2005), *available at* http://www.healthaffairs.org. Furthermore, the few large awards are not growing at the same pace as awards that would not be affected by a cap on damages. *Id.*

[157] Theresa Wedekind, *Patients Compensation Claims Experience,* WiscRisk (Wis. Patients Comp. Fund), Spring 2004, at 2.

There are million dollar awards, but they are infrequent. For example, in a recent case a jury awarded damages of $17.4 million on behalf of deceased Sarah Hegarty who, at age "16, died in 1998 after two years of medical treatment and 89 operations that followed her [trip to the hospital where she received negligent treatment.]" Derrick Nunnally, *Judge Reduces Malpractice Award,* Milwaukee J. Sentinel, Dec. 9, 2004, at B3. The circuit court apparently reduced the award, probably under its remittitur powers.

[158] Gfell, *supra* note 12, at 804 (citing U.S. General Accounting Office, *Medical Malpractice: Effects of Varying Laws in the District of Columbia, Maryland and Virginia* (1999)); *see also State ex rel. Ohio Acad. of Trial Lawyers v. Sheward,* 715 N.E.2d 1062, 1092 (Ohio 1999) ("[A] 1987 study by the Insurance Service Organization, the rate-setting arm of the insurance industry, found that savings from various tort reforms, including a $250,000 cap on noneconomic damages, were 'marginal to nonexistent.' " (quoted source omitted)).

the legislative objective of lowering medical malpractice insurance premiums.

3.

¶ 130. We next examine whether the $350,000 cap on noneconomic damages is rationally related to the legislative objectives of keeping the Fund's annual assessments to health care providers at a low rate and enabling the Fund to operate on a sound financial basis. These objectives should ultimately relate to the primary objective of lowering health care costs for Wisconsin consumers.

¶ 131. The Fund was created to provide excess liability coverage for health care providers.[159] The Fund is managed by a Board of Governors[160] and administered by the Office of the Commissioner of Insurance.[161]

¶ 132. "The [Fund] is funded through annual assessments paid by providers and through investment income."[162] Assessments are determined and collected based on a health care provider's specialty. For example,

---

[159] Wisconsin Legislative Audit Bureau Audit Summary, Report 94–29 (Dec. 1994).

[160] The Fund's Board consists of three insurance industry representatives, a member named by the Wisconsin Academy of Trial Lawyers, a member named by the State Bar Association, two members named by the Wisconsin Medical Society, a member named by the Wisconsin Hospital Association, four public members appointed by the Governor, and the Commissioner of Insurance, who serves as the Chair. *See* Wis. Stat. § 619.04(3).

[161] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2003).

[162] Legislative Fiscal Bureau, *Injured Patients and Families Compensation Fund (Insurance and Health and Family Ser-*

certified nurse anesthetists are placed in a category of providers that is assessed lower fees; those in the highest-risk specialties, like neurosurgeons and obstetric surgeons, are placed in a category of providers that is assessed higher annual fees.[163] Health care providers are required to participate in the Fund unless they qualify for an exemption.[164]

¶ 133. To determine how much the assessments will be for a given year, an actuarial consultant analyzes the Fund's loss experience and financial position and submits a fee level recommendation to a committee that in turn makes the recommendation for use by the Board.[165]

---

*vices)*, Paper #450 to Joint Committee on Finance 2 (May 17, 2005) (hereinafter Legislative Fiscal Bureau Paper #450).

[163] Legislative Fiscal Bureau, *Patients Compensation Fund (Insurance and Health and Family Services)*, Paper #458 to Joint Committee on Finance 13 (Apr. 23, 2003) (hereinafter Legislative Fiscal Bureau Paper #458).

[164] Legislative Fiscal Bureau Paper #450. Among the types of health care providers qualifying for exemptions are, for example: providers practicing less than 241 hours in a year; retired providers; state-, county- or municipal-employed providers; and providers who have never practiced in Wisconsin to date.

[165] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2003). The Board's rates often differ from the actuaries' recommended rates. Legislative Fiscal Bureau Paper #450. In five of nine fiscal years since July 1, 1985–86, the final fee levels were below the break-even fee levels estimated by the actuaries. The result is that the Board's ability to reduce the deficits is impeded. *Testimony of Peter Farrow, Executive Assistant to the Commissioner of Insurance, Relating to Medical Malpractice Reform before the Assembly Committee on Insurance, Securities, and Corporate Policy by the Office of the Commissioner of Insurance,*

¶ 134. The Fund estimates its "loss liabilities . . . based on estimates of what [the Fund] may be required to pay for malpractice incidents that have occurred but may not yet have been settled or even reported."[166] That is to say, total loss liability equals the amount the Fund would have to pay if every possible malpractice incident in a given year resulted in a lawsuit that eventually produced a settlement or trial verdict and award in favor of the injured patient.

¶ 135. The Fund has assets. The assets include cash and investment balances. Investment income accounts for 33% of the Fund's balance growth, $410.8 million since the Fund was created in 1975.[167]

¶ 136. When the Fund's "estimated loss liabilities exceed[] . . . cash and investments," the Fund runs an "accounting deficit."[168] The accounting balance as of June 30, 2003 was $7.9 million and was estimated to be approximately $21.0 million as of June 30, 2004.[169] Conversely, if cash and investments are greater than the estimated loss liabilities, the Fund runs a positive accounting balance.

---

Jan. 19, 1995, at 4 (available in the Amicus Curiae Brief and Appendix of the Wisconsin Academy of Trial Lawyers at App. I).

For the eight policy years from 1994–95 until 2001–02, the actuaries' recommendation was an average assessment increase, but the Board approved an average assessment decrease. Legislative Fiscal Bureau Paper #450; Legislative Fiscal Bureau Paper #458 at 5. For the policy year of 2004–05, the Board decreased assessments by 20%. Legislative Fiscal Bureau Paper #450 at 4.

[166] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund,* at 4 (Oct. 2004).

[167] *Id.* at 13.

[168] *Id.* at 4.

[169] *Id.* at 5.

¶ 137. The Fund uses an accrual accounting method.[170] That means that health care providers are assessed fees based on "estimates of what all claims would total over time for incidents that occurred in any given year, rather than on what the payout amount was for that year."[171] The accrual accounting method helps ensure that the Fund will have sufficient assets to pay all outstanding liabilities, including those not reported, if the Fund were to be discontinued.[172] The 1990s also saw the Fund's Board increase reserves to further ensure that it could pay any outstanding claims if the Fund was eliminated.[173] As of June 30, 2003, the Fund's cash and investment balances have grown to $658.9 million.[174]

¶ 138. The Fund has not always used the accrual accounting method. For the first five years of the Fund's existence starting in 1975, it operated on a cash basis.[175] That is, health care providers were charged assessments based on the actual payout for malpractice claims in a given year.[176]

---

[170] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

[171] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

[172] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

[173] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

[174] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 4 (Oct. 2004).

[175] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

[176] Legislative Fiscal Bureau Paper #450 at 3; Legislative Fiscal Bureau Paper #458 at 4.

¶ 139. Switching from the cash basis to accrual accounting was an attempt to improve the integrity of the Fund. The accrual accounting method brings with it a degree of uncertainty because predicting what claims might be filed and eventually result in payment by the Fund is "highly uncertain," and the result has been that "actual expenditures have been much lower than projected expenditures."[177] As a result, the Fund has historically paid out much less than its projected expenditures.[178]

¶ 140. Since fiscal year 1984–85, the loss liability estimates for the Fund have been reduced, both in years in which there was a cap and in years in which there was no cap.[179] The actuarial original losses for the last 20 years have been reduced over time by a net amount of $217.3 million, representing 13.9% of the original total losses estimated for those years.[180]

¶ 141. Predictions about jeopardy of the Fund's financial status as evidenced by oft-indicated deficits is unfounded, as the Fund actually ran surpluses in years both with and without a cap.

¶ 142. Simply put, the actuaries have consistently overestimated the amount of losses the Fund would incur in any given year. The overestimates of loss, sometimes nearly $200 million in a given fiscal year, are illustrated by the following chart:

---

[177] Legislative Fiscal Bureau Paper #450 at 5; Legislative Fiscal Bureau Paper #458 at 5.

[178] Legislative Fiscal Bureau Paper #450 at 5; Legislative Fiscal Bureau Paper #458 at 5.

[179] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 5 (Oct. 2004).

[180] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 16 (Oct. 2004).

| Fiscal Year Ending | Published Surplus (Deficit) | Hindsight Surplus (Deficit) |
|---|---|---|
| No Cap in Place (1979 – 1985) | | |
| 1979 | ($728,759) | ($15,648,947) |
| 1980 | ($1,919,872) | ($34,664,878) |
| 1981 | ($7,016,326) | ($45,144,847) |
| 1982 | ($8,954,431) | ($62,817,470) |
| 1983 | ($19,826,057) | ($72,514,141) |
| 1984 | ($49,623,089) | ($81,211,029) |
| 1985 | ($79,624,322) | ($58,580,371) |
| In 1986, noneconomic damages were capped at $1,000,000. | | |
| 1986 | ($100,555,257) | ($69,795,008) |
| 1987 | ($112,101,947) | ($32,740,686) |
| 1988 | ($122,722,600) | ($25,156,233) |
| 1989 | ($108,256,349) | $14,292,005 |
| 1990 | ($73,597,992) | $57,623,296 |
| 1991 | ($71,679,588) | $94,005,693 |
| The $1,000,000 cap ended due to its "sunset" provision. | | |
| 1992 | ($78,982,681) | $110,252,749 |
| 1993 | ($71,613,641) | $126,753,323 |
| 1994 | ($67,903,761) | $120,337,198 |
| 1995 | ($57,722,772) | $135,133,860 |
| Cap on noneconomic damages re-established at $350,000. | | |
| 1996 | ($41,795,496) | $161,537,129 |
| 1997 | ($44,094,214) | $178,044,919 |
| Providers required to carry $1,000,000 of insurance. | | |
| 1998 | ($19,383,934) | $195,982,368 |
| 1999 | $8,579,767 | $194,099,916 |
| 2000 | $27,210,974 | $189,648,947 |

647

| 2001 | $28,724,959 | $165,777,386 |
| 2002 | $4,888,065 | $127,606,855 |
| 2003 | $7,932,348 | $82,655,325 |
| 2004[181] | $24,616,324 | n/a[182] |

¶ 143. According to the Legislative Fiscal Bureau's May 17, 2005 report to the Joint Committee on Finance, the Fund's balance sheet through fiscal year 2003–04 appears as follows:

---

[181] The numbers come from the Fund's audits and actuary. *See* Legislative Audit Bureau, *An Audit of: Patients Compensation Fund Fiscal Years Ended June 30, 1982 and 1981, 83–20* 16 (June 1983); Legislative Audit Bureau, *1986 Functional and Progress Report – Patients Compensation Fund*, (Mar. 23, 1987) (Exhibit 3); Legislative Audit Bureau, *An Audit of: Patients Compensation Fund, 93–18* 9, 10 (July 1993); Legislative Audit Bureau, *An Audit of: Patients Compensation Fund, 94–29* 17, 18 (Dec. 1994); Legislative Audit Bureau, *An Audit: Patients Compensation Fund, 98–7* 11, 12 (June 1998); Legislative Audit Bureau, *An Audit: Patients Compensation Fund, 01–11* 23, 24 (June 2001); Milliman & Robertson, Inc., Memorandum (reprinted in part in the brief and appendix of the Wisconsin Academy of Trial Lawyers at Appendix J-1).

The actuarial bases for the Fund's fiscal reports have been challenged. In light of these challenges, the Legislative Audit Bureau, a nonpartisan legislative service agency responsible for conducting financial and program evaluation audits of state agencies, recommended in 2001 that the Office of the Commissioner of Insurance contract for an audit of actuarial methods and assumptions used in estimating the Fund's loss liabilities. *See* Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 6, 21 (Oct. 2004). In February 2005 the Commissioner of Insurance contracted for an audit, but no report has been received. Legislative Fiscal Bureau Paper #450 at 9; Legislative Fiscal Bureau Paper #458 at 9.

[182] Hindsight means the actual deficit or surplus, not a forward-looking projected amount of the deficit or surplus.

| | Fund Financial Statement *As Published* | Hindsight Restatement Based on *Actuarial Studies 9/30/04* | |
|---|---|---|---|
| | | *Milliman*[183] | *Aon*[184] |
| 1. Total Fund Assets | 741,283,000 | 741,283,000 | 741,283,000 |
| 2. Fund Undiscounted Unpaid Claim Liabilities | 880,445,000 | 786,030,000 | 493,625,000[185] |
| 3. Offset for Investment Income | -213,948,000 | -165,427,000 | -105,638,000 |
| 4. Fund Discounted Unpaid Claim Liabilities (2 + 3) | 666,497,000 | 620,603,000 | 387,987,000 |
| 5. Total Fund Liabilities | 716,667,000 | 670,773,000 | 438,157,000 |
| 6. Fund Surplus (1 − 5) | 24,616,000 | 70,510,000 | 303,126,000 |

¶ 144. The above data illustrate that the Fund has operated and been fiscally sound when there were no caps on noneconomic damages, when there was a $1,000,000 cap on noneconomic damages, and since 1995 when there has been a $350,000 cap on noneconomic damages. The trend is likely to continue for the fiscal year ending in 2004: one actuary has projected the Fund's surplus for fiscal year 2003–04 as exceeding $303 million.[186]

¶ 145. The actuaries estimate that if the cap were vitiated effective May 1995, the Fund's undiscounted, unpaid claim liabilities might increase by as much as

[183] Long-time actuary for the Fund.

[184] New actuary retained to provide independent actuarial opinion of the Fund.

[185] Unpaid claim liabilities as of 9/30/04 represent estimates at an 85% confidence percentile.

[186] Legislative Fiscal Bureau Paper #450 at 10–11.

$144 million as of June 30, 2003.[187] But the Wisconsin Legislative Fiscal Bureau concluded that if up to $300 million were transferred out of the Fund, and if the assessment remained static at $31 million per year (the 2003–04 level) for the next ten years, the Fund would still be left with assets of $134.2 million in 2012, not including potential financial liquidation penalties.[188] The Fiscal Bureau concluded that the total assets in ten years could be sufficient to pay all claims, even with a static assessment of $31 million a year and a $300 million withdrawal.[189]

¶ 146. Even though as enacted in 1975, chapter 655 did not initially contain a cap on noneconomic damages in medical malpractice actions,[190] the Fund's fiscal position was a consideration in the 1975 enactment. Chapter 655 originally provided that if the Fund's cash flow were in jeopardy, there would be a $500,000 cap on certain damages.[191] The $500,000cash-flow-dependent cap was apparently never triggered.

[187] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 49 (Oct. 2004). According to the Legislative Fiscal Bureau, the retroactive amount of liability may increase by $150 million to $200 million. Legislative Fiscal Bureau Paper #450 at 8.

[188] "The total assets in ten years could be sufficient to pay all claims . . . ." Legislative Fiscal Bureau Paper #458 at 10.

[189] Legislative Fiscal Bureau Paper #458 at 10.

[190] *Maurin,* 274 Wis. 2d 28, ¶ 51.

[191] Wisconsin Stat. § 655.27(6) (1975) read, in relevant part, as follows:

AWARD LIMITATION. If, at any time after July 1, 1979, the commissioner finds that the amount of money in the fund has fallen below a $2,500,000 level in any one year or below a $6,000,000 level for any 2 consecutive years, an automatic limitation on awards of

¶ 147. The Fund's fiscal position was again a concern in the early 1980s during discussions about implementing a cap on damages in medical malpractice actions. In 1983, the Commissioner of Insurance sent a letter to the Governor expressing concern that the Fund may experience an accrual deficit in the future.[192] The Fund was not in danger of running a cash deficit. The drafting records for the 1986 legislation indicate that from 1978 to 1981, claims, and the "severity" of the claims, were increasing. The Governor responded that steps should be taken to ensure the Fund's financial position.[193]

¶ 148. The Legislative Council's Special Study Committee on Medical Malpractice grappled with the various issues in medical malpractice. In the May 1986 Special Session Assembly, the legislature adopted Bill 4, which capped noneconomic damages at $1,000,000. This legislation contained a "sunset" provision, that is, the $1,000,000 cap on noneconomic damages was set to expire in 1991 unless the legislature renewed it. The legislature did not renew the $1,000,000 cap on noneconomic damages, and therefore, from 1991 to 1994, noneconomic damages for medical malpractice claims were not capped.

¶ 149. It was not until 1995 that a cap on noneconomic damages in medical malpractice actions again

$500,000 for any one injury or death on account of malpractice shall take effect. This subsection does not apply to injury or death resulting from an incident of malpractice which occurred prior to the date on which such an award limitation takes effect. This subsection does not apply to any payments for medical expenses.

[192] Letter from Thomas O. Fox, Commissioner of Insurance, to Governor Anthony Earl (Oct. 25, 1983).

[193] Letter from Governor Anthony Earl to Thomas O. Fox, Commissioner of Insurance (Dec. 22, 1983).

came into effect. As originally drafted, the bill set the cap on noneconomic damages in medical malpractice at $250,000, consistent with a 1994 recommendation by the Special Committee created by the Fund's Board of Governors.

¶ 150. The Special Committee's 1994 report[194] analyzed the advantages and disadvantages of a $250,000 cap on noneconomic damages in medical malpractice actions. According to the report, the advantages were as follows:

- If the cap were retroactive it would reduce the deficit without collecting fees in excess of the actuarially determined break-even level;[195]

---

[194] The Special Committee to the Fund's Board of Governors prepared and submitted a Report to the Joint Legislative Audit Committee dated June 13, 1994.

In contrast with the Special Committee's recommendation, the Fund's Board of Governors recommended that a noneconomic damage cap be set at a level not to exceed $1 million. Commissioner of Insurance, *1994 Functional and Progress Report—Patients Compensation Fund,* at 4 (Feb. 22, 1995).

The Wisconsin Legislative Council Study Committee's bill file contains letters from various individuals and groups suggesting a number of alternatives, ranging from no cap to a return to the $1,000,000 cap. Predictably, groups aligned with doctors, insurance companies, and hospitals favored the $250,000 cap. Patients' advocates and lawyers suggested there be no cap.

No documents indicate why $350,000 was chosen over $250,000. The inference, of course, is that in adopting a $350,000 cap on noneconomic damages in medical malpractice cases, as opposed to $250,000, the legislature sought to balance patients' compensation for injuries with the potential reductions of the Fund's assessments.

[195] The Fund had a deficit as of June 30, 1994, on an audited basis of $67.9 million. *See* ¶ 142, *supra,* however, showing a $120.3 million hindsight surplus.

- The cap reduces the future anticipated payments of the Fund; and

- The cap may allow for claims to be settled more expeditiously.[196]

¶ 151. The disadvantages of imposing a $250,000 cap on non-economic damages were, according to the report, as follows:

- The cap limits a claimant's right to recovery for damages such as pain and suffering, loss of consortium, etc.;

---

The Fund's deficits are a projection of the unfunded liabilities that would remain outstanding if the Fund ceased to collect further assessments. The deficit represents a long-term shortage in the cash and investments balance that eventually will be needed to make the Fund's projected payments. The deficit was incurred primarily in its first 10 years of operation. Had the Special Committee's proposal that the cap be applied retroactively been adopted, the cap would have helped the Fund's deficit position. *See Martin v. Richards,* 192 Wis. 2d at 156 (declaring the retroactive application of the $1,000,000 cap unconstitutional on due process grounds). Because the damage cap does not apply to claims incurred prior to enactment of the cap, the $350,000 cap has no impact on the Fund's deficit position. Memorandum from Robert L. Sanders, Milliman & Robertson, Inc., to Danford C. Bubolz, Chief, Patients Compensation Fund 3 (Jan. 18, 1995) (available in Bill File at the Wisconsin Legislative Council, Madison, Wisconsin); Commissioner of Insurance, *1994 Functional and Progress Report— Patients Compensation Fund* 3, 4 (Feb. 22, 1995); Wis. Patients Comp. Fund, *Report To The Joint Legislative Audit Committee* (prepared by the Special Committee of the Board of Directors) Executive Summary 3, 14 (June 13, 1994).

[196] Wisconsin Patients Compensation Fund, *Report to Joint Legislative Audit Committee* (prepared by the Special Committee of the Board of Governors), Executive Summary at 14 (June 13, 1994).

- The cap has the greatest impact on the most severely injured patients; and

- The cap is subject to constitutional challenges.[197]

¶ 152. The prediction was that a cap would reduce the assessments charged by the Fund. To use the Special Committee's and Commissioner of Insurance's terminology, the Fund's break-even funding level would be reduced with a $250,000 cap. The break-even funding level is an estimate of assessment charges that would be needed to cover estimated losses for the year.[198] Over a five-year period beginning on June 30, 1994, if noneconomic damages were capped at $250,000, it was estimated that the Fund would have to take in approximately $67.8 million less in assessments on health care providers in order to break even.[199]

¶ 153. The contention that assessments would be reduced if the cap were adopted is consistent with other reports to the legislature. For example, a memorandum from Peter Farrow, the executive assistant to the Commissioner of Insurance, to Representative Sheryl Albers, Chair of the Assembly Committee on Insurance, Securities, and Corporate Policy, indicated a $350,000 cap would mean the Fund would have to take in $46

---

[197] Wisconsin Patients Compensation Fund, *Report to Joint Legislative Audit Committee* (prepared by the Special Committee of the Board of Governors), Executive Summary at 14 (June 13, 1994).

[198] Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 20 (Oct. 2004).

[199] Memorandum from Robert L. Sanders, Milliman & Robertson, Inc., to Danford C. Bubolz, Chief, Patients Compensation Fund 4 (Jan. 18, 1995) (available in Bill File for 1995 Wis. Act 10 at the Wisconsin Legislative Council, Madison, Wisconsin).

million less in assessments from health care providers.[200] If the cap were $1,000,000, the Fund would have to take in $32.3 million less in assessments over that five-year period.[201]

¶ 154. Fund assessments have been decreasing over the years.[202] In five reports from the Commissioner of Insurance, for 2005, 2003, 2001, 1999, and 1997, the Commissioner indicated that "the only discernible impact" of the $350,000 cap "on health care providers has been a reduction" in Fund assessments collected.[203] In any event, as we explain below, a reduc-

---

[200] Memorandum from Peter Farrow to Representative Sheryl Albers (Jan. 24, 1994) (available in Bill File for 1995 Wis. Act 10 at the Wisconsin Legislative Council, Madison, WI).

[201] Memorandum from Robert L. Sanders, Milliman & Robertson, Inc., to Danford C. Bubolz, Chief, Patients Compensation Fund 4 (Jan. 18, 1995) (available in Bill File for 1995 Wis. Act 10 at the Wisconsin Legislative Council, Madison, WI).

Total fee assessments taken in from health care providers for the relevant five-period would be $335.2 million if there was no cap on noneconomic damages; $267.4 million with a $250,000 cap; and $302.9 million with a $1,000,000 cap. Memorandum from Robert L. Sanders, Milliman & Robertson, Inc., to Danford C. Bubolz, Chief, Patients Compensation Fund (Jan. 18, 1995) (available in Bill File for 1995 Wis. Act 10 at the Wisconsin Legislative Council, Madison, WI).

[202] Legislative Fiscal Bureau Paper #450 at 4.

[203] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005) ("Analysis of these statistics determined the only discernable effect . . . has been an estimated $89 million . . . reduction in the actuarially determined assessment levels . . . over the last seven years."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10,* at 3 (May 12, 2003) ("[T]he only discernable impact of Wisconsin Act 10 on health care providers has been a reduction in fees collected . . .

tion in the assessments is not necessarily germane to the legislative objectives of lowering health costs to consumers or ensuring the availability of doctors in the state.

¶ 155. The goal of lowering health care provider assessments motivated raising the minimum amount of malpractice insurance health care providers are required to carry from $400,000 per occurrence and $1,000,000 per year to $1,000,000 per occurrence and $3,000,000 per year.[204] Testimony by Peter Farrow of the Office of the Commissioner of Insurance to the

over the last seven years."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (July 25, 2001) ("[T]he only discernable impact of Wisconsin Act 10 on health care providers has been a reduction in fees collected . . . over the last five years. However, the loss experience to date is too immature to validate the reduction."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 6, 1999) ("Analysis of these statistics determined the only discernable effect on these areas has been [a] . . . reduction[] of fees collected . . . over the last five years. However, it was further noted that loss experience to date is too immature to validate the reduction."); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 20, 1997) ("While analysis of these statistics determined that not enough time has elapsed since the enactment of Act 10 to allow for a conclusive analysis of its impact, it should be emphasized that explicit recognition of the cap has been made in the annual fee setting process for the Fund. Specifically, a reduction in . . . fees paid by Wisconsin health care providers for fiscal years 1995–1996 through 1997–1998.").

Another factor that may or may not have contributed to lower assessments is that health care providers were required in 1997 to carry increased levels of primary medical malpractice insurance. Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005).

[204] 1997 Wis. Act 11.

Assembly Committee on Judiciary offered the following observation regarding raising the minimum amount of malpractice insurance health care providers would have to carry:

> The actuaries for the Fund and the Plan have estimated that increasing the threshold [to $1,000,000/$3,000,000] will result in a reduction in fees providers pay to the Fund of 21 percent, and an increase to Plan policyholders ranging from 19 to 32 percent, depending on provider class.[205]

In effect, the Office of the Commissioner is saying that while Fund assessments on health care providers may go down, there will be a corresponding increase for health care providers in their malpractice insurance premiums. In fact, for some health care providers the increase in malpractice insurance premiums may be greater than the reduction in Fund assessments.[206] Any reduction in Fund assessments as a result of raising the required level of insurance must be viewed with an understanding that costs of medical malpractice insurance will rise as a result because private insurers will be liable for increased amounts.

¶ 156. So while Fund assessments may go down, it cannot be said that health care providers necessarily benefit from the reduction as a result of 1997 Wis. Act

---

[205] Wisconsin Office of the Commissioner of Insurance, *Testimony Relating to Assembly Bill 248 Before the Assembly Committee on Judiciary* 2 (Apr. 15, 1997) (available at the Wisconsin Legislative Council, Madison, WI).

[206] The Fund's assessments are levied against broad categories of health care providers as compared with medical malpractice insurance policies, which reflect more nuanced underwriting of risk.

11's requiring health care providers to shoulder more of the burden for private malpractice insurance.

¶ 157. The Fund has also played an important role in contributing to Wisconsin's reputation as a desirable place for health care providers to practice.[207] Since the Fund was created in 1975, only 609 out of 4,944 total claims have resulted in payment by the Fund.[208] Not only has the Fund not had to pay out in over 87% of medical malpractice claims naming the Fund,[209] but Wisconsin has "not seen the huge jury verdicts that have been reported in other states, although verdicts here occasionally range as high as three to eight million dollars."[210] The nature of jury verdicts in Wisconsin has been attributed to Midwesterners' sensibility.[211] For example, "Wisconsin settlements and jury verdicts worked out to be $1,711 per 1,000 people in the state" in 2001, while in "Pennsylvania, payouts came to $27,268 per 1,000 people."[212]

¶ 158. The Fund has flourished both with and without a cap. If the amount of the cap did not impact the Fund's fiscal stability and cash flow in any appreciable manner when no caps existed or when a $1,000,000 cap existed, then the rational basis standard requires more to justify the $350,000 cap as rationally related to the Fund's fiscal condition.

---

[207] Wedekind, *supra* note 157, at 2.

[208] *Id.* at 1.

[209] *Id.* at 2.

[210] *Id.* at 1.

[211] Tanya Albert, *A Tale of Two States: Different Approaches to Tort Reform* (May 12, 2003), *available at* http://www.ama-assn.org/amednews/2003/ind03.htm#05.

[212] *Id.*

4.

¶ 159. Next we turn to the legislature's fourth objective, lowering overall health care costs for the consumers of health care.

¶ 160. The question we must answer is whether there is a conceivable set of facts from which the legislature could conclude that a $350,000 cap on non-economic damages furthers the state's interest in controlling medical malpractice insurance costs for health care providers, thereby controlling health care costs for the people of the state.[213]

¶ 161. As we have explained previously, a $350,000 cap on noneconomic damages appears, at first blush, to be related to the legislative objective of keeping overall health care costs down. The central theory underlying the cap is that large payouts by insurance companies (because of large judgments and settlements) raise malpractice insurance premiums. Therefore, the theory goes, a limitation on damages means insurance companies pay out less. Because insurance companies are paying out less, they will be able to reduce the premiums they charge health care providers. If insurance premiums decrease, health care providers should be able to charge less, thereby lowering health care costs for patients.

¶ 162. The problem with this logic is that even assuming that a $350,000 cap affects medical malprac-

---

[213] A National Association of Attorneys General report concluded that insurance rates have risen not as a result of a medical malpractice crisis but as a result of poor management. Furthermore, the medical malpractice insurance industry enjoys higher profits than comparable insurance sectors. Gfell, *supra* note 12, at 803–04 (citations omitted).

tice insurance premiums and the Fund's assessments on health care providers, medical malpractice insurance premiums are an exceedingly small portion of overall health care costs.[214]

¶ 163. Overall health care costs in the United States are in excess of $1 trillion annually,[215] and are expected to reach $2 trillion by 2006.[216] The direct cost of medical malpractice insurance is less than one percent of total health care costs. For example, in 1992,

[214] Gfell, *supra* note 12, at 800 (citations omitted).

Because the cost of medical malpractice insurance premiums represents only a small component of the total burden borne by health care consumers, the Alabama Supreme Court concluded that "the correlation between the damage cap . . . and the reduction of health care costs to the citizens of Alabama is, at best, indirect and remote." *Moore v. Mobile Infirmary Ass'n,* 592 So. 2d 156, 168 (Ala. 1992).

[215] Alan Sager & Deborah Socolar, *Health Care Costs Absorb One-Quarter of Economic Growth, 2000–2005,* (Feb. 9, 2005), *available at* http://dcc2.bumc.bu.edu/hs/ushealthreform.htm.

[216] Joint Economic Committee, *Liability for Medical Malpractice: Issues and Evidence* 23 (May 2003), *available at* http://www.house.gov/jec/tort/05–06–03.pdf. The U.S. Congress Joint Economic Committee has recently, in conjunction with efforts to pass federal medical malpractice tort reform, issued policy papers "focusing on the cost and impact [of] excessive litigation" on health care costs. *Id.* at 1.

The Joint Economic Committee's primary task is reviewing economic conditions and to recommend improvements in economic policy. The Committee is not an independent or nonpartisan organization. The Committee's makeup reflects the makeup of the U.S. House of Representatives and U.S. Senate. This means that 60% of the Committee's current members are members of the Republican Party (six representatives and six senators); 40% are members of the Democratic Party (four representatives and four senators). The current chairman of the Committee is Representative Jim Saxton (R-NJ).

doctors paid five to six billion dollars in premiums, while the overall cost of health care nationwide reached $840 billion.[217] This is consistent with the findings of several commentators who conclude that medical malpractice insurance-related costs range from 0.56% to 2% of overall health care costs.[218] The non-partisan

[217] Gfell, *supra* note 12, at 800 (citations omitted); Berger, *supra* note 146, at 176 (citation omitted).

[218] *See, e.g.,* David B. Simpson, *Compulsory Arbitration: An Instrument of Medical Malpractice Reform and a Step Towards Reduced Health Care Costs?,* 17 Seton Hall Legis. J. 457, 459–60 (1993) (finding that in 1991 not even one percent of the total costs associated with health care could be attributed to medical malpractice premiums); Dennis J. Rasor, *Mandatory Medical Malpractice Screening Panels: A Need to Reevaluate,* 9 Ohio St. J. on Disp. Resol. 115, 119 (1993) (concluding that "[t]he cost of medical malpractice insurance can not be greatly responsible for the increase in the cost of medical care."); David Morrison, *In Search of Savings: Caps on Jury Verdicts Are Not a Solution to Health Care Crisis,* 7 Loy. Consumer L. Rep. 141, 149 (1995) (showing that Indiana's cap on damages has not resulted in a savings for health care consumers); Jacqueline Ross, Note, *Will States Protect Us, Equally, From Damage Caps in Medical Malpractice Litigation?,* 30 Ind. L. Rev. 575, 588 (1997) (medical malpractice insurance rates are a tiny percentage of overall health care costs); W. John Thomas, *The Medical Malpractice "Crisis": A Critical Examination of a Public Debate,* 65 Temp. L. Rev. 459, 506 n.329 (1992) (malpractice insurance premiums are less than one percent of health care costs); Thomas Horenkamp, Comment, *The New Florida Medical Malpractice Legislation and Its Likely Constitutional Challenges,* 58 U. Miami L. Rev. 1285, 1326 (2004) (medical malpractice insurance premiums amounted to one percent of total health care expenditures in 1988, 0.56% in 2000, and approximately one percent in 2004); Paul C. Weiler, *Reforming Medical Malpractice in a Radically Moderate—and Ethical—Fashion,* 54 DePaul L. Rev. 205, 208 (2005) (malpractice insurance and litigation costs are approximately one percent of total health care costs); Geoff Boehm,

661

Congressional Budget Office recently found that "even large savings in premiums can have only a small direct impact on health care spending—private or governmental—because malpractice costs account for less than 2 percent of that spending."[219]

¶ 164. The figures are similar in Wisconsin. Of every $100 spent on health care in Wisconsin between 1987 and 2002, less than one dollar can be traced to medical malpractice related costs.[220]

¶ 165. Therefore, even if the $350,000 cap on noneconomic damages would reduce medical malpractice insurance premiums, this reduction would have no effect on a consumer's health care costs. Accordingly, there is no objectively reasonable basis to conclude that the $350,000 cap justifies placing such a harsh burden on the most severely injured medical malpractice victims, many of whom are children.

¶ 166. We agree with those courts that have determined that the correlation between caps on noneco-

---

*Debunking Medical Malpractice Myths: Unraveling the False Premises Behind "Tort Reform"*, 5 Yale J. Health Pol'y & Ethics 357, 362 (2005) (suggesting the cost of medical malpractice insurance is about two percent of total health care costs).

[219] Congressional Budget Office, *Limiting Tort Liability for Medical Malpractice* (Jan. 8, 2004) (available in Matthew Ferdon's Supplemental Appendix).

[220] Medical malpractice insurance costs have steadily decreased as a percentage of health care expenditures in Wisconsin from just over 1.01% of health care expenditures in 1987 to .402% in 2002. The decrease is in both years with and without a cap on noneconomic damage awards. *See* Amicus Brief of Wisconsin Academy of Trial Lawyers, Appendix C-1, calculations derived from Office of the Commissioner of Insurance, Wisconsin Insurance Report years 1987–2002, and U.S. Census Bureau, Statistical Abstract of the United States: 2003 at 104, 107.

nomic damages and the reduction of medical malpractice premiums or overall health care costs is at best indirect, weak, and remote.[221]

5. 

¶ 167. To ensure quality health care in Wisconsin, the state has to attract and retain health care providers. The availability of health care providers is dependent on the availability of reasonably priced medical malpractice insurance, according to the 1975 legislative findings.[222] The legislature declared that "[t]he cost and

---

[221] *See, e.g., Martin,* 192 Wis. 2d at 204–05; *Moore,* 592 So. 2d at 168 ("We conclude that the correlation between the damages cap imposed by § 6–5-544(b) and the reduction of health care costs to the citizens of Alabama is, at best, indirect and remote."); *Carson,* 424 A.2d at 836 ("We find that the necessary relationship between the legislative goal of rate reduction and the means chosen to attain that goal is weak . . . ."). *See also Judd,* 103 P.3d at 147 (Durham, C.J., dissenting) ("Discussing his landmark Harvard study on medical malpractice, Paul Weiler notes the critical limitations of available evidence in determining the relationship between medical malpractice litigation and insurance premiums and the inherent unfairness and high social cost of damage caps as a response in the absence of any showing of their effectiveness.").

[222] In Wisconsin, the Wisconsin Health Care Liability Insurance Plan acts "as the insurer of last resort for doctors, hospitals, and other health professionals who are unable to find coverage in the private market." *See* Office of the Commissioner of Insurance, *Special Report, Wisconsin Health Care Liability Insurance Plan (WHCLIP): Preliminary Report on Medical Malpractice in Wisconsin,* Report Number IP13–92, at 1 (1992).

A report focusing exclusively on Pennsylvania mentions the exit of a medical malpractice insurer from the medical malpractice insurance market. Randall R. Bovbjerg & Anna Bartow,

the difficulty in obtaining insurance for health care providers discourages and has discouraged young physicians from entering into the practice of medicine in this state . . . ."[223]

¶ 168. Studies indicate that caps on noneconomic damages do not affect doctors' migration. The nonpartisan U.S. General Accounting Office concluded that doctors do not appear to leave or enter states to practice based on caps on noneconomic damages in medical malpractice actions.[224] The General Accounting Office found that despite extensive media coverage of physician departures from states, the numbers of physician departures reported were sometimes inaccurate and were actually relatively low.[225] The General Accounting Office further reported that the problems it was able to

*Understanding Pennsylvania's Medical Malpractice Crisis* (2003), *available at* http://medliabilitypa.org/research/. The report does not mention the national market share of the insurance company that is withdrawing from the market, but that insurance group accounted for only 3.3% of the Pennsylvania market. *Id.* at 8. The report draws no specific conclusions outside of Pennsylvania, noting that "Pennsylvania has been especially hard hit." *Id.* at 45. The report concludes, "No clear evidence yet exists as to the effects of the malpractice crisis on Pennsylvania's health care system." *Id.*

[223] *Maurin,* 274 Wis. 2d at Appendix (legislative findings).

[224] U.S. General Accounting Office, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care,* GAO-03–836 (Aug. 2003) *available at* http://www.gao.gov (finding that based on available data, there is no indication that increased premium costs had a widespread impact on health care access; the American Medical Association disputed these findings).

[225] U.S. General Accounting Office 03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 17 (Aug. 29, 2003), *available at* http://www.gao.gov.

confirm about shortages of doctors were limited to scattered instances, often in rural locations. The Office found that in most cases, providers identified long-standing factors in addition to malpractice pressures that affected the availability of services.[226]

¶ 169. The conclusions reached by the General Accounting Office are supported by other reports and studies.[227]

---

[226] *Id.* at 13.

[227] *See, e.g.,* Boehm, *supra* note 218, at 360–61 & n.17 (citing several studies that concluded medical malpractice insurance rates are not the cause of doctors leaving a state).

Isolated health care provider specialties in a few states have vigorously asserted that malpractice premiums are driving them out of state or practice. *See* Lauren Elizabeth Rallo, Comment, *The Medical Malpractice Crisis—Who Will Deliver the Babies of Today, the Leaders of Tomorrow?,* 20 J. Contemp. Health L. & Pol'y 509, 510–511 (2004) (discussing the protests by surgeons and obstetricians in several "problem" states, of which Wisconsin is not one).

Not all studies have reached the same conclusion as the General Accounting Office study. One recent study suggested that caps have resulted in an increased supply of certain types of doctors in rural areas. William E. Encinosa & Fred J. Hellinger, *Have State Caps On Malpractice Awards Increased The Supply of Physicians?* (May 31, 2005), *available at* http://www.healthaffairs.org.The article, published by the online journal *Health Affairs,* also noted that state caps on damages in medical malpractice actions instituted in 1985 had more of an effect than caps instituted in 1975. *Id.* The article cannot explain the anomaly. The article also does not mention or address the fact that Wisconsin had no cap on medical malpractice damages from 1991 to 1995. Further, the article noted that if the state's cap amount were set at a level over $250,000, there was no effect on the supply of doctors; if the cap amount were $250,000 there was only a 2% increase in the supply of doctors for some specialties in rural areas. *Id.* The study makes no findings as to health care

providers as defined by Wis. Stat. § 655.002, only the much narrower category of licensed physicians.

An unpublished study from 2003 paradoxically reaches the conclusion that a $500,000 cap on noneconomic damages increases the number of physicians in a state, but a $250,000 cap (or lower) does not. That is to say, according to the study, there is no statistical significance to a $250,000 cap as it pertains to the number of physicians in a state. *See* Jonathon Klick & Thomas Stratmann, *Does Medical Malpractice Reform Help States Retain Physicians and Does It Matter?* 9 (Oct. 2, 2003) (unpublished manuscript, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=453481). The study also notes that caps on total medical malpractice damages do not attract physicians, and in fact may drive them away. *Id.* The same with patients' compensations funds: If a state has a fund, it may drive physicians out of the state. *Id.* at 9–10. The study offers no firm conclusion as to the reason behind the inconsistent results.

Yet another study indicates that between 1970 and 2000 in states with caps on noneconomic damages, the percent increase in the number of physicians per capita was 95.7%. For states with no cap, or a cap that was overturned, the increase in physicians was only 79.1%. Fred J. Hellinger & William E. Encinosa, U.S. Dept. of Health & Human Services, *The Impact of State Law Limiting Malpractice Awards on the Geographic Distribution of Physicians* (July 3, 2003). No state listed in this study, with or without a cap, showed a decrease in the number of physicians. In fact, Wisconsin saw, according to this study, an increase in physicians of 104.5%. However, the study fails to take into account that for the 30–year period examined, Wisconsin did not have a cap for approximately half that time. Wisconsin's increase in physicians is consistent with 11 other states with no caps on noneconomic damages, and Wisconsin had a smaller increase than seven states without noneconomic damage caps (Alabama, Maine, New Jersey, North Carolina, Rhode Island, South Carolina and Tennessee).

health care providers in Wisconsin. The Commissioner's 2003 report shows a slight decrease in the number of providers. The Commissioner's 2005, 2001, and 1999 reports show a slight increase in the number of health care providers.[228] The Commissioner's reports do not attribute either the increases or decreases in the number of health care providers to 1995 Wis. Act 10, much less to the $350,000 noneconomic damages cap.[229]

¶ 171. Based on the available evidence, we cannot conclude that a $350,000 cap on noneconomic damages is rationally related to the objective of ensuring quality health care by creating an environment that health care providers are likely to move into, or less likely to move out of, in Wisconsin. The available evidence indicates that health care providers do not decide to practice in a particular state based on the state's cap on noneconomic damages.

[228] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2005); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 12, 2003); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (July 25, 2001); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 6, 1999); Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* (May 20, 1997).

[229] The recent study by Duke University Law Professor Neil Vidmar, commissioned by the Illinois State Bar Association, reported that despite claims by the American Medical Association that doctors were leaving the state as a result of medical malpractice actions and a rise in premiums, the facts did not support the AMA's assertion. Neil Vidmar, *Medical Malpractice and the Tort System in Illinois: A Report to the Illinois State Bar Association,* 73–82 (May 2005) (provided to the Illinois General Assembly on May 10, 2005).

¶ 172. Closely related to concerns about access is the practice of "defensive medicine."[230] Among the legislature's findings were that as a result of medical malpractice actions, "health care providers are often required, for their own protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care."[231] Defensive medicine, the argument goes, drives up the cost of health care because health care providers will order expensive and unnecessary tests to ensure that if they have to defend themselves against a claim, they can say they did everything possible for the health of the patient.

¶ 173. There is anecdotal support for the assertion that doctors practice defensive medicine,[232] although an "accurate measurement of the extent of this phenomenon is virtually impossible."[233] The Wisconsin Legislative Council Study Committee bill file contains a

---

[230] Defensive medicine has been defined as occurring "when doctors order tests, procedures, or visits, or avoid high-risk patients or procedures, primarily . . . to reduce their exposure to malpractice liability." Office of Technology Assessment, U.S. Congress, *Defensive Medicine and Medical Malpractice* 3 (1994), *available at* http://www.wws.princeton.edu/~ota.

[231] § 1(1)(f), ch. 37, Laws of 1975.

[232] American Medical Association, *Medical Liability Reform – NOW!* 8 (Dec. 3, 2004), *available at* http://www.ama-assn.org/go/mlrnow (indicating that 76% of doctors "believe that concern about medical liability litigation has negatively affected their ability to provide quality care in recent years.").

[233] Office of Technology Assessment, U.S. Congress, *Defensive Medicine and Medical Malpractice* 3–4 (1994), *available at* http://www.wws.princeton.edu/~ota. *But see* American Medical Association, *Medical Liability Reform – NOW!* 8 (Dec. 3, 2004), *available at* http://www.ama-assn.org/go/mlrnow ("The costs of defensive medicine are estimated to be between $70–$126 billion per year.").

number of letters from doctors who assert they have practiced defensive medicine. Similarly, the General Accounting Office recently found anecdotal evidence of the practice of defensive medicine by health care providers.[234]

¶ 174. Three independent, non-partisan governmental agencies have found that defensive medicine cannot be measured accurately and does not contribute significantly to the cost of health care.[235] The General Accounting Office study found that "the overall preva-

[234] U.S. General Accounting Office GAO-03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 6 (Aug. 2003), *available at* http://www.gao.gov.

One study limited to elderly Medicare patients with heart disease attempts to quantify the extent to which doctors practice defensive medicine without attributing its conclusions to caps on noneconomic damages alone, but rather to a combination of eight different reform measures. Daniel Kessler & Mark McClellan, *Do Doctors Practice Defensive Medicine?*, 111 Quarterly J. of Econ. 353 (1996). The study's conclusion is that "treatment of elderly patients with heart disease does involve 'defensive' medical practices . . . ." *Id.* at 388. The authors of the study "use[d] longitudinal data on all elderly Medicare recipients hospitalized for treatment of a new heart attack (acute myocardial infarction, or AMI) or of new ischemic heart disease (IHD) in 1984, 1987, and 1990 . . . " to draw their limited conclusions. *Id.* at 354. The study also defined "defensive medicine" as "a socially excessive level of care," which, in turn, was defined as "high expenditures per year of life saved . . . ." *Id.* at 355. Medicine was not "defensive" if it did not cost as much to keep the patient alive.

[235] Office of Technology Assessment, U.S. Congress, *Defensive Medicine and Medical Malpractice* 4 (1994), *available at* http://www.wws.princeton.edu/~ota; U.S. General Accounting Office GAO-03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 5–6 (Aug. 2003), *available at* http://www.gao.gov; Congressional Budget Office,

lence and costs of [defensive medicine] have not been reliably measured."[236] Findings about defensive medicine must be based on surveys of health care providers, and those

> surveys typically ask [health care providers] if or how they have practiced defensive medicine but not the extent of such practices. In addition, very few physicians tend to respond to these surveys, raising doubt about how accurately their responses reflect the practices of all [health care providers]. [The results] cannot be generalized more broadly [beyond anecdotal evidence].[237]

Other studies have concluded that defensive medicine does not significantly affect the cost of medicine[238] and

---

*Limiting Tort Liability for Medical Malpractice* (Jan. 8, 2004) (available in Matthew Ferdon's Supplemental Appendix).

[236] U.S. General Accounting Office GAO-03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care,* at 6 (Aug. 2003), *available at* http://www.gao.gov.

[237] *Id.* at 6, 28.

[238] Office of Technology Assessment, U.S. Congress, *Defensive Medicine and Medical Malpractice* 18 (1994), *available at* http://www.wws.princeton.edu/~ota.

> It is impossible to accurately measure the overall level and national cost of defensive medicine.
>
> . . . .
>
> Overall, a small percentage of diagnostic procedures—certainly less than 8 percent—is likely to be caused primarily by conscious concern about malpractice liability. This estimate is based on physicians' responses to hypothetical clinical scenarios that were designed to be malpractice-sensitive; hence, it overestimates the rate at which defensive medicine is consciously practiced in diagnostic situations.

*Id.* at 1.

"that 'some so-called defensive medicine may be motivated less by liability concerns than by the income it generates for physicians or by the positive (albeit small) benefits to patients . . . . [The Congressional Budget Office] believes that savings from reducing defensive medicine would be very small.' "[239]

¶ 175. The evidence does not suggest that a $350,000 cap on noneconomic damages is rationally related to the objective of ensuring quality health care by preventing doctors from practicing defensive medicine. We agree with the non-partisan Congressional Budget Office's finding that evidence of the effects of defensive medicine was "weak or inconclusive."[240]

¶ 176. The North Dakota Supreme Court, reaching the same result we reach in this case in invalidating North Dakota's cap on medical malpractice economic and noneconomic damages, summarized its holding well, as follows:

> At the beginning of this opinion we quoted the preamble of the statute, containing its legislative purposes. These include assurance of availability of competent medical and hospital services at reasonable cost, elimi-

---

[239] Boehm, *supra* note 218, at 363 (citing U.S. Cong. Budget Office, *Limiting Tort Liability for Medical Malpractice* 6 (2004)). *See also* Michelle M. Mello & Troyen A. Brennan, *Deterrence of Medical Errors: Theory and Evidence for Malpractice Reform,* 80 Tex. L. Rev. 1595, 1607 (2002) (discussing potential deterrent effects of medical malpractice liability and indicating that "[i]t is likely that defensive medicine, to the extent that it ever took place, has diminished over time in response to the growing presence of managed care.").

[240] Congressional Budget Office, *Limiting Tort Liability for Medical Malpractice* (Jan. 8, 2004) (available in Matthew Ferdon's Supplemental Appendix).

nation of the expense involved in nonmeritorious malpractice claims, provision of adequate compensation to patients with meritorious claims, and the encouragement of physicians to enter into practice in North Dakota and remain in such practice so long as they are qualified to do so.

Does the limitation of recovery of seriously damaged or injured victims of medical negligence promote these aims? We hold that it does not and that it violates the Equal Protection Clause of the State Constitution. Certainly the limitation of recovery does not provide adequate compensation to patients with meritorious claims; on the contrary, it does just the opposite for the most seriously injured claimants. It does nothing toward the elimination of nonmeritorious claims. Restrictions on recovery may encourage physicians to enter into practice and remain in practice, but do so only at the expense of claimants with meritorious claims.[241]

## V. OTHER STATUTES

¶ 177. The Fund (and the amici who support the Fund's position) argue that striking down the $350,000 cap on noneconomic damages for common-law medical malpractice actions will mean the end to caps in a variety of other contexts.[242] This "the sky is falling" argument is unpersuasive. We rest our decision on

---

[241] *Arneson,* 270 N.W.2d at 135–36.

[242] Numerous non-party briefs were received in conjunction with this case. Non-party briefs were filed by the Wisconsin Academy of Trial Lawyers; Wisconsin Coalition for Civil Justice and Wisconsin Manufacturers and Commerce; Wisconsin Hospital Association, Inc. and the American Hospital Association; Wisconsin Insurance Alliance, Physicians Insurance Company of Wisconsin and Property Casualty Insurers Association of America; and Wisconsin Medical Society and the American Medical Association.

equal protection grounds. Thus, the decision is limited to the statutes (Wis. Stat. §§ 655.017 and 893.55(4)(d)) at issue in the instant case and the facts and rationales motivating and supporting the enactment of the statutes.

¶ 178. To determine the constitutionality of a statute, the classification in the statute must be analyzed along with the objectives of the statute. The analysis of each statute under equal protection will be different if circumstances so warrant, because the facts and rationales motivating and supporting the enactment of the statutes will most likely be different. Past Wisconsin challenges to various statutes that impact damages awards illustrate this point.

¶ 179. First, our decision does not impinge on the no-fault guaranteed recovery workers' compensation system that replaced causes of action against employers.

¶ 180. Second, and perhaps more closely analogous to the cap on noneconomic damage awards in the instant case, is Wis. Stat. § 81.15, which caps the recovery of damages in actions for damages caused by highway defects. This statute has survived a constitutional challenge.[243] Municipalities were immune from suit at the adoption of the Wisconsin constitution, and concern about public finances as a result of numerous actions against municipalities for highway defects has justified the cap involved in that statute.

¶ 181. Third, amici also point us to another arguably analogous statute: Wisconsin's comparative negligence provision, set forth in Wis. Stat. § 895.045(1). This statute does not provide a cap on damages, but it

[243] *See Sambs v. City of Brookfield,* 97 Wis. 2d 356, 293 N.W.2d 504 (1980).

adjusts the amount of damages owed by a particular defendant based on the comparative negligence of the plaintiff. Amici do not argue that this statute violates equal protection.[244]

¶ 182. The amicus brief of the Wisconsin Coalition for Civil Justice and Wisconsin Manufacturers and Commerce gives yet another example of what proponents of the cap call a statutory "manipulation" of a jury damage award, the so-called "seat belt defense."[245] This statute operates as a reverse cap on damages. If a jury makes a finding, for example, that 30% of the damage caused to a plaintiff is due to the plaintiff's failure to wear a seat belt, the statute creates a ceiling on the plaintiff's liability for failure to wear a seat belt at 15%. The argument seems to go to the right to trial by jury. No equal protection challenges have been made to the seat belt defense statute.

¶ 183. We are therefore unconvinced that our holding today in any way undermines any of the statutes discussed by the Fund and amici.[246]

## VI. CONCLUSION

¶ 184. The court must presume that the legislature's judgment was sound and look for support for the legislative act. But the court cannot accept rationales so broad and speculative that they justify any

[244] *See Guzman,* 240 Wis. 2d 559, ¶ 54 (Schudson, J., dissenting) (asserting this statute is consistent with right to trial by jury).

[245] *See* Wis. Stat. § 347.48(2m)(g).

[246] Other statutes limit damages in certain circumstances. These statutes have not been raised or briefed by the parties.

enactment. "[W]hile the connection between means and ends need not be precise, it, at least, must have some objective basis."[247]

¶ 185. While we adhere to the concept of judicial restraint that cautions against substituting judicial opinion for the will of the legislature, we do not abdicate judicial responsibility. To hold that a rational basis exists for the $350,000 statutory cap on noneconomic damages in medical malpractice cases would amount to applying a judicial rubber stamp to an unconstitutional statute.

¶ 186. The invalid cap can be severed from the remainder of chapter 655 without frustrating the legislature's purpose in enacting chapter 655.[248] Chapter 655 has existed both with and without a cap on noneconomic damages since 1975.

¶ 187. For the reasons set forth, we conclude that the challengers have met their burden and have demonstrated that the $350,000 cap in Wis. Stat. §§ 655.017 and 893.55(4)(d) is unconstitutional beyond a reasonable doubt. We hold that the $350,000 cap on noneconomic medical malpractice damages set forth in Wis. Stat. §§ 655.017 and 893.55(4)(d) (adjusted for inflation) violates the equal protection guarantees of the Wisconsin Constitution. We therefore need not, and do not, address the other constitutional challenges Matthew Ferdon asserts against the cap.

¶ 188. For the reasons set forth, we do not address the second and third questions presented and remand them to the circuit court. Accordingly, we reverse the decision of the court of appeals and remand the cause to the circuit court for further proceedings not inconsistent with this opinion.

---

[247] *Logan,* 455 U.S. at 442 (Blackmun, J., concurring).

[248] *See* Wis. Stat. § 990.001(11).

675

*By the Court.*—The decision of the court of appeals is reversed and the cause remanded.

¶ 189. N. PATRICK CROOKS, J. (*concurring*). I join the majority opinion and its holding that the $350,000 cap on noneconomic medical malpractice damages in Wis. Stat. §§ 655.015 and 893.55(4)(d) (2001–02) (adjusted for inflation) violates the equal protection guarantees of Article I, Section 1 of the Wisconsin Constitution. *See* majority op., ¶ 10. I write separately, however, to emphasize that statutory caps on noneconomic damages in medical malpractice cases, or statutory caps in general, can be constitutional. While the majority states that this case does not take issue with the constitutionality of all statutory caps, *see* majority op., ¶ 13, I want to stress that such caps can satisfy the requirements of the Wisconsin Constitution. However, I am convinced that the current cap on noneconomic medical malpractice damages is unconstitutional. The stated legislative objectives, when reviewed in accord with a rational basis test, provide insufficient justification for that cap under the equal protection clause and, further, the $350,000 cap is too low to satisfy the right to a jury trial as guaranteed in Article I, Section 5,[1] when considered in conjunction with the right to a remedy in Article I, Section 9[2] of the Wisconsin Constitution.

---

[1] Article I, Section 5 of the Wisconsin Constitution states in relevant part:

> The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided, however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof.

[2] Article I, Section 9 of the Wisconsin Constitution states in relevant part: "Every person is entitled to a certain remedy in

¶ 190. In Wisconsin, the history behind the legislature's setting of caps for noneconomic damages in medical malpractice actions demonstrates arbitrariness, and leads to a conclusion that a rational basis justifying the present cap was, and is, lacking. When Wis. Stat. ch. 655 was first enacted in 1975, there was no cap on noneconomic damages, but a $500,000 conditional cap that could be triggered if the Wisconsin Patient Compensation Fund's cash-flow was in jeopardy. *See* majority op., ¶ 133. Then, in 1986, the legislature set the cap at $1,000,000. This $1,000,000 cap remained in effect until 1991, when a sunset provision became effective. There was no cap on noneconomic damages from 1991 until the legislature passed the current statutory cap of $350,000 in 1995. Thus, the caps changed from nothing, to $1,000,000, back to nothing, and finally to $350,000 over the course of 20 years.

¶ 191. The legislative history behind this current cap further reveals no rational basis justification for settling on the amount of $350,000. The bill involved, as originally drafted, set a cap on noneconomic damages at $250,000. However, a number of alternatives were suggested throughout the legislative process, ranging from $1,000,000, to nothing, to $250,000, to $350,000. The final act set the cap at $350,000, without providing any explanation for the jump from the original $250,000. *See* majority op., ¶¶ 136–37. It appears quite clear that the legislature settled on an amount for the noneconomic damage cap without a rational basis for doing so. It seems as if the $350,000 figure was plucked

the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws."

out of thin air. Such an arbitrary cap, *see* majority op., ¶¶ 10, 177, "is violative of the equal protection clause in the Wisconsin Constitution, since it unduly burdens medical malpractice claimants without a rational basis that justifies . . ." its stated legislative objectives. *Maurin v. Hall*, 2004 WI 100, ¶ 214, 274 Wis. 2d 28, 682 N.W.2d 866, (Abrahamson, C.J. and Crooks, J., concurring). Statutory caps " 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation' in order to satisfy State equal protection guarantees." *Carson v. Maurer,* 424 A.2d 825 (N.H. 1980) (citation omitted).

¶ 192. I also conclude that this cap on noneconomic damages violates Article I, Section 5 when linked to Article I, Section 9 of the Wisconsin Constitution. Although the majority opinion does not fully address this issue, I conclude that these two provisions of the Wisconsin Constitution may be applied together to determine whether the noneconomic damages cap of $350,000 was set unreasonably low, thus making it unconstitutional on that basis as well. *See Maurin,* 274 Wis. 2d 28, ¶ 197 (Abrahamson, C.J. and Crooks, J., concurring). In this case, the jury awarded Ferdon $700,000 in noneconomic damages. The circuit court, however, had no choice but to reduce these damages to $410,322—the equivalent of the $350,000 cap adjusted for inflation. Consequently, Ferdon lost a significant portion of the full damage award—more than 41 percent—as determined by the jury. The jury verdict for damages was reduced by $289,678 in light of the $350,000 cap. While I recognize that the legislature may place a statutory cap on noneconomic damages in medical malpractice actions, the cap cannot be set

unreasonably low.[3] If $1,000,000 was the appropriate figure for the cap in 1986, how can a $350,000 cap satisfy the constitutional requirements nine years later? "Such a low cap on noneconomic damages effectively denies plaintiffs the constitutional right to trial by jury under Article I, Section 5 and, in turn, to a remedy as guaranteed by Article I, Section 9 of the Wisconsin Constitution." *Id.* (footnote omitted).

¶ 193. As Chief Justice Abrahamson and I noted in the *Maurin* concurrence, other jurisdictions have found similar state constitutional violations resulting from noneconomic damage caps in medical malpractice actions. For example, the Florida Supreme Court struck down its legislature's attempt to impose a $450,000 cap on noneconomic damages. In *Smith v. Department of Insurance,* 507 So.2d 1080 (Fla. 1987), the court read two provisions of its state constitution—access to courts for redress for a particular injury and trial by jury—in conjunction with one another. In doing so, the court stated:

> Access to courts is granted for the purpose of redressing injuries. A plaintiff who receives a jury verdict for, e.g., $1,000,000, has not received a constitutional redress for injuries if the legislature statutorily, and arbitrarily, caps the recovery at $450,000. Nor, we add, because the verdict is being arbitrarily capped, is the plaintiff receiving the constitutional benefit of a jury trial as we have heretofore understood that right. Further, if the

---

[3] I agree with the majority opinion that a statutory cap set too low may also violate the equal protection clause of the Wisconsin Constitution: "We have said that a statutory limit on tort recoveries may violate equal protection guarantees if the limitation is harsh and unreasonable, that is, if the limitation is too low when considered in relation to the damages sustained." Majority op., ¶ 111 (citations omitted).

legislature may constitutionally cap recovery at $450,000, there is no discernible reason why it could not cap the recovery at some other figure, perhaps $50,000 or $1,000, or even $1.

*Id.* at 1088–89.

¶ 194. In Maine, the Supreme Judicial Court determined that a statutory cap set too low could result in a denial of the constitutional right to trial by jury and a denial of the right to a remedy. In *Peters v. Saft,* 597 A.2d 50 (Me. 1991), the court stated that "it is conceivable that a statute could limit the measure of tort damages so drastically that it would result in a denial of the right to trial by jury and the denial of a remedy. . . ." *Id.* at 53. Other states have thought it necessary to overturn caps on similar grounds.[4]

¶ 195. In sum, I conclude that this particular cap on noneconmic damages, set arbitrarily and unreasonably low by the legislature, violates Article I, Section 1, as well as Article I, Section 5 interpreted in conjunction with Article I, Section 9, of the Wisconsin Constitution.

¶ 196. Wisconsin can have a constitutional cap on noneconomic damages in medical malpractice actions, but there must be a rational basis so that the legislative objectives provide legitimate justification, and the cap must not be set so low as to defeat the rights of

---

[4] *See also Kansas Malpractice Victims Coalition v. Bell,* 757 P.2d 251 (Kan. 1988), overruled in part not relevant here, by *Bair v. Peck,* 811 P.2d 1176 (Kan. 1991) (The Kansas Supreme Court struck down a bill capping noneconomic damages, finding them to be arbitrary and in violation of both the right to trial by jury and the right to a remedy under the Kansas Constitution.); *Lucas v. United States,* 757 S.W.2d 687, 690 (Tex. 1988) (citation omitted) (the Texas Supreme Court held that a statutory cap on noneconomic damages limited a litigant's "right of access to the courts for a 'remedy by due course of law.' ").

Wisconsin citizens to jury trials and to legal remedies for wrongs inflicted for which there should be redress.

¶ 197. For these reasons, I respectfully concur.

¶ 198. I am authorized to state that Justice LOUIS B. BUTLER, JR. joins in this concurrence.

¶ 199. DAVID T. PROSSER, J. (*dissenting*). Matthew Ferdon suffered a life-changing injury to his arm at birth as the result of medical malpractice. He deserves fair compensation. Years ago the legislature established a patients compensation system, including mandatory health care provider insurance and a Patients Compensation Fund, that will *assure* that Matthew and other medical malpractice victims receive *all* the economic damages such as medical expenses, physical therapy, and loss of earnings and earning capacity, that a judge or jury is prepared to award.

¶ 200. To stabilize liability costs in this guaranteed payment system, the legislature capped noneconomic damages that compensate a patient for such unquantifiable harms as pain and suffering. In 1995 this cap was $350,000. Because it was indexed for inflation, the cap today is $445,755.

¶ 201. Caps on noneconomic damages are part of a broad legislative strategy to keep health care affordable and available in a way that will benefit Wisconsinites as a whole. Even when this strategy works exactly as intended, it has the effect of limiting the noneconomic damages for some patients.

¶ 202. The principal issue presented in this case is whether the cap on noneconomic damages in Wisconsin medical malpractice cases is constitutional.

¶ 203. Some members of the court, irrespective of what they say in this opinion, believe that all caps on noneconomic damages are unconstitutional. In his con-

currence, Justice N. Patrick Crooks contends that some damage caps are constitutional but not the cap set by the legislature in this case.

¶ 204. "Our form of government provides for one legislature, not two." *Flynn v. DOA*, 216 Wis. 2d 521, 529, 576 N.W.2d 245 (1998). This court is not meant to function as a "super-legislature," constantly second-guessing the policy choices made by the legislature and governor. In part, this is because

> The legislature has the ability to hear from everybody —plaintiffs' lawyers, health care professionals, defense lawyers, consumer groups, unions, and large and small business. . . . And, ultimately, legislators make a judgment. If the people who elected the legislators do not like the solution, the voters have a good remedy every two years: retire those who supported laws the voters disfavor.

Victor Schwartz, *Judicial Nullification of Tort Reform: Ignoring History, Logic, and Fundamentals of Constitutional Law*, 31 Seton Hall L. Rev. 688, 689 (2001).

¶ 205. Today, a majority of this court utilizes several unacceptable tactics to invalidate a legislative act.

¶ 206. First, the majority relies on the Wisconsin Constitution, not the United States Constitution, to nullify legislation. This tactic assures that the court's decision will receive minimal scrutiny from legal scholars and no review by the United States Supreme Court.

¶ 207. Second, the majority alters the test for reviewing the constitutionality of legislation on equal protection grounds, where the legislation does not affect a fundamental right. It moves from a "rational basis" test, long established in our law, to an intermediate scrutiny test which it euphemistically labels "rational basis with teeth."

¶ 208. Third, the majority lays the groundwork for invalidating other damage caps and preventing the legislature from responding to this decision. When the court insulates its decisions from review by the United States Supreme Court and response by other branches of state government, it is effectively destroying the checks and balances in our constitutional system.

¶ 209. Fourth, the majority marshals non-Wisconsin studies and articles to undermine decisions made in and for Wisconsin by our legislature. The use of these studies is selective, not comprehensive, so that non-Wisconsin studies that would support our legislation are played down, overlooked, or disregarded.

¶ 210. Finally, in direct contradiction to the applicable level of scrutiny, the majority systematically minimizes the importance of facts that support the constitutionality of the legislation. For instance, the majority ignores the fact that certain types of malpractice insurance premiums have actually decreased in Wisconsin, while similar premiums have climbed in other states.

¶ 211. In this dissent, I will concentrate on three issues. First, I will discuss the majority's adoption of "rational basis with teeth," which, in reality, "is simply intermediate scrutiny without an articulation of the factors that triggered it."[1] Second, I will discuss the broad sweep of the majority's rationale in relation to the narrow issue before the court.

¶ 212. Finally, I will take issue with the majority's conclusion that the legislature had no rational basis for enacting the medical malpractice noneconomic damage cap.

---

[1] Gayle Lynn Pettinga, Note, *Rational Basis With Bite: Intermediate Scrutiny By Any Other Name*, 62 Ind. L.J. 779, 780 (1987).

## I

¶ 213. First, I disagree with the majority's ultimate determination of the applicable level of scrutiny.

¶ 214. Initially, the majority states: "We agree with the Fund that rational basis, not strict scrutiny, is the appropriate level of scrutiny in the present case." Majority op., ¶ 65. But the opinion gives rational basis a "makeover," and it reappears as "rational basis with teeth." ("Whether the level of scrutiny is called rational basis, rational basis with teeth, or meaningful rational basis, it is this standard we now apply in this case." Majority op., ¶ 80.) This obfuscation implies that these three standards are equivalent.

¶ 215. It should be apparent that these three different standards are not equivalent.[2] The "rational

---

[2] In a few cases decided in the 1980s, the United States Supreme Court appeared to use a higher order of rational basis review in a handful of cases without ever using the phrase "rational basis with bite." *See, e.g., City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985); *Williams v. Vermont,* 472 U.S. 14, 22–23 (1985); *Zobel v. Williams,* 457 U.S. 55 (1982).

In *City of Cleburne,* Justice Thurgood Marshall blasted the majority for its deception:

> To be sure, the Court does not label its handiwork heightened scrutiny, and perhaps the method employed must hereafter be called "second order" rational-basis review rather than "heightened scrutiny." But however labeled, the rational basis test invoked today is most assuredly not the rational-basis test of *Williamson v. Lee Optical of Oklahoma, Inc.;* 348 U.S. 483, (1955), *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522 (1959), and their progeny.

*City of Cleburne,* 473 U.S. at 458 (Marshall, J., concurring in part and dissenting in part).

Justice Marshall forecast that "[t]he suggestion that the traditional rational-basis test allows this sort of searching inquiry

basis with teeth" standard is actually closer to the "intermediate level of scrutiny" than to rational basis review. Compare the following definitions: 1) "Under intermediate scrutiny, the classification 'must serve important governmental objectives and be substantially related to achievement of those objectives.' " Majority op., ¶ 63 (citing *Craig v. Boren*, 429 U.S. 190, 197 (1976)); 2) The rational basis with teeth standard

---

creates precedent for this Court and lower courts to subject economic and commercial classifications to similar and searching 'ordinary' rational-basis review—a small and regrettable step back toward the days of *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)." *Id.* at 459–60.

The *Lochner* Court's infamous usurpation of legislative power has been relegated to the ash heap of history. Writing for the majority in *Ferguson v. Skrupa*, 372 U.S. 726 (1963), Justice Black summed up the Court's repudiation of *Lochner:*

> [*Lochner*] has long since been discarded. We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, "We are not concerned . . . with the wisdom, need, or appropriateness of the legislation." Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to "subject the State to an intolerable supervision hostile to the basic principles of our Government . . . ."

*Ferguson*, 372 U.S. at 730.

This court has also recognized that rational basis with "bite" is equivalent to "a middle level tier of judicial scrutiny." *State ex rel. Watts v. Combined Community Servs.*, 122 Wis. 2d 65, 81 n.8, 362 N.W.2d 104 (1984). *See also S. Dakota Farm Bureau, Inc. v. Hazeltine*, 202 F. Supp. 2d 1020, 1048 n.3 (D.S.D. 2002) ("rational basis with bite" is "heightened scrutiny"); *Am. Fed'n of Gov't Employees (AFL-CIO) v. United States*, 195 F. Supp. 2d 4, 12 n.12 (D.D.C. 2002).

685

focuses on the legislative means used to achieve the ends. This standard simply requires the court to conduct an inquiry to determine whether the legislation has more than a speculative tendency as the means for furthering a valid legislative purpose. "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."

Majority op., ¶ 78 (citing Gerald Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv. L. Rev. 1, 18–19 (1972)). Equating "rational basis" and "rational basis with bite" is "indefensible," a mere sleight-of-hand presaging the application of heightened scrutiny without the label.[3]

¶ 216. By contrast, the "rational basis" standard that this court has long adhered to is much more deferential.

"A legislative classification is presumed to be valid. The burden of proof is upon the challenging party to establish the invalidity of a statutory classification. Any reasonable basis for the classification will validate the statute. . . . The basic test is not whether some inequality results from the classification, but whether there exists any reasonable basis to justify the classification.

"Judicial response to a challenged legislative classification requires only that the reviewing court locate some reasonable basis for the classification made. The public policy involved is for the legislature, not the courts, to determine."

*Sambs v. City of Brookfield,* 97 Wis. 2d 356, 371, 293 N.W.2d 504 (1980) (citation omitted). Perfection is not required: the rational basis test, properly stated and

---

[3] Pettinga, *supra* n.1, at 802.

understood, "does not require a statute to treat all persons identically, but it mandates that any distinction have some relevance to the purpose for which the classification is made." *Doering v. WEA Ins. Group,* 193 Wis. 2d 118, 131–32, 532 N.W.2d 432 (1995).

¶ 217. The majority opinion's extensive discussion of the appropriate level of scrutiny stands in stark contradiction to our earlier cases. In cases like *Sambs,* the court was able to state the rational basis test in a few paragraphs. Here, pages and pages of obfuscation are required to disguise the majority's adoption of a new level of scrutiny never used before in Wisconsin. This requires the concurrence to refer to "*a* rational basis test" rather than "*the* rational basis test." Justice Crooks' concurrence, ¶ 189. In Wisconsin, until today, there was only one "rational basis test." Now there are two.

¶ 218. Constitutional law scholar Laurence Tribe describes rational basis with bite as "covertly heightened scrutiny," and warns that "covert use [of heightened scrutiny] presents dangers of its own." 2 Laurence H. Tribe, *American Constitutional Law* § 16.3 at 1443, 1445 (2d ed. 1988). Such a practice promotes arbitrariness and allows courts to "remain essentially unaccountable." *Id.*

¶ 219. The "unaccountability" Professor Tribe warns of is simple to perceive. In future cases, the majority will be able to rely on "rational basis with teeth" to invalidate legislation that does not suit the majority's fancy.

¶ 220. Professor Tribe further cautions that "with no articulated principle guiding the use of this more searching inquiry, even routine economic regulations may from time to time succumb to a form of review

reminiscent of the *Lochner* era." Today, the majority inaugurates the "*Ferdon* era."

¶ 221. As the majority admits, majority op., ¶ 79 n.95, Tribe argues that "A *far better approach* would subject to heightened review only those classifications determined to be quasi-suspect after explicit judicial debate over the reasons for so regarding them . . . ." 2 Laurence Tribe, *American Constitutional Law,* § 16.3 at 1445 (2d ed. 1988) (emphasis added).

¶ 222. The choice of the applicable level of scrutiny is extremely important. One treatise examining courts' treatment of noneconomic damage caps notes that,

> [t]hose decisions that have applied a rational basis test have almost uniformly upheld the statutory caps on noneconomic damages. In contrast, where the courts have invalidated such laws on equal protection grounds, the governing test has been more stringent, usually an "intermediate" level of scrutiny, or "heightened scrutiny, but not as demanding as strict scrutiny." 3 Jacob A. Stein, *Stein on Personal Injury Damages* § 19:3 (3d ed. 2005).[4]

¶ 223. The majority equates "rational basis" and "rational basis with teeth" as if the choice between them is unimportant. In fact the opposite is true: when process is respected, the level of scrutiny is often outcome-determinative. The majority's result-oriented focus made it necessary to disguise the level of scrutiny in an attempt to justify its result.

---

[4] *See also* Mitchell S. Berger, *Following the Doctor's Orders—Caps on Noneconomic Damages in Medical Malpractice Cases,* 22 Rutgers L.J. 173, 195–96 (1990) ("Those courts which have invalidated caps invariably apply a higher degree of scrutiny than the rational relationship test.").

## II

¶ 224. Second, I object to the exceedingly broad scope of the majority's rationale, in light of the narrow issue before us. The majority's studies and statistics are geared to support its position that the cap violates equal protection because "[t]hose who suffer the most severe injuries will not be fully compensated for their noneconomic damages, while those who suffer relatively minor injuries with lower noneconomic damages will be fully compensated." Majority op., ¶ 98.

¶ 225. Such a statement would be true of any cap on damages. All caps have that effect.[5] A perfect example is the cap limiting damages against state employees to $250,000.[6] Under the majority opinion, a plaintiff alleging that a state-employed health-care provider injured him could claim an equal protection violation on several theories. First, consistent with the majority opinion, the plaintiff could claim that the cap discriminates against plaintiffs who obtain awards above the cap. Second, the plaintiff could complain that the cap discriminates against young patients and patients with multiple family members. Third, the plaintiff could claim that the cap creates two classes of plaintiffs: those injured by state-employed health care providers and

---

[5] *See, e.g.,* Wis. Stat. § 893.82(6) (caps damages for plaintiffs suing state employees at $250,000). *See also* Wis. Stat. § 893.80(3) (caps damages for certain offenses committed by government officials in their official capacity at $50,000; when offense is by a volunteer fire company, damages cannot exceed $25,000); Wis. Stat. § 895.04(4) (caps damages for wrongful death of a minor at $500,000 and wrongful death of an adult at $350,000); Wis. Stat. § 973.20(4m) (limits, in some circumstances, the amount of restitution to be paid by a defendant convicted of certain sexual crimes to $10,000).

[6] Wis. Stat. § 893.82(6).

those injured by private health care providers. In light of this opinion, if an appropriate case were to come before us, the majority would have difficulty distinguishing a cap on malpractice by government-employed health care providers from a cap on malpractice by private health care providers.

¶ 226. It must be remembered in assessing the majority's disavowal of any impact of its decision beyond this case that the majority uses and quotes some of the reasoning that invalidated the retroactive application of a $1,000,000 noneconomic damages cap. *Martin v. Richards,* 192 Wis. 2d 156, 210, 531 N.W.2d 70 (1995). And just a year ago, two members of the current majority voted to strike down the cap on wrongful death damages.[7] The majority denounces any cap on medical malpractice because it "diminishes the deterrent effect of tort law." Majority op., ¶ 89. The implication is that medical doctors feel free to act negligently simply because there is a cap on noneconomic damages. The majority's citation of authority for this assertion is taken out of context, and stands only for the proposition that tort law is supposed to have a deterrent effect. Nothing in the cited hornbook discusses whether caps add to or detract from this effect.

### III

¶ 227. Finally, I strongly disagree with the majority's conclusion that the legislature did not have a rational basis to enact the cap on noneconomic damages in medical malpractice actions contained in Wis. Stat. § 893.55(4)(d).

---

[7] *Maurin v. Hall,* 2004 WI 100, ¶ 197, 274 Wis. 2d 28, 682 N.W.2d 866 (Abrahamson, C.J., and Crooks, J., concurring).

¶ 228. To understand the legislature's motivations, one must understand the history of the burgeoning medical malpractice problem over the final quarter of the twentieth century.

¶ 229. As of 1975, the legislature believed it faced a health care crisis. Ch. 37, Laws of 1975; *see also Maurin v. Hall*, 2004 WI 100, ¶¶ 49–50, 274 Wis. 2d 28, 682 N.W.2d 866; *State ex rel. Strykowski v. Wilkie*, 81 Wis. 2d 491, 509, 261 N.W.2d 434 (1978). Accordingly, it created chapter 655 of the statutes. Ch. 37, Laws of 1975. As part of that endeavor, it made eleven findings regarding the nature of the crisis. § 1, ch. 37, Laws of 1975; majority op., ¶ 86 n.101. Having set forth the legislative findings, the majority takes it upon itself to "summarize" the legislative findings into five judicial findings. Majority op., ¶ 86. From these summarized findings, the majority "deduces" legislative objectives.

¶ 230. The majority alleges that the first "objective" is "[e]nsur[ing] adequate compensation for victims of medical malpractice with meritorious injury claims." Majority op., ¶ 91.

¶ 231. The second objective, according to the majority, is to reduce the size of medical malpractice awards, thereby reducing malpractice insurance premiums. Majority op., ¶ 92.

¶ 232. The third objective, according to the majority, is to keep the annual Fund assessments at a reasonable rate and protect the Fund's financial status. Majority op., ¶ 93.

¶ 233. The fourth objective, according to the majority, is to reduce overall health care costs. Majority op., ¶ 94.

¶ 234. The fifth objective, according to the majority, is to encourage health care providers to practice in

Wisconsin, reducing the practice of defensive medicine, and retaining malpractice insurers in Wisconsin. Majority op., ¶ 95.

¶ 235. The majority takes a novel approach to nullifying the damage cap. Instead of concentrating its fire on Wisconsin's enactment of the damage cap, the majority attacks the effectiveness of *any* cap on noneconomic damages *anywhere,* and concludes that no such cap has had any effect at all on any of the five legislative objectives it deduced.

¶ 236. The breadth of this holding is staggering. It means that, contrary to the majority's narrow statement of the issue, it will be very difficult for Wisconsin legislators to re-enact a cap on noneconomic damages in the future. The majority has attempted to insulate its ruling from legislative reaction and redress by making its ruling so broad.

¶ 237. Accordingly, in the following sections of this dissent, I am compelled to cite not only local studies that show the effectiveness of the cap contained in Wis. Stat. § 893.55(4)(d), but also national studies establishing the effectiveness of medical malpractice caps.

¶ 238. The majority concludes that there is no rational relationship to *any* of the five objectives that it says might justify the cap. It is wrong on every count.

A. The Damage Cap Helps Ensure Adequate Compensation at Reasonable Cost

¶ 239. The majority's first "legislative objective," ensuring adequate compensation for plaintiffs, is not explicitly listed in the statutory findings. Nevertheless, it represents a reasonable summation of the whole purpose of Chapter 655 and exposes the absurdity of this court's holding that medical residents are not

covered by Chapter 655. *See Phelps v. Physicians Ins. Co.,* 2005 WI 85, 282 Wis. 2d 69, 698 N.W.2d 643.

¶ 240. As Justice Roggensack carefully explains in her dissent, Wisconsin's patients compensation system guarantees unlimited coverage of economic damages obtained in a settlement or at trial. It requires doctors to purchase liability insurance coverage and requires health care providers to pay annual assessments into the Fund. Thus, a cap helps ensure predictable and certain compensation for medical malpractice patients.

¶ 241. By contrast, plaintiffs in other kinds of tort cases, even wrongful death suits in which there is a statutory cap, sometimes may be able to prove more than a million dollars in noneconomic damages but they are rarely able to recover that amount from defendants. That is why underinsured motorist coverage is so important in motor vehicle accidents.

¶ 242. The majority belittles Ferdon's $410,000 award in noneconomic damages to supplement his $403,000 award for future medical expenses. *This money will be paid.* How many motorists purchase $500,000 in liability coverage in the event they injure another motorist, or $500,000 in underinsured motorist coverage for situations in which they are injured by another driver? If Ferdon were to suffer an equivalent injury in a work-related accident, would workers' compensation payments even come close to the total payment in this case?

¶ 243. To understand the stabilizing effect of the noneconomic damage cap, one must understand the nature of the unreformed medical malpractice liability system. "Taken as a whole, the [unreformed] medical liability system appears to be, quite simply, ineffective at consistently penalizing negligence. Appropriate acts

of medical care can easily result in large damage awards, while true acts of negligence go unpunished."[8] According to some studies, close to 70% of claims result in no payment, while a small amount of claims result in huge payments.[9] Because of frustration with the system, only about 1.5 percent of patients actually injured by medical malpractice even file a claim.[10]

¶ 244. The Wisconsin Commissioner of Insurance recently extolled the predictability and stability the statutory cap brings to the medical malpractice legal

---

[8] U.S. Congress, Joint Economic Committee, *Liability for Medical Malpractice: Issues and Evidence* at 11 (May 2003) (hereinafter U.S. Congress, Joint Economic Committee, *Liability for Medical Malpractice*). The majority disparages the Joint Economic Committee report as a "policy paper," despite the fact that the report cites abundant independent statistical evidence in support of its bottom line conclusion: caps work.

[9] According to one recent study, in a sample of 5524 malpractice cases, "0.9% resulted in jury verdicts for the plaintiff, 27.4% were settled before trial, 67.7% were dropped or dismissed, and 4% ended in a verdict for the defendant." William P. Gunnar, *Is There An Acceptable Answer To Rising Medical Malpractice Premiums?*, 13 Annals Health L. 465, 477 (2004).

[10] United States Department of Health & Human Services, *Addressing the New Health Care Crisis: Reforming the Medical Litigation System to Improve the Quality of Health Care* 15 (Mar. 3, 2003) (citing A.R. Localio, A.G. Lawthers, et al., *Relation between malpractice claims and adverse events due to negligence: Results of the Harvard Medical Practice Study III*, 325 New Eng. J. Med. 245 (July 25, 1991)) (hereinafter United States Department of Health & Human Services, *Addressing the New Health Care Crisis*). The majority disparages the DHHS report as a "policy paper," despite the fact that the report cites abundant independent statistical evidence in support of its bottom line conclusion: caps work.

arena.[11] Caps may contribute to an increased percentage of settlements, because plaintiffs are aware that unlimited noneconomic damages are not available.

¶ 245. The majority focuses all its attention on the few medical malpractice patients who do not benefit from the statutory scheme. This small minority of cases does not make the statutory scheme irrational.

B. The Damage Cap Reduces the Size of Malpractice Awards, Thereby Reducing the Size of Malpractice Insurance Premiums

¶ 246. The majority's second "objective" can be broken down into two component objectives: reducing the size of malpractice awards and reducing the size of malpractice insurance premiums.

1. The Cap Reduces the Size of Malpractice Awards

¶ 247. It would seem to be a simple, mathematical certainty that the cap on noneconomic damages reduces the size of some malpractice claims. However, the majority finds a way to disagree even with this unremarkable proposition, relying on two principal sources: older studies quoted in *Martin* and reports by the Wisconsin Commissioner of Insurance. One of the amici supporting the plaintiff asked the court to consider other national data such as the Internet "Weiss Ratings." None of the three sources provides substantial support for the majority's position.

---

[11] Wisconsin Office of the Commissioner of Insurance, *Report on the Impact of 1995 Wisconsin Act 10* 3–4 (May 12, 2005) (emphasis added) (hereinafter *Report on the Impact of 1995 Wisconsin Act 10*).

a. *Martin v. Richards*

¶ 248. In *Martin,* this court cited a 1986 study by the U.S. Department of Justice purporting to show that "few individuals receive noneconomic damages in excess of $1,000,000." *Martin,* 192 Wis. 2d at 203. The *Martin* court also considered other courts' statements of the average level of awards as of 1970, and as of 1980. *Id.* I do not dispute the accuracy of these 20 to 35–year old figures.

¶ 249. Nonetheless, the medical malpractice climate has changed in recent decades.

¶ 250. In 2003, a federal agency reported that "[t]he number of payments of $1 million or more reported to the [National Practitioner Data Bank] exploded in the past 7 years, not only in AMA crisis states such as New Jersey, Pennsylvania, and Ohio, but nationwide."[12] In more than five percent of all claims resulting in payment, the payout exceeds $1 million.[13] The maximum reported payout was $20,700,000.[14] Seven of the twenty highest verdicts in 2001 and 2002 were in medical malpractice cases.[15] In a recent Wisconsin case, a jury awarded noneconomic damages of $17.4 million.[16]

---

[12] United States Department of Health & Human Services, *Addressing the New Health Care Crisis* at 12.

[13] *Id.*

[14] *Id.*

[15] Gunnar, *supra* n.9, at 477.

[16] Derrick Nunnally, *Judge Reduces Malpractice Award,* Milwaukee Journal Sentinel (Dec. 9, 2004). The trial judge reduced these noneconomic "pain and suffering" damages to about $12 million dollars plus interest, an amount roughly twenty-five times the current cap.

¶ 251. A substantial part of the huge awards are comprised of non-economic damages. Recent studies have concluded that non-economic damages comprise 77 percent of awards.[17] In Texas, the average judgment in medical malpractice cases is now $2.1 million; 70 percent of that figure, on the average, is noneconomic damages.[18]

¶ 252. Last term in the *Maurin* case, a jury awarded the Estate of Shay Leigh Maurin $550,000 in noneconomic damages for her pain and suffering before her death. The doctor's negligence in diagnosis occurred on March 6, 1996. Shay died on March 8, 1996, less than 48 hours later. *Maurin,* 274 Wis. 2d 28, ¶¶ 9, 11. During a substantial part of this time she was unconscious. The facts of the case are tragic and heart-wrenching. But the fact that a jury awarded $275,000 in pain and suffering damages for each day she lived undermines many of the arguments made by the majority.

b. Report by Commissioner of Insurance

¶ 253. Second, the majority relies on reports by Wisconsin's Commissioner of Insurance. Specifically, the majority argues that the "bottom line conclusion" in the Commissioner's 2005 report is that "the only discernable effect on these areas has been . . . [a] reduction in the actuarially determined assessment levels . . . over the last seven years."[19]

¶ 254. In reality, the "bottom line" of the Commissioner's most recent report does not support

---

[17] United States Department of Health & Human Services, *Addressing the New Health Care Crisis* at 13.

[18] *Id.*

[19] Majority op., ¶ 120.

697

the majority's position. Contrary to the majority's assertion, the Commissioner's 2005 report does not "draw similar conclusions to the Commissioner's reports issued" in prior years. In the 2005 report, Commissioner Jorge Gomez stated:

> [I]t is important to note that any analysis of the effects of the enactment of Wisconsin act 10 is very difficult due to several factors including:
>
>> Many of the payments made on claims are a result of a settlement and not a jury trial. *The settlement amount takes into consideration the caps that exist;* therefore there is no discernable amount that can be attributed to a reduction due to the caps.
>>
>> It is not possible to determine the number of the claims that were not filed *due to a limited amount of economic damages in addition to the caps.*
>>
>> To conclude . . . Wisconsin's malpractice marketplace is stable. Insurance is available and affordable, and patients who are harmed by malpractice occurrences are fully compensated for unlimited economic losses. *Tort reform of 1995,* along with well regulated primary carriers and a well managed and fully funded Patients Compensation Fund *has resulted in the stable medical malpractice environment, and the availability of health care in Wisconsin.*[20]

¶ 255. The Commissioner's new report makes plain the impact of 1995 Act 10. The "bottom line conclusions" drawn by the Commissioner are as follows: 1995 Act 10 affects settlement amounts; it discourages some claims from being filed; and it has "resulted in [a] stable medical malpractice environment, and the avail-

---

[20] *Report on the Impact of 1995 Wisconsin Act 10* at 3–4 (emphasis added).

ability of health care in Wisconsin."[21] Accordingly, the Commissioner of Insurance, who is in an excellent position to evaluate the effect of 1995 Act 10, disagrees with the majority's conclusions.

c. National Data

¶ 256. Third, the majority cites a national study, the "Weiss Ratings," presented by the Wisconsin Academy of Trial Lawyers (WATL).[22] This report, according to WATL, showed the lack of any connection between noneconomic damage caps, plaintiffs' awards, and malpractice premiums. However, "this case is not about whether all caps, or even all caps on noneconomic damages, are constitutionally permissible. The question . . . is a narrow one: Is the $350,000 cap . . . on noneconomic damages in medical malpractice cases set forth in Wis. Stat. §§ 655.017 and 893.55(4)(d) constitutional?" Majority op., ¶ 13.

¶ 257. The Weiss report draws two broad conclusions. The first conclusion is that noneconomic damage caps are not holding down damage awards; for example, the median award in Wisconsin increased over 180% between 1991 and 2002, from about $90,000 to about $256,000.[23] However, it should be obvious that a cap will not effect a reduction in the *median* award until the *median* award becomes greater than the cap amount. As the cap amount, adjusted for inflation, is currently

---

[21] *Id.; contra* majority op., ¶ 120.

[22] Majority op., ¶ 123 n.141.

[23] Martin D. Weiss et al., *Medical Malpractice Caps: The Impact of Non-Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage* 3 (Weiss Ratings, Inc. June 2, 2003) (available online at http://www.weissratings.com).

$445,755, it would be impossible for the cap to reduce the *median* award of about $256,000.[24] A cap has the effect of reducing only the awards that are *above* the cap amount. Accordingly, the amount of the *median* payout is simply irrelevant.

¶ 258. Similarly, the majority cites a study from the General Accounting Office. As it did with the report by the Wisconsin Commissioner of Insurance, the majority is forced to twist the GAO's blunt conclusion that malpractice claims tended to be lower and grew less rapidly in states with noneconomic damage caps.[25] The majority's wordplay again reveals its disregard for any

---

[24] The *median* award is very different from the *mean* award. In statistical parlance, the *median* refers to "the middle value in a distribution, above and below which lie an equal number of values." *Heritage Dictionary of the English Language* 1120 (3d ed. 1992). By contrast, the *mean* is what, in everyday language, one would call the "average value of a set of numbers." *Id.* at 1116.

A simple example illustrates the point. Consider five noneconomic damage awards, in the following amounts: $50,000, $100,000, $200,000, $350,000, and $20 million. Consider further two states, one in which damages are uncapped and another in which noneconomic damages are capped at $350,000.

In both states, the *median* of this set of data is the middle number, $200,000. However, the *mean* of the data would be very different in the two states. In the uncapped state, the *mean* of the data is $4.14 million. In the capped state, the mean of the data is $210,000. The majority notes that "a very small number of claims are . . . for an amount above the cap." Majority op., ¶ 126. Thus, it is unremarkable that the cap has little if any effect on the *median* award. The Weiss Report's conclusion that the *median* award value is unrelated to the caps is similarly unsurprising. The Weiss Report apparently did not investigate the *mean* value of awards in capped versus uncapped states.

[25] Majority op., ¶ 124.

700

evidence supporting the legislature's action, in direct contradiction to hortatory statements elsewhere in the opinion.

¶ 259. In summary, "[c]aps on awards ... have had significant effects, in the direction and magnitude that is consistent with theory, prior evidence, and *common sense."* Patricia M. Danzon, *The Effects of Tort Reforms on the Frequency and Severity of Medical Malpractice Claims,* 48 Ohio St. L.J. 413, 417 (1987) (emphasis added). I agree with the Wisconsin Commissioner of Insurance and with the U.S. Department of Health and Human Services that the noneconomic damage cap helps control medical malpractice damage awards and creates a stable legal environment.[26] Accordingly, I disagree with the majority that there is no rational connection between 1995 Act 10's enactment of a cap and the size of damage awards.

2. The Cap Helps Reduce the Size of Malpractice Insurance Premiums

¶ 260. The majority also questions whether the damage cap has actually reduced malpractice insurance premiums. Majority op., ¶¶ 121–29. It trumpets a report by the GAO that multiple factors have contributed to increased malpractice insurance premiums. But even the GAO report concluded that "losses on medical malpractice claims—which make up the largest part of

---

[26] *See also* Patricia M. Danzon, *The Frequency and Severity of Medical Malpractice Claims: New Evidence,* 49 Law & Contemp. Probs. 57, 76 (1986) (concluding that "[t]he average impact of the various statutes to cap all or part of the plaintiff's recovery has been to reduce average severity by twenty-three percent.").

701

insurers' costs—appear to be the primary driver of rate increases in the long run."[27] The Congressional Budget Office concluded that federal caps on damage awards, in combination with other tort reforms, would reduce malpractice insurance premiums by 25 to 30 percent over the ten-year period between 2004 and 2013.[28]

¶ 261. The majority also attempts to disparage the Weiss report's conclusion that *Wisconsin* insurance premiums *dropped* by 5% during 1991–2002.[29] In that same eleven-year period, the median malpractice premiums rose between 35 and 50 percent in other states.[30]

¶ 262. Undeniable statistical evidence reveals that increases in malpractice insurance premiums are far lower in Wisconsin than in states without caps. For example, during the two-year period between 2001 and 2003, federal studies showed that the average highest premium[31] increased 5% in Wis-

---

[27] United States General Accounting Office, *Medical Malpractice Insurance: Multiple Factors Have Contributed to Increased Premium Rates (GAO-03–702)* at "Highlights" (June 2003); *see also id.* at 43.

[28] U.S. Congress, Congressional Budget Office, *Cost Estimate: H.R. 5 – Help Efficient, Accessible, Low-Cost, Timely Healthcare (HEALTH) Act of 2003* at 4 (Mar. 10, 2003).

[29] Martin D. Weiss et al., *Medical Malpractice Caps: The Impact of Non-Economic Damage Caps on Physician Premiums, Claims Payout Levels, and Availability of Coverage* 16 (Weiss Ratings, Inc. June 2, 2003) (*available at* http://www.weiss ratings.com).

[30] *Id.* at 16–17.

[31] Typically, the "average highest premium" refers to the highest premium increase among internal medicine, general surgery or obstetrics/gynecology specialists. United States Department of Health & Human Services, *Addressing the New Health Care Crisis* at 23.

consin.[32] Over the same time period, the cost for the same type of insurance coverage increased 45% in states without caps.[33] One study took care to note that this success in holding down premiums is "not accidental."[34]

¶ 263. As of 2004, in 28 states, medical malpractice insurers reported a loss ratio *above* 100 percent; that is, for each premium dollar received, more than one dollar is expected to be paid out.[35] As of 2001, medical malpractice insurers nationally paid out $1.53 in claims and expenses for each $1 in premiums collected.[36] On the other hand, Wisconsin reported the lowest ratio, 61.71 percent, of all reporting jurisdictions.[37]

¶ 264. Yet another recent empirical study showed that malpractice "[p]remiums in states with a cap on awards were 17.1 percent lower than in states without such caps."[38]

¶ 265. The majority simply chooses to disbelieve this evidence, claiming that "differences in both premiums and claims payments are affected by multiple factors in addition to damage caps, including state premium rate regulation, level of competition among

---

[32] *Id.*

[33] *Id.*

[34] *Id.* at 24.

[35] Joint Committee on Finance, *Injured Patients and Families Compensation Fund,* Paper #450, at 7 (May 17, 2005).

[36] Gunnar, *supra* n.9, at 482.

[37] Joint Committee on Finance, *Injured Patients and Families Compensation Fund,* Paper #450, at 7 (May 17, 2005).

[38] Kenneth E. Thorpe, *The Medical Malpractice 'Crisis': Recent Trends and the Impact of State Tort Reforms,* Health Affairs at W4–26 (Jan. 21, 2004) (at http://content. healthaffairs.org/cgi/reprint/hlthaff.w4.20v1).

insurers, and interest rates and income returns that affect insurers' investment returns." Majority op., ¶ 125.

¶ 266. The majority questions whether the crisis is real. *See* majority op., ¶ 160 n. 213. Consider this: St. Paul, for many years the number one medical malpractice insurer in the nation, announced in 2001 that it would completely abandon providing medical malpractice insurance because it was no longer profitable. In an unrelated section of the majority opinion, the majority notes that St. Paul provided only 3.3% of malpractice insurance in Pennsylvania. Majority op., ¶ 167 n. 222. Nationally, though, St. Paul "was the largest malpractice carrier in the United States, covering 9% of all doctors."[39]

¶ 267. However, even the studies the majority cites recognize that while there are several factors driving up the cost of insurance premiums, *malpractice awards are one of those factors.*[40]

¶ 268. For example, the GAO report conclusively showed that during 2001–02, states with caps experienced an average premium rate increase of 10%, as compared with a 29% increase for states without caps over the same period.[41]

¶ 269. As the majority admits, the Wisconsin Commissioner of Insurance is in accord: "rate stability

[39] U.S. Department of Health & Human Services, *Confronting the New Health Care Crisis: Improving Health Care Quality and Lowering Costs By Fixing Our Medical Liability System* at 14 (Jul. 24, 2002).

[40] *See* Health Insurance Association of America, *Issue Brief: Why Do Health Insurance Premiums Rise* at 13 (Sept. 2002).

[41] United States General Accounting Office, Pub. No. GAO-03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care* 31–32 (Aug. 2003) (*available at* www.gao.gov/new.items/d03836.pdf).

could be dramatically impacted for both the Fund and primary carriers should the caps be removed and insurers face unlimited non-economic damages."[42]

¶ 270. The majority's rejection of such straightforward statements and evidence provides further proof of its complete abandonment of the standard of review. As in other parts of its opinion, instead of searching for or constructing a rationale to support the legislature's action, the majority takes it upon itself to weigh competing evidence and decides the matter as if it were deciding a case on de novo review.

¶ 271. This court used to summarize the appropriate standard of review as follows: " 'Judicial response to a challenged legislative classification requires only that the reviewing court *locate some reasonable basis for the classification made.*' " *Sambs,* 97 Wis. 2d at 371 (emphasis added) (citation omitted). Now, instead of attempting to locate a rationale to support the caps, the majority searches for studies to discredit them.

¶ 272. The legislature had a rational basis to find that the noneconomic damage cap assists in reducing medical malpractice insurance premiums.

C. The Cap Protects the Fund's Financial Status and Keeps the Annual Provider Assessments to a Reasonable Level

¶ 273. The majority's third legislative objective should also be separated into two component objectives: preserving the Fund's financial status and keeping annual provider assessments to a reasonable level. On

---

[42] Majority op., ¶ 122 (citing *Report on the Impact of 1995 Wisconsin Act 10*).

both grounds, the legislature had a rational basis to conclude that the noneconomic damage cap serves the intended purposes.

1. The Cap Protects the Fund's Financial Status

¶ 274. In December 1994, the nonpartisan Wisconsin Legislative Audit Bureau compiled an accounting estimate revealing that the Fund was in dire economic straits.[43] The Fund had an accounting deficit of $67.9 million.[44] As the majority notes, this deficit dated from the Fund's "first 10 years of operation." Majority op., ¶ 150 n.195. "For a number of years, the Board ha[d] been studying ways to . . . retire its financial deficit."[45]

¶ 275. The Office of the Commissioner of Insurance prepared a fiscal estimate in connection with 1995 Assembly Bill 36, and concluded as follows:

> In evaluating the fiscal impact of 1995 AB 35,[46] OCI concentrated on its effect on the Fund. . . .
>
> . . . .
>
> . . . If a cap had been in place as of June 30, 1994, the break-even Fund levels could have been reduced by 19.0% or approximately $10.5 million. Over a five-year period the total cumulative savings resulting from a cap

---

[43] Wisconsin Legislative Audit Bureau, *Audit Summary: Patients Compensation Fund,* Document 94–29, at 1 (Dec. 1994).

[44] *Id.; see also* majority op., ¶ 150 n.195.

[45] Testimony of Peter Farrow, Executive Assistant to the Commissioner of Insurance, before the Assembly Committee on Insurance, Securities, and Corporate Policy, at 1 (Jan. 19, 1995).

[46] The reference to "1995 A.B. 35" is an obvious typographical error logically intended to reference 1995 A.B. 36. 1995 A.B. 35 concerned substitution of judges in criminal cases, and was never passed.

of \$250,000 enacted June 30, 1994, is projected to be \$67.8 million.[47]

¶ 276. Later, as the majority notes, the bill was revised to reflect an increased cap of \$350,000. A revised fiscal estimate was never done. Cumulative savings may have been used simply to reduce provider assessments. In retrospect, though, is it merely a fascinating coincidence that the Fund had a deficit of \$67.9 million, and the Commissioner of Insurance estimated the five-year savings to the Fund at \$67.8 million?

¶ 277. It is interesting to examine the Fund's deficit through the past twenty years, keeping in mind that the effects of tort reform often take three to five years to become apparent,[48] probably because of the lag time between enactment and the filing of claims based on events that occurred after enactment. With that in mind, consider the following data and commentary:

| Year | Surplus (Deficit)[49] |
| --- | --- |
| 1980–1981 | (8,000,000)* |

---

[47] Fiscal estimate for 1995 A.B. 36.

[48] Daniel Kessler and Mark McClellan, *Do Doctors Practice Defensive Medicine?*, 111 Quarterly J. of Econ. 353, 386 (1996).

[49] Figures marked with * are estimated from graphical data. *See* Wisconsin Legislative Audit Bureau, *An Audit of Patients Compensation Fund, Document 94–29* 7–8 (Dec. 1994) (Figure 1). Deficits between FY 1989–90 and 1991–92 are taken from Wisconsin Legislative Audit Bureau, *An Audit of Patients Compensation Fund, Document 93–18* 10 (July 1993). Deficits between FY 1992–93 and 1993–94 are taken from Wisconsin Legislative Audit Bureau, *An Audit of Patients Compensation Fund, Document 94–29* 18 (Dec. 1994). Deficit and surplus amounts between 1994–95 and 2001–02 are taken from Legislative Fiscal Bureau, *Paper #458: Patients Compen-*

| | |
|---|---|
| 1981–1982 | (9,000,000)* |
| 1982–1983 | (20,000,000)* |
| 1983–1984 | (50,000,000)* |
| 1984–1985 | (80,000,000)* |

Prior to 1985, no cap on noneconomic damages existed. 1985 Act 340 capped noneconomic damages at $1,000,000.

| | |
|---|---|
| 1985–86 | (100,000,000)* |
| 1986–87 | (112,000,000)* |
| 1987–88 | (122,700,000) |

Three years after 1985 Act 340 became law, the Fund's deficit began to decrease.

| | |
|---|---|
| 1988–89 | (108,300,000)* |
| 1989–90 | (73,597,992) |
| 1990–91 | (71,679,588) |

In 1991 the damage caps enacted in 1985 Act 340 were "sunset," meaning that no cap existed.

| | |
|---|---|
| 1991–92 | (78,982,681) |
| 1992–93 | (71,613,641) |
| 1993–94 | (67,903,761) |
| 1994–95 | (57,722,800) |

In 1994 the legislature studied whether to reenact caps. 1995 Act 10, reenacting caps, became law in May 1995.

---

*sation Fund* 7 (Apr. 23, 2003). The 2003–04 value is drawn from Wisconsin Legislative Audit Bureau, *An Audit: Injured Patients and Families Compensation Fund* 37 (Oct. 2004).

| 1995–96 | (41,795,500) |
| 1996–97 | (44,094,200) |
| 1997–98 | (22,166,700) |

Three years after the passage of 1995 Act 10, the Fund's fortunes dramatically improved, and it began to show an accounting surplus for the first time.

| 1998–99 | 8,579,800 |
| 1999–00 | 27,229,700 |
| 2000–01 | 28,460,500 |
| 2001–02 | 6,604,100 |
| 2002–03 | 7,935,026 |

¶ 278. The majority relies on its expertise in accounting to conduct a detailed fiscal analysis[50] and then declares

> The Fund has flourished both with and without a cap. If the amount of the cap did not impact the Fund's fiscal stability and cash flow in any appreciable manner when no caps existed or when a $1,000,000 cap existed, then the rational basis standard requires more to justify the $350,000 cap as rationally related to the Fund's fiscal condition.

Majority op., ¶ 158.

¶ 279. This analysis, while admittedly an inexact science, shows that the caps *do* have an impact on the Fund's fiscal stability. Recent estimates confirm this analysis.

¶ 280. On May 17, 2005, the Legislative Fiscal Bureau released Paper #450, relating to the Patients

---

[50] Majority op., ¶¶ 130–58.

Compensation Fund. The paper notes that this court upheld the cap on noneconomic damages in wrongful death cases, and had accepted review in the case at bar. The study notes that, according to actuarial estimates, "if Wisconsin's cap on noneconomic damages were to be declared unconstitutional, the potential fund liabilities may be increased by an estimated $150 million to $200 million."[51]

¶ 281. In 2001, the nonpartisan Legislative Audit Bureau reached the same findings: "Action by the Board of Governors and the Legislature . . . have contributed to a significant improvement in the Fund's financial position, which showed an accounting surplus of $27.2 million as of June 30, 2000."[52] The 2001 study specifically cited the legislature's re-establishment of a limit on awards for non-economic damages in 1995 as one of the reasons behind the Fund's stabilization.[53]

¶ 282. The nonpartisan study provided concrete evidence for this finding: "the Fund's claim payments were below $20 million in each year from FY 1997–98 through FY 1999–2000. In contrast, a number of recent medical malpractice cases in other states have resulted in verdicts of more than $30 million, including a $79 million verdict in New York, a $55 million verdict in Illinois, and a $40 million verdict in Texas."[54] In other words, thanks to the majority's action today, the Fund may be held liable for an award *in a single case* that

[51] Legislative Fiscal Bureau, *Paper #450: Injured Patients and Families Compensation Fund* 8 (May 17, 2005).

[52] Letter from Janice Mueller, State Auditor, to Senator Gary George and Representative Joseph Leibham, Co-chairpersons, Legislative Audit Committee (June 5, 2001).

[53] Legislative Audit Bureau, *An Audit: Patients Compensation Fund* 11 (June 2001).

[54] *Id.* at 12.

dwarfs the Fund's current *yearly* expenditures. It is impossible to conceive that this would not have a deleterious effect on the Fund.

¶ 283. The majority ignores this evidence. The legislature had a rational basis to believe that the cap would increase the financial stability of the fund.

### 2. The Cap Allows the Fund to Keep Provider Assessments to a Reasonable Level

¶ 284. The damage cap has also allowed the Fund to keep provider assessments low. Between fiscal year 1995–96 and fiscal year 2001–02, the Fund *increased assessments only once.*[55] In another year, there was no change in assessments. In the remaining five years, assessments decreased.[56]

¶ 285. The majority plainly states that one of the legislative objectives was to keep provider assessments to a minimum. After examining the data, despite its best efforts the majority is powerless to conclude that this objective has not been met. Accordingly, as the data do not support the answer the majority sought, the majority simply recasts the inquiry: "In any event, as we explain below, a reduction in the assessments is not necessarily germane to the legislative objectives . . . ." Majority op., ¶ 154. How can the majority make this claim after stating earlier in the opinion that keeping assessments low *was itself* one of the legislative objectives?

¶ 286. From an accounting perspective, it should be clear that the level of the assessments is tied in some way to the financial health of the Fund. As the Fund's

---

[55] *Id.* at 15.

[56] *Id.*

stability and assets increase, the assessments will go down. As already noted, the majority's removal of the cap will decrease the economic health of the Fund, and likely increase the provider assessments.

D. The Cap Reduces the Overall Cost of Health Care

¶ 287. The majority opinion does not allege that noneconomic damage caps do not reduce the cost of health care. Rather, the majority concentrates on the fact that "medical malpractice insurance premiums are an exceedingly small portion of overall health care costs." Majority op., ¶ 162. The majority equates small percentages with small costs.

¶ 288. A multitude of studies and statistics belie the majority's conclusion. First, a May 2003 study by the Joint Economic Committee of the United States Congress concluded that medical malpractice reform could produce $12.1 billion to $19.5 billion in annual savings for the federal government, and, by decreasing costs, increase the number of Americans with health insurance coverage by as many as 3.9 million people.[57] Another study estimated that the savings from national reform would be $70 to $126 billion dollars per year.[58]

¶ 289. The Congressional Budget Office has estimated that malpractice reforms, including the imposition of caps on noneconomic damages, would result in a 0.4 percent decrease in the price of health insurance.[59]

[57] United States Congress Joint Economic Committee, *Liability for Medical Malpractice* at 1.

[58] United States Department of Health & Human Services, *Addressing the New Health Care Crisis* at 11.

[59] U.S. Congress, Joint Economic Committee, *Liability for Medical Malpractice* at 22.

Nationwide, this would mean that an additional 385,000 Americans could obtain health insurance.[60]

¶ 290. While these figures may represent a small *percentage* of total health care costs or the total number of Americans, they are not inconsequential. There is no reason to believe that these findings are not also applicable, on a smaller scale, in Wisconsin. The legislature had a rational basis to believe that the imposition of damage caps would reduce overall health care costs and increase the availability of health insurance.

E. The Cap Encourages Providers to Stay in Wisconsin and Reduces the Practice of Defensive Medicine

¶ 291. The majority concludes that the existence of the cap does not encourage providers to stay in Wisconsin, nor does it reduce the practice of defensive medicine. I disagree on both counts.

1. The Cap Encourages Health Care Providers to Remain in Wisconsin

¶ 292. In one term, this court has transformed the medical malpractice climate in this state. In *Lagerstrom v. Myrtle Werth Hospital*, 2005 WI 124, ___ Wis. 2d ___, 700 N.W.2d 201, the court eviscerated the statute modifying the collateral source rule in medical malpractice actions. In *Phelps,* the court held that medical residents are not health care providers covered by Chapter 655. And today, the majority delivers its masterstroke—the abolition of the statutory cap on noneconomic damages.

¶ 293. The majority dismisses any potential consequences, citing a GAO study's tentative conclusion that, "doctors do not appear to leave or enter states to

[60] *Id.*

practice based on caps on noneconomic damages . . . ." Majority op., ¶ 168. However, the GAO study included limited data from only five states.[61] The majority claims that these conclusions "are supported by other reports and studies." Majority op., ¶ 169. This is simply incorrect.

¶ 294. The majority cites three other "studies." The first is a student-written comment.[62] Far from supporting the majority's mistaken premise, this article relates anecdotal evidence of physician migration from states without a noneconomic damage cap.[63] The majority latches on to the article's recognition that the AMA has not declared Wisconsin a "problem" state, majority op., ¶ 169 n.227, but the majority misses the point. Wisconsin is not in a medical malpractice crisis because the legislature has addressed it through tort reform. By undoing the work of the legislature, the majority will drag Wisconsin back into the crisis. It is disingenuous to claim that Wisconsin is not experiencing a physician migration problem and use that as a reason to get rid of the cap, when the cap is one reason that Wisconsin has no migration problem at this time.

¶ 295. Another article cited by the majority cites the GAO study already discussed, as well as several newspaper articles, but adds no independent research to the question.[64]

---

[61] U.S. General Accounting Office, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care, GAO03–836* 17 (August 2003) (*available at* http://www.gao.gov).

[62] Lauren Elizabeth Rallo, Comment, *The Medical Malpractice Crisis—Who Will Deliver the Babies of Today, the Leaders of Tomorrow?*, 20 J. Contemp. Heath L. & Pol'y 509 (2004).

[63] *Id.* at 510–11.

[64] Geoff Boehm, *Debunking Medical Malpractice Myths: Unraveling the False Premises Behind "Tort Reform"*, 5 Yale J. Health Pol'y, L. & Ethics 357, 360–61 & n.17.

¶ 296. The third article the majority cites is a policy paper presented to the Illinois State Bar Association and later the Illinois General Assembly.[65] The Illinois legislators obviously were not convinced by the assertions in the study—they enacted a $500,000 cap on noneconomic damages in medical malpractice actions shortly thereafter.[66]

¶ 297. Only one study has comprehensively surveyed this question. In 2003, the U.S. Department of Health & Human Services commissioned a study that evaluated data from 49 states over an extended time period.[67] This study concluded that "States with a cap average 24 more physicians per 100,000 residents than States without a cap. Thus, States with caps have about 12 percent more physicians per capita than States without a cap."[68]

¶ 298. This effect is even more pronounced in Wisconsin. The same study evaluated the supply of physicians in Wisconsin over the years 1970–2000, and found that the physician population increased by 104.5% over that time span.[69] Meanwhile, the average supply in states without caps increased by only 79.1%—a difference of over 25%.[70]

---

[65] Majority op., ¶ 170 n.229 (citing Neil Vidmar, *Medical Malpractice and the Tort System in Illinois: A Report to the Illinois State Bar Association,* 73–82 (May 2005).

[66] Dave McKinney, Chris Fusco, et al., *Medical Malpractice Caps Cleared,* Chicago Sun-Times (May 26, 2005).

[67] United States Dep't of Health & Human Servs., *The Impact of State Laws Limiting Malpractice Awards on the Geographic Distribution of Physicians* (Jul. 3, 2003).

[68] *Id.*

[69] *Id.*

[70] *Id.*

¶ 299. Similarly, in Wisconsin, the Commissioner of Insurance reported increases in the number of physicians in Wisconsin in 2005. This conclusion forces the majority to explain away yet more evidence of the positive effects of the cap; according to the majority, the report is unreliable because the Commissioner did not expressly conclude that the positive effect was the result of the noneconomic damage cap. Once again, the majority doesn't let hard evidence get in the way of its preordained conclusion.

¶ 300. Yet another study, after evaluating substantial statistical data spanning 1980–1998, confirmed that "enacting caps on non-economic damages is an effective way to attract and retain physicians."[71] The study went one step further, establishing that the increased number of physicians translated to increased availability of health care in some regions, statistically reducing infant mortality rates among African-American babies by 67 deaths per 100,000 births.[72]

¶ 301. A small dose of common sense compels the conclusion that doctors would prefer to practice medicine in a favorable legal environment. The quoted surveys confirm this notion. Accordingly, the legislature

---

[71] Jonathan Klick & Thomas Stratmann, *Does Medical Malpractice Reform Help States Retain Physicians and Does It Matter?* 12–13 (Oct. 2, 2003) (unpublished manuscript, available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=453481). The study concluded "The effect of caps on non-economic damages in general and those set at $500,000 is positive on the number of doctors per capita, and the result is statistically significant." *Id.* at 9 (emphasis added). The noneconomic damage cap in Wis. Stat. § 893.55(4)(d), adjusted for inflation, is currently $445,755.

[72] *Id.* at 13–14.

had a rational basis to conclude that the cap on non-economic damages would encourage physicians to remain in—or move into—Wisconsin.

## 2. The Cap Reduces the Practice of Defensive Medicine

¶ 302. The issue of whether doctors are less likely to practice defensive medicine is related to medical migration. Majority op., ¶ 172. The majority admits that "an 'accurate measurement of the extent of this phenomenon is virtually impossible,'" then holds this difficulty against the legislature. *Id.,* ¶ 173.

¶ 303. The majority cites three studies, all concluding that defensive medicine is difficult to measure because "[f]indings about defensive medicine must be based on surveys of health care providers . . . ." Majority op., ¶ 174.

¶ 304. It is true that physician surveys provide ample evidence of the existence of the practice of defensive medicine. However, the majority's assertion that such surveys are the *only* evidence of the practice is simply not correct. On the contrary, "[a] large body of research has accumulated showing that medical malpractice liability causes doctors to practice defensive medicine."[73] Of course, the majority repudiates or ignores physician surveys attesting to the fact that "more than three out of four (76 percent) doctors report that they practice defensive medicine."[74] However, scientific studies arrive at the same conclusion.

¶ 305. In 1996, a study jointly undertaken by Stanford University and the National Bureau on Eco-

---

[73] U.S. Congress, Joint Economic Committee, *Liability for Medical Malpractice* at 13 (collecting studies).

[74] *Id. See also* Gunnar, *supra* n.9, at 495.

nomic Research employed mathematical models and statistical research over the years 1984–1990 to study the effect of medical malpractice reform—particularly noneconomic damage caps—on the practice of defensive medicine. Daniel Kessler and Mark McClellan, *Do Doctors Practice Defensive Medicine?*, 111 Quarterly J. of Econ. 353 (1996). The conclusion: "Our analysis indicates that reforms that directly limit liability—caps on damage awards,[75] abolition of punitive damages,[76] abolition of mandatory prejudgment interest, and collateral-source-rule reforms[77]—reduce hospital expenditures by 5 to 9 percent within three to five years of adoption, with the full effects of reforms requiring several years to appear." *Id.* at 386.[78] The study further found that

> if reforms directly limiting malpractice liability had been applied throughout the United States [between 1984 and 1990] expenditures on cardiac disease would have been around $450 million per year lower for each of the first two years after adoption and close to $600

[75] *See* Wis. Stat. § 893.55(4)(d) (today declared unconstitutional by the majority).

[76] *See* Wis. Stat. § 893.55(5); *Lund v. Kokemoor,* 195 Wis. 2d 727, 734, 537 N.W.2d 21 (Ct. App. 1995).

[77] *See* Wis. Stat. § 893.55(7) (eviscerated by the majority in *Lagerstrom v. Myrtle Werth Hospital,* 2005 WI 124, ___ Wis. 2d ___, 700 N.W.2d 201).

[78] The GAO study cited by the majority did not dispute these conclusions, but commented that "the savings cannot be generalized across all services, populations, and health conditions." United States General Accounting Office, Pub. No. GAO-03–836, *Medical Malpractice: Implications of Rising Premiums on Access to Health Care, GAO-03–836,* at 30 (2003). Aside from that conclusory comment, the GAO did not give any statistical reason that the study's findings would not be more widely applicable.

> million per year lower for each of years three through five after adoption, compared with nonadoption of direct reforms.

*Id.* at 387.

¶ 306. Another recent study concluded that tort reform, including the imposition of damage caps, would result in "between $9.3 billion and $16.7 billion in additional budgetary savings in 2013 from reduced defensive medicine."[79] The Joint Economic Committee estimates that the reduced cost of health insurance resulting from the reduction in defensive medicine practices would contribute to allowing an additional 1.6 million to 2.6 million Americans to afford health insurance.[80]

¶ 307. Similar studies are in accord.[81]

¶ 308. These conclusions, based on statistical analysis, obliterate the majority's vague assertions that the effects of defensive medicine either cannot be measured or do not affect health care costs. Majority op., ¶ 174. The legislature unquestionably had a rational basis to conclude that its enactment of the noneconomic damage cap would both keep physicians in Wisconsin and reduce the practice of defensive medicine.

---

[79] U.S. Congress, Joint Economic Committee, *Liability for Medical Malpractice: Issues and Evidence* at 21.

[80] *Id.* at 23.

[81] U.S. Department of Health & Human Services, *Confronting the New Health Care Crisis: Improving Health Care Quality and Lowering Costs By Fixing Our Medical Liability System* 7 (Jul. 24, 2002) ("If reasonable limits were placed on noneconomic damages to reduce defensive medicine, it would reduce the amount of taxpayers' money the Federal Government spends by $25.3–44.3 billion per year.").

## DECISIONS BY OTHER COURTS

¶ 309. No other court evaluating a cap on noneconomic damages in medical malpractice cases has considered (or at least has not cited) the amount of statistical data and evidence this court has cited in this case. On more limited data, some courts have struck down caps on noneconomic damages in medical malpractice cases. Others have upheld them. In my view, the better reasoning has been put forth in the cases upholding caps.

¶ 310. Given the standard of review, which it faithfully claims is the "rational basis" test, the majority should not be able to ignore the mountain of evidence supporting the effectiveness of caps. The length of the majority opinion illustrates just how hard the majority has to work to discredit study after study, fact after fact, fighting its way to the desired result. Other courts' decisions show the error in the majority's ways.

¶ 311. California was one of the first states to enact medical malpractice tort reform. In 1975 its legislature enacted the Medical Injury Compensation Reform Act (MICRA) which, among other reforms, limited noneconomic damages in medical malpractice cases to $250,000. *See Fein v. Permanente Med. Group,* 695 P.2d 665 (Cal. 1985). The constitutionality of various aspects of MICRA has been challenged. In *Fein,* the plaintiff challenged the noneconomic damage cap on an equal protection theory, placing that case on equal footing with this one. Faced with the identical issue we face, the California court responded:

> We have . . . found that the statutory classifications are rationally related to the "realistically conceivable legislative purpose[s]" of MICRA. *We have not invented fictitious purposes that could not have been within the contemplation of the Legislature* nor ignored the dispar-

ity in treatment which the statute in realistic terms imposes. But [prior cases] have *never been interpreted to mean that we may properly strike down a statute simply because we disagree with the wisdom of the law or because we believe that there is a fairer method for dealing with the problem.* Our recent decisions do not reflect our support for the challenged provisions of MICRA as a matter of policy, but simply our conclusion that under established constitutional principles the Legislature had the authority to adopt such measures.
. . . *"[A] court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature."*

*Fein,* 695 P.2d at 684 (emphasis added) (internal citations omitted).[82]

¶ 312. Many other courts have reached the same conclusion.[83] In 2003 the Nebraska Supreme Court, faced with a cap on total damages, summarized the current state of the law:

---

[82] The United States Supreme Court dismissed an appeal for want of a federal question. *Fein v. Permanente Med. Group,* 474 U.S. 892 (1985) (mem.).

[83] *See, e.g., Davis v. Omitowoju,* 883 F.2d 1155, 1158–59 (3d Cir. 1989); *Boyd v. Bulala,* 877 F.2d 1191, 1196–97 (4th Cir. 1989) ("the cap on liability bears a reasonable relation to a valid legislative purpose—the maintenance of adequate health care services in the Commonwealth of Virginia"); *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1054 (Alaska 2002) ("the nexus between the legislative objectives and the damage caps is adequate"); *Garhard v. Columbia/Healthtone, L.L.C.,* 95 P.3d 571, 575 (Colo. 2004); *Univ. of Miami v. Echarte,* 618 So. 2d 189, 191 (Fla. 1993) (extensively discussing Florida's medical malpractice crisis); *Murphy v. Edmonds,* 601 A.2d 102, 115–16 (Md. 1992); *Zdrojewski v. Murphy,* 657 N.W.2d 721, 737–39 (Mich. Ct. App. 2003); *Adams v. Childrens Mercy Hosp.,* 832 S.W.2d 898, 904–05 (Mo. 1992); *Gourley ex rel. Gourley v. Neb. Methodist Health*

721

A majority of jurisdictions apply a rational basis or other similar test and determine that a statutory cap on damages *does not violate equal protection. See, e.g., Phillips v. Mirac, Inc.,* 251 Mich. App. 586, 651 N.W.2d 437 (2002); *Guzman v. St. Francis Hospital, Inc.,* 240 Wis.2d 559, 623 N.W.2d 776 (Wis. App. 2000); *Scholz v. Metropolitan Pathologists, P.C.,* 851 P.2d 901 (Colo. 1993) (en banc); *Murphy v. Edmonds,* 325 Md. 342, 601 A.2d 102 (1992); *Adams v. Children's Mercy Hosp.,* 832 S.W.2d 898 (Mo. 1992) (en banc); *Butler v. Flint Goodrich Hosp.,* 607 So.2d 517 (La. 1992); *Peters v. Saft,* 597 A.2d 50 (Me. 1991); *Robinson v. Charleston Area Med. Center,* 186 W.Va. 720, 414 S.E.2d 877 (1991); *Fein v. Permanente Medical Group,* 38 Cal.3d 137, 695 P.2d 665, 211 Cal. Rptr. 368 (1985); *Etheridge v. Medical Center Hospitals,* 237 Va. 87, 376 S.E.2d 525 (1989); *Johnson v. St. Vincent's Hospital,* 273 Ind. 374, 404 N.E.2d 585 (1980), abrogated on other grounds, *Collins v. Day,* 644 N.E.2d 72 (Ind. 1994). *See, also, Evans ex rel. Kutch v. State,* 56 P.3d 1046 (Alaska 2002) (reaching this conclusion but stating that it was not binding precedent); *Trujillo v. City of Albuquerque,* 125 N.M. 721, 965 P.2d 305 (1998) (overruling use of heightened standard, but remanding for determination of constitutionality under rational basis standard); *Morris v. Savoy,* 61 Ohio St.3d 684, 576 N.E.2d 765 (1991) (finding

---

*Sys., Inc.,* 663 N.W.2d 43 (Neb. 1998); *Rose v. Doctors Hosp. Facilities,* 735 S.W.2d 244, 253–54 (Tex. App. 1987); *Etheridge v. Med. Ctr. Hosps.,* 376 S.E.2d 525, 534 (Va. 1989) (noneconomic damage cap passes "rational basis" test, and therefore does not violate equal protection); *Judd v. Drezga,* 103 P.3d 135, 141–43 (Utah 2004); *Robinson v. Charleston Area Med. Ctr.,* 414 S.E.2d 877, 886–87 (W. Va. 1991).

Still other courts have concluded that noneconomic damage caps in other, non-medical malpractice settings, do not violate constitutional guarantees including equal protection. *See, e.g., Phillips v. Mirac, Inc.,* 685 N.W.2d 174, 186 (Mich. 2004); *Meech v. Hillhaven West, Inc.,* 776 P.2d 488, 504 (Mont. 1989).

no violation of equal protection, but finding damages cap unconstitutional on other grounds).

*Gourley ex rel. Gourley v. Nebraska Methodist Health Sys., Inc.,* 663 N.W.2d 43, 70–71 (Neb. 2003) (emphasis added).

¶ 313. After consulting legislative findings similar to those discussed in the majority opinion, the *Gourley* court resisted the plaintiff's invitation to "second guess the conclusions of the Legislature" by deciding that the Nebraska damage cap was "unwise or unnecessary." *Id.* at 72. Instead, it concluded that "[r]educing health care costs and encouraging the provision of medical services are legitimate goals which can reasonably be thought to be furthered by lowering the amount of medical malpractice judgments." *Id.*

## SUMMATION

¶ 314. In 1995 the legislature approved comprehensive medical malpractice reform. Over the past decade it has been very successful. Upon reviewing validly enacted legislative acts, the court is supposed to recognize that it is the legislature's function, not the court's, to evaluate studies and reports. The court should not second guess the legislature.

¶ 315. The majority obviously disagrees.

¶ 316. Nevertheless, in its closing paragraphs the majority states, "The court must presume that the legislature's judgment was sound and look for support for the legislative act."[84]

---

[84] Majority op., ¶ 184.

¶ 317. The majority also pledges its adherence "to the concept of judicial restraint that cautions against substituting judicial opinions for the will of the legislature . . . ."[85]

¶ 318. The changes wrought by the majority opinion will be profound, but it is these concluding passages that hurt the most.

¶ 319. I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join this dissent.

¶ 320. PATIENCE DRAKE ROGGENSACK, J. *(dissenting)*. The majority opinion concludes that the legislature's establishment of the cap on noneconomic damages under Wis. Stat. § 655.017 (2003–04)[1] and Wis. Stat. § 893.55(4)(d)[2] is facially unconstitutional on equal protection grounds. Majority op., ¶ 10. The two classes the majority opinion compares are those persons subjected to medical malpractice who were awarded noneconomic damages in excess of the cap and those who were awarded noneconomic damages less than the cap. It then employs a new rational basis test, which it calls "rational basis with teeth, or meaningful rational basis," to conclude that the cap has no rational basis, in violation of the equal protection clause of Article I, Section 1 of the Wisconsin Constitution. Majority op., ¶ 80. Because I conclude that Ferdon has not met his burden to prove that the cap required by Wis. Stat. § 655.017 is not rationally related to the legitimate

---

[85] Majority op., ¶ 185.

[1] All further references to the Wisconsin Statutes are to the 2001–02 version, unless otherwise noted.

[2] The cap on noneconomic damages is indexed for inflation. As of June 16, 2005, the limit on those damages was $445,755. Ferdon received $410,322, the capped limit at that time.

legislative objectives of (1) reducing the size of medical malpractice judgments and settlements in order to tame the costs of medical malpractice insurance; and (2) to make the choice to continue as, or to become, a health care provider in Wisconsin desirable so that quality health care will continue to be readily available in Wisconsin; I respectfully dissent.

## I. DISCUSSION

### A. Standard of Review

¶ 321. Whether a statute is constitutional is a question of law that we decide de novo. This case presents a facial challenge to the constitutionality of a statute and as such, we are asked to determine, independent of the particular facts of this case, whether the statute states an invalid rule of law. *Dane County Dep't of Human Servs. v. P.P.,* 2005 WI 32, ¶ 67, 279 Wis.2d 169, 694 N.W.2d 344 (Roggensack, J. concurring).

### B. Equal Protection

¶ 322. A statute that is challenged on equal protection grounds is presumed to be constitutional. *Aicher v. Wis. Patients Comp. Fund,* 2000 WI 98, ¶ 18, 237 Wis. 2d 99, 613 N.W.2d 849; *see also State v. Cole,* 2003 WI 112, ¶ 11, 264 Wis. 2d 520, 665 N.W.2d 328; *Lounge Mgmt., Ltd. v. Town of Trenton,* 219 Wis. 2d 13, 20, 580 N.W.2d 156 (1998); *State v. Konrath,* 218 Wis. 2d 290, 302, 577 N.W.2d 601 (1998). This presumption is based on our respect for a co-equal branch of government and is meant to promote due deference to legislative acts. *Cole,* 264 Wis. 2d 520, ¶ 18. "[E]very presumption must be indulged to sustain the law." *Jackson v. Benson,* 218 Wis. 2d 835, 853, 578 N.W.2d 602 (1998).

¶ 323. We resolve any doubt about the constitutionality of a statute in favor of upholding its constitutionality. *Aicher,* 237 Wis. 2d 99, ¶ 18; *see also Monroe County Dep't of Human Servs. v. Kelli B.,* 2004 WI 48, ¶ 16, 271 Wis. 2d 51, 678 N.W.2d 831; *Cole,* 264 Wis. 2d 520, ¶ 11. Further, in choosing between reasonable interpretations of a statute, we "must select the construction [that] results in constitutionality." *Am. Family Mut. Ins. Co. v. DOR,* 222 Wis. 2d 650, 667, 586 N.W.2d 872 (1998) (quoting *State ex rel. Strykowski v. Wilkie,* 81 Wis. 2d 491, 526, 261 N.W.2d 434 (1978)).

¶ 324. It is insufficient for the party challenging the statute to establish either that the statute's constitutionality is doubtful or that the statute is probably unconstitutional. *Cole,* 264 Wis. 2d 520, ¶ 11; *Jackson,* 218 Wis. 2d at 853. Instead, the party challenging a statute's constitutionality must demonstrate that the statute is unconstitutional beyond a reasonable doubt. *Cole,* 264 Wis. 2d 520, ¶ 11; *Jackson,* 218 Wis. 2d at 853. While this language implies the evidentiary burden of proof most commonly used for factual determinations in a criminal case, in this context, the phrase, "beyond a reasonable doubt," establishes the force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute can be set aside. *See Guzman v. St. Francis Hosp., Inc.,* 2001 WI App 21, ¶ 4 n.3, 240 Wis. 2d 559, 623 N.W.2d 776.

¶ 325. The cap on noneconomic damages survives an equal-protection challenge if "a rational basis exists to support the classification, unless the statute impinges on a fundamental right or creates a classification based on a suspect criterion." *Id.,* ¶ 19 (citation omitted). *Guzman* examined the same classification described in the majority opinion under an equal protec-

tion challenge. *Guzman* explained that this court previously had determined that the statutory scheme set out in chapter 655 did not involve a fundamental right or a suspect criterion. *Id.,* ¶ 20. Therefore, the rational basis test provides the appropriate analysis for the cap on noneconomic damages. *Id.*

¶ 326. In *Aicher,* we explained the legislature's motivation in establishing a specific statutory scheme for medical malpractice actions. We stated that the medical malpractice statutes were aimed at addressing:

> a sudden increase in the number of malpractice suits, in the size of awards, and in malpractice insurance premiums, and identified several impending dangers: increased health care costs, the prescription of elaborate "defensive" medical procedures, the unavailability of certain hazardous services and the possibility that physicians would curtail their practices.

*Aicher,* 237 Wis. 2d 99, ¶ 22 (quoting *Strykowski,* 81 Wis. 2d at 508). Although *Aicher* involved the constitutional analysis of a statute of repose in regard to medical malpractice actions brought by children, we examined and approved the policy bases of the legislature for the comprehensive statutory scheme of which an action by a minor was a part. We explained that "[u]nder the rational basis test, a statute is unconstitutional if the legislature applied an irrational or arbitrary classification when it enacted the provision." *Aicher,* 237 Wis. 2d 99, ¶ 57 (citing *Omernik v. State,* 64 Wis. 2d 6, 18–19, 218 N.W.2d 734 (1974)). We also explained that "[I]t is not our role to determine the wisdom or rationale underpinning a particular legislative pronouncement." *Aicher,* 237 Wis. 2d 99, ¶ 57 (citing *Tomczak v. Bailey,* 218 Wis. 2d 245, 265, 578 N.W.2d 166 (1998)). We recognized that legislatively chosen classifications are a matter of line-drawing that

might not be precise and that at times can produce some inequities, but that our goal was simply to determine whether the statutory scheme advances a stated legislative objective or an objective that the legislature may have had in passing this statute. *Aicher,* 237 Wis. 2d 99, ¶ 57.

¶ 327. We also described the rational basis test, which has been used for more than 30 years. *Id.,* ¶ 58. As we said, a classification that is part of a legislative scheme will pass the rational basis test if it meets five criteria:

> (1) All classifications must be based upon substantial distinctions which make one class really different from another.
>
> (2) The classification adopted must be germane to the purpose of the law.
>
> (3) The classification must not be based upon existing circumstances only. [It must not be so constituted as to preclude addition to the numbers included within the class].
>
> (4) To whatever class a law may apply, it must apply equally to each member thereof.
>
> (5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

*Id.* (quoting *Tomczak,* 218 Wis. 2d at 272–73, in turn quoting *Dane County v. McManus,* 55 Wis. 2d 413, 423, 198 N.W.2d 667 (1972)).

¶ 328. Applying the five-step rational basis test set out above, I conclude that the cap on noneconomic damages has a rational basis and therefore, it does not violate Ferdon's right to equal protection of the law.

First, the cap, now set at $445,755, is a limit on noneconomic damages that establishes a real difference between those victims of medical malpractice who have been awarded more than $445,755 in noneconomic damages and those victims who have been awarded less.

¶ 329. Second, chapter 655 is a comprehensive legislative scheme that creates a right to the unlimited payment of damages for economic loss and health care costs, past and future. Wis. Stat. §§ 655.23, 655.27. It also creates a right to a limited payment of noneconomic damages. Wis. Stat. § 655.017. This statutory scheme was created over several years, as the legislature addressed what it perceived as a growing medical malpractice crisis. When the legislature enacted chapter 655, it made 11 specific findings about its reasons for doing so. § 1, ch. 37, Laws of 1975. The findings of the legislature are entitled to great weight in our consideration of whether a statute has a rational basis. *Strykowski,* 81 Wis. 2d at 508.

¶ 330. The full text of the 11 legislative findings is set out in the majority opinion as a quote of *Maurin v. Hall,* 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866, wherein *Maurin* repeats the actual legislative findings. Majority op., ¶ 86, n.101. Therefore, I will not repeat them here. However, I do note that the majority opinion "summarizes" them into five findings that do not adequately incorporate all the reasons the legislature gave. Majority op., ¶ 86. The majority opinion omits the following findings and their content:

(a) The number of suits and claims for damages arising from professional patient care has increased tremendously in the past several years and the size of the judgments and settlements in connection therewith has increased even more substantially;

(d) The increased costs of providing health care services, the increased incidents of claims and suits against health care providers and the size of such claims and judgments has caused many liability insurance companies to withdraw completely from the insuring of health care providers;

(f) As a result of the current impact of such suits and claims, health care providers are often required, for their own protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care;

(i) Inability to obtain, and the high cost of obtaining, such insurance has affected and is likely to further affect medical and hospital services available in this state to the detriment of patients, the public and health care providers.

§ 1, ch. 37, Laws of 1975. It is important to note that the legislature was concerned with the increasing number of medical malpractice suits, with the increasing size of the judgments and settlements from those suits and with the results that have followed: (1) increased cost of medical malpractice insurance; (2) increased use of diagnostic tests that the patient's condition does not require, but are used in an effort to head off a malpractice claim if the patient did not do well; (3) the rising costs of health care that accompany greater use of testing procedures; (4) the early retirement of practicing physicians and the choice of a different career by those who may have entered the health care field; and (5) the overall detriment to the patient, the health care provider and the general public.

¶ 331. The cap that creates the classification at issue here is rationally related to the legislature's goal of reducing the size of medical malpractice verdicts and settlements, so that premiums for medical malpractice will be contained. In moving toward this goal, the legislature made a rational policy choice that some victims of medical malpractice would not receive all of the noneconomic damages they were awarded, for the public good. That is a choice that any cap will have to make, no matter what the amount.[3] However, the legislature did not make this choice in a vacuum; it was made as part of a comprehensive plan that *fully compensated all victims* of medical practice for *all of the other damages* they sustained.[4]

¶ 332. In order to achieve full payment, chapter 655 requires health care providers to maintain and provide proof of threshold medical malpractice insurance before they are permitted to provide health care, Wis. Stat. § 655.23(7), and health care providers must contribute to the Injured Patients and Families Compensation Fund (the Fund), in amounts sufficient to assure the unlimited payment of economic damages, past and future medical care and the cap of $445,755 on noneconomic damages. Wis. Stat. § 655.27(3).

¶ 333. This is a much more generous plan for payment to a party injured through the negligence of another than the legislature has elsewhere established.

---

[3] The majority opinion asserts that this case is not about "all caps." Majority op., ¶ 13. While it is true that only one statutory cap is before us, the classification chosen and the reasoning of the majority apply to all caps as we explain below.

[4] There is no limit on guaranteed recovery for economic losses, such as loss of earnings or loss of earning capacity. There is no limit on guaranteed recovery for health care expenses, both past and future.

For example, the legislature requires only $25,000 per person/$50,000 per occurrence in payment capacity for injuries caused by the negligent driving of an automobile. Wis. Stat. §§ 344.24–.33. This may be provided either as a self-insured driver or through purchased insurance. *See id.* The damages to one person injured in a serious automobile accident can easily exceed the $25,000 statutory requirement, and at times may exceed that limit by 100 times. However, § 344.33 has never been held to deny equal protection of the law because many drivers are unable to pay $2,500,000 in damages, thereby leaving the most seriously injured persons compensated for only 1% of their total damages.

¶ 334. Being awarded damages by a jury and being able to collect them are two very different things. Chapter 655 establishes a *statutory right to payment* that is unique in Wisconsin law. Ferdon complains that the chapter 655 right to payment is not good enough because he did not get all the jury awarded him. His plea ignores the fact that many people are not paid all a jury awards them because of the tortfeasor's inability to pay. Many more injured persons settle their claims for whatever insurance the tortfeasor has without going to trial because they recognize the tortfeasor's inability to pay limits their actual recovery.

¶ 335. Returning now to the third part of the rational basis test (whether the classification would preclude additions to the numbers included within the class), Wis. Stat. § 655.017 has no limit on the number of persons who are subject to its terms. Fourth, the cap of § 655.017 does apply equally to all medical malpractice claimants. And, fifth, the characteristics of those who have received an award of more than the cap amount, now $445,755, are clearly set by the legislative

choice to guaranty payment of no more than the capped amount for that type of damage in order to reduce the size of medical malpractice judgments and settlements and to reduce the cost of malpractice insurance.

¶ 336. The majority asserts that the cap on noneconomic damages violates the equal protection clause because those who suffer noneconomic damages in excess of the cap are not able to recover the full amount of their damages, while victims of medical malpractice suffering noneconomic damages below the cap will be fully compensated. Majority op., ¶¶ 97–105. This rationale is flawed because it would cause all caps on damages to be unconstitutional, as victims suffering damages above the threshold, no matter where it is set, will not recover fully while those suffering damages below the threshold will.[5]

¶ 337. The concurrence joins the majority opinion, concurrence, ¶ 189, but then goes on to say some caps are constitutional and the cap in Wis. Stat. § 655.15 might pass constitutional muster too, but the amount the legislature set is just too low. *Id.* There is an inconsistency in the concurrence joining the majority's opinion striking down the statute on equal protection grounds and yet saying a cap in some higher amount would be constitutional. The inconsistency arises because it is the conclusion of the majority opinion that those who suffer damages in excess of the cap are denied equal protection of the law due to the cap. Majority op., ¶¶ 97–105.

---

[5] Indeed, if this were not the case and *every* victim of malpractice were paid the entire amount of noneconomic damages, the cap would be entirely ineffective in achieving at least two of its purposes, limiting the size of malpractice verdicts and settlements and reigning in the escalating costs of malpractice insurance.

733

¶ 338. The concurrence bases its decision that the cap in Wis. Stat. § 655.017 is quantitatively insufficient on Article I, Sections 5 and 9 of the Wisconsin Constitution. Concurrence, ¶ 189. The concurrence repeatedly refers to the amount that is insufficient as $350,000, but the cap is now $445,755. Is that too low? What is high enough? Who gets to determine that? Is it a question of fact or a question of law? How do you tell when it is high enough? If there were no Fund, no statutory requirement for health care providers to maintain sufficient underlying malpractice insurance to guaranty payment of unlimited amounts of medical expenses and economic damages and no cap, would that be better for Ferdon? He would be able to keep an unlimited jury verdict, but who would pay it? Would nurses leave the profession? Would other health care providers leave the state? Would Wisconsin continue to have the excellent medical care that we have all come to expect? I conclude that the legislature considered all those questions and many more. Contrary to the position of the concurrence, concurrence, ¶¶ 190–91, the legislature's experimentation with caps of various descriptions was not arbitrary. It was an attempt to slow the rapidly escalating costs of health care and yet not lose sight of the need to pay those injured by medical malpractice.

¶ 339. Furthermore, despite the fact that the very essence of a liability cap is to cause some injured persons not to recover fully, we have previously ruled that similar provisions, e.g., caps on the recovery of victims from government-employee tortfeasors, do not violate the equal protection clause. *See Sambs v. City of Brookfield,* 97 Wis. 2d 356, 377–78, 293 N.W.2d 504 (1980); *Stanhope v. Brown County,* 90 Wis. 2d 823, 842–44, 280 N.W.2d 711 (1979) (both cases involved

plaintiffs injured in automobile accidents due to highway defects; caps in Wis. Stat. §§ 81.15 and 895.43 limited recovery to $25,000).[6]

¶ 340. The legislature also has provided caps on damages under the Worker's Compensation Act, ch. 102. Under the Worker's Compensation Act, injuries are categorized and each category has a damage limit established. *See, e.g.,* Wis. Stat. § 102.52–.56; *Hagen v. LIRC,* 210 Wis. 2d 12, 23, 563 N.W.2d 454 (1997). Worker's compensation is generally the exclusive remedy for workers' claims against their employers. Wis. Stat. § 102.03(2); *St. Paul Fire & Marine Ins. Co. v. Keltgen,* 2003 WI App 53, ¶ 19, 260 Wis. 2d 523, 659 N.W.2d 906. Notwithstanding the premise that an injured worker may not be fully compensated for his individualized component of noneconomic damages, we have held that the Worker's Compensation Act is constitutional. *See Pierce v. Indus. Comm'n of Wis.,* 188 Wis. 53, 54, 205 N.W. 496 (1925), *aff'd Pierce v. Barker,* 274 U.S. 718 (1927). Therefore, it is not consistent with prior case law to conclude that the cap on noneconomic damages is unconstitutional because some persons injured by malpractice will be fully compensated while others will not.

¶ 341. The majority opinion also relies on *Martin v. Richards,* 192 Wis. 2d 156, 531 N.W.2d 70 (1995), for the proposition that "the correlation between caps on noneconomic damages and the reduction of medical malpractice premiums or overall health care costs is at best indirect, weak, and remote." Majority op., ¶ 166 & n. 221. The statement is strong and broad, but *Martin*

---

[6] Wisconsin Stat. § 81.15 has been renumbered Wis. Stat. § 893.83 and Wis. Stat. § 895.43 has been renumbered Wis. Stat. § 893.80; the cap on recovery against government tortfeasors has been increased to $50,000.

does not support it. The question answered in *Martin* was whether a *retroactive* application of the cap violated the plaintiff's due process rights. *Martin*, 192 Wis. 2d at 198. *Martin* did not examine the *prospective* effects of a cap on noneconomic damages. There is a significant difference in assessing the effect on future insurance premiums, when an actuary can use the statute to set insurance rates based on malpractice that is yet to occur, and considering any effect on those future rates of placing a cap on malpractice that has already occurred. However, notwithstanding that distinction, the majority opinion repeatedly inserts *Martin* as a citation to support the proposition that the legislature was wrong in finding that a cap on noneconomic damages would have the effect of reducing future costs of health care in Wisconsin. Majority op., ¶¶ 115–19, 166.

¶ 342. The majority opinion also adds another new wrinkle to our constitutional analysis of a statute that is challenged as being unconstitutional on its face. It asserts, "A statute may be constitutionally valid when enacted but may become constitutionally invalid because of changes in the conditions to which the statute applies. A past crisis does not forever render a law valid." Majority op., ¶ 114. There is no authority for this extraordinary declaration. Indeed, I could find no Wisconsin case that would support the view of the majority opinion in this regard. Certainly, it differs from what we said in *Aicher*, when we examined whether there was a rational basis "when [the legislature] enacted the provision." *Aicher*, 237 Wis. 2d 99, ¶ 57 (citing *Omernik*, 64 Wis. 2d at 18–19). It also differs from our focus in *Strykowski*, where we said "there is a rational basis upon which the legislature could and did act *when enacting Chapter 655*." *Strykowski*, 81 Wis. 2d at 508 (emphasis added).

¶ 343. The majority opinion cites *Hanauer v. Republic Bld. Co.*, 216 Wis. 49, 255 N.W. 136 (1934) to support its expansive assertion in this facial challenge to the constitutionality of Wis. Stat. § 655.017. Majority op., ¶ 114 n.126. Its reliance on *Hanauer* is misplaced. *Hanauer* involved an *as applied* challenge to depression-era legislation that imposed a procedural limitation on a bondholder's remedies. *Hanauer*, 216 Wis. at 50–52. The statute was held unconstitutional as applied under the particular circumstances presented. *Id.* at 61–62. It was not held facially invalid due to changed facts, as the majority opinion implies.

¶ 344. The majority opinion also misuses United States Supreme Court precedent to justify its extensive fact-finding that it uses to strike down Wis. Stat. § 655.017. Majority op., ¶ 114 n.126. It cites *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), *Borden's Farm Products Co. v. Baldwin*, 293 U.S. 194 (1934) and *Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924). *Id.*

¶ 345. *Carolene Products* involved a facial challenge to a federal statute enacted pursuant to the Commerce Clause. *Carolene Products*, 304 U.S. at 147. It does not involve a statute that was constitutional when enacted and became unconstitutional due to a factual change, nor does it involve fact-finding by the Supreme Court, as the majority opinion implies. When *Carolene Products* says, "Where the existence of a rational basis for legislation whose constitutionality is attacked depends upon facts beyond the sphere of judicial notice, such facts may be properly made the subject of judicial inquiry," *id.* at 153, the "judicial inquiry" to which it refers is done *at the trial court*. That the trial court is the fact-finder was explained in *Borden's Farm Products* on which *Carolene Products*

737

relied.[7] That the trial court is the fact-finder was also clearly stated in *Chastleton Corp.* The United States Supreme Court explained,

> Here however it is material to know the condition of Washington at different dates in the past. Obviously the facts should be accurately ascertained and carefully weighed, and this can be done more conveniently in the Supreme Court of the District than here. The evidence should be preserved so that if necessary it can be considered by this Court.

*Chastleton Corp.*, 264 U.S. at 549.

¶ 346. And finally, the majority opinion does not subject the cap on noneconomic damages to the five-part test used by all Wisconsin courts for more than 30 years. Instead, it conducts a mini-trial, to find facts that it then uses to say that the reasons the legislature set out when it enacted chapter 655 are not borne out by the evidence it has examined. It conducts its trial without the benefit of witnesses, without giving each of the parties an opportunity to submit relevant evidence of their choosing. It conveniently ducks evidence that does not fit with its conclusion.[8] For example, the

---

[7] *Borden's Farm Prods. Co. v. Baldwin*, 293 U.S. 194 (1934) gave several examples of the "findings" and "facts" and where they were to be made. It explained, "[t]he lower courts had not made findings upon crucial questions of fact. . . . We held that before the questions of constitutional law, both novel and of far-reaching importance, were passed upon by this Court, 'the facts essential to their decision should be definitely found by the lower court upon adequate evidence.' " *Id.* at 212 (citing *Hammond v. Schappi Bus Line, Inc.*, 275 U.S. 164, 171–72 (1927)).

[8] Malpractice premiums for health care providers practicing in Wisconsin have gone down 5% between 1991 and 2002. Martin D. Weiss, et al., *Medical Malpractice Caps: The Impact of Non-Economic Damages Caps on Physician Premiums,*

majority opinion notes the "General Accounting Office study concluded that malpractice claims payments against all physicians between 1996 and 2002 tended to be lower and grew less rapidly in states with noneconomic damage caps." Majority op., ¶ 124. It then avoids consideration of this reduction by saying it is not possible to tell whether the caps actually were a factor in the reductions. Majority op., ¶¶ 125–26.

¶ 347. The process the majority opinion employs gives no weight to the findings of the legislature, to which we are supposed to give great weight. *Strykowski*, 81 Wis. 2d at 508. It does not give the benefit of any doubt to the legislature, as we should do if we are to accord the legislature the respect of a co-equal branch of government. *Cole*, 264 Wis. 2d 520, ¶ 18. The majority opinion "talks the talk" about respect for legislative enactments and the heavy burden a challenger of a statute has, majority op., ¶ 68, but it does not "walk the walk." It simply substitutes its findings for that made by the legislature and concludes that Wis. Stat. § 655.017 is unconstitutional.

## II. CONCLUSION

¶ 348. Because I conclude that Ferdon has not met his burden to prove that the cap required by Wis. Stat. § 655.017 is not rationally related to the legitimate legislative objectives of (1) reducing the size of medical malpractice judgments and settlements in order to tame the costs of medical malpractice insurance; and (2) to make the choice to continue as, or to become, a health care provider in Wisconsin desirable so that

*Claims Payout Levels, and Availability of Coverage* at 2 (June 2, 2003) (*available at* http://www.weissratings.com).

quality health care will continue to be readily available in Wisconsin; I respectfully dissent.

¶ 349. I am authorized to state that Justices JON P. WILCOX and DAVID T. PROSSER join this dissent.